**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MALEEK JONES, | : | |
| Petitioner, | : | CIVIL CASE NO. |
| | : | 3:19-CV-1691 (JCH) |
| v. | : | |
| | : | |
| ANGEL QUIROS, | : | |
| Defendant. | : | AUGUST 11, 2023 |
| | : | |

**RULING ON PETITION FOR WRIT OF HABEAS CORPUS (DOC. NO. 52)**

**Contents**

I.    INTRODUCTION ....................................................................................... 1
II.   FACTUAL BACKGROUND ...................................................................... 2
   A.   Pre-trial ............................................................................................. 2
      1.   October 14, 1992 ..................................................................... 2
      2.   Warrant for Mr. Jones's Arrest ............................................... 3
         a)  Sheila McCray ................................................................... 3
         b)  Jody Taylor and James Bailey .......................................... 4
      3.   Pre-trial Investigation ............................................................. 5
         a)  Private Investigator: James Byrd ...................................... 5
         b)  Prosecution's File ............................................................. 7
   B.   1995 Criminal Trial: Prosecution .................................................... 7
      1.   Ballistics Testimony ................................................................ 7
      2.   "Star Witness": Tyrone Spears ............................................... 8
         a)  Shots Fired ...................................................................... 10
      3.   Mr. Jones's Letters to Mr. Spears ....................................... 14
   C.   1995 Criminal Trial: Defense ........................................................ 15
      1.   Two Shooters ........................................................................ 15
         a)  Tyrese White .................................................................. 16
         b)  Lee Bember .................................................................... 18
         c)  Ernestine Bember .......................................................... 22
      2.   Alibi Witness: Terralyn Stephens ......................................... 24
      3.   Missing Witness Charges ...................................................... 27
      4.   Mr. Jones's Self-Advocacy ................................................... 27
         a)  Mr. Jones's Attempted Correspondence ......................... 28
            i.   December 14, 1993 Letter .......................................... 28
            ii.  February 2, 1995 Letter ............................................. 29
         b)  Mr. Jones's In-court Statement ...................................... 30
   D.   Direct Appeal .................................................................................. 31
   E.   First State Habeas ("FSH") ........................................................... 32
   F.   Second State Habeas ("SSH") ...................................................... 33
   G.   Federal Habeases: 2013 and Today .............................................. 34
III.   LEGAL STANDARDS ............................................................................ 35
IV.  EXHAUSTION ....................................................................................... 38
   A.   Legal Standards ............................................................................. 38
      1.   Exhaustion of State Remedies – 28 U.S.C. § 2254(b)(1)(A) .............. 38

a)   Adequate and Independent State Grounds ....................................... 39

b)   Procedural Default.......................................................................... 40

c)   "Adjudication on the Merits" (28 U.S.C. § 2254(d))............................ 41

2.   Ground One ......................................................................................... 43
3.   Ground Two ......................................................................................... 52
4.   Ground Three ...................................................................................... 52
5.   Ground Four......................................................................................... 53

V.   DISCUSSION .............................................................................................. 54

A.   Ground One............................................................................................. 55

1.   SSH Appellate Court's "Adjudication"................................................. 56

a)   Criminal Trial Record...................................................................... 56

b)   2015 Testimony of Ms. McCray...................................................... 58

c)   Arguments Made in SSH Proceedings ........................................... 61

d)   SSH's Strickland Holdings ............................................................. 63

2.   Strickland Prong 1: Deficient Performance ......................................... 64

a)   SSH Court's Articulated Reasoning................................................ 65

b)   Attorney Ahern's Articulated Strategy............................................ 68

c)   Possible Unarticulated Strategy..................................................... 72

3.   Strickland Prong 2: Prejudice ............................................................. 75

a)   SSH Court's Grasp of the Criminal Trial Record ............................ 76

b)   SSH Court's "Reasonable" Determinations ................................... 77

B.   Ground Two.............................................................................................. 82

1.   Favorable and Material Evidence........................................................ 84
2.   Section 2254(e)(1) .............................................................................. 84

a)   SSH Court's Factual Finding .......................................................... 85

3.   Confidence in the Trial's Outcome ...................................................... 87

a)   Cross Examination .......................................................................... 88

b)   Closing Arguments .......................................................................... 90

C.   Ground Three .......................................................................................... 92

1.   Habeas Standard for Claims of Error in State Evidentiary Rulings ..... 93
2.   1995 Trial Court Erred in Excluding Mr. Bember's Testimony............. 95
3.   Exclusion Violated Mr. Jones's Due Process Rights ......................... 102
4.   Unreasonable Application of Due Process Precedent........................ 106

a)   Appellate Court's "Adjudication" .................................................. 107

b)   Clearly Established Federal Law ................................................... 108

c)   Unreasonable Application of Chambers ........................................ 109

D.     Ground Four ........................................................................... 116

   1.     Relevant Record Excerpts ................................................ 117

     a)   1995 Criminal Trial Testimony ........................................ 117

     b)   Dr. Harper's 2015 Report ............................................... 120

   2.     SSH Appellate "Adjudication" .......................................... 121

   3.     Legal Standard: Prejudice ............................................... 122

VI.   CONCLUSION ........................................................................... 125

I.          **INTRODUCTION**

Petitioner Maleek Jones ("Mr. Jones") has filed a Petition for a Writ of Habeas Corpus pursuant to section 2254 of title 28 of the United States Code, challenging his state conviction for murder, conspiracy to commit murder, and carrying a pistol without a permit.[1]  In particular, Mr. Jones seeks habeas relief on four grounds.  First, he alleges that his trial counsel, Attorney Leo Ahern ("Attorney Ahern"), was ineffective for failing to "investigate and present testimony from eyewitness Sheila McCray" ("Ms. McCray") in violation of the Sixth Amendment.[2]  Second, Mr. Jones alleges that the State withheld evidence of and presented false testimony regarding Tyrone Spears's ("Mr. Spears") plea agreement" in violation of the Fourteenth Amendment.[3]  Third, Mr. Jones claims that he was deprived of his right to a fair trial and his right to present a defense when the trial court erroneously excluded material evidence at his trial in violation of the Fourteenth Amendment.[4]  Fourth, Mr. Jones alleges ineffective assistance based on Attorney Ahern's failure to retain and present the testimony of an expert in crime scene reconstruction or ballistics in violation of the Sixth Amendment.[5]

For the reasons stated below, the court finds merit in Mr. Jones's First and Third Grounds for relief and, therefore, **GRANTS** Mr. Jones's Petition for a Writ of Habeas Corpus (Doc. No. 52).

---

[1] See Second Amended Petition for Writ of Habeas Corpus ("Pet.") (Doc. No. 52).

[2] Id. ¶ 168.

[3] Id. ¶¶ 186–87.

[4] Id. ¶¶ 209, 212.

[5] Id. ¶ 221.

II.          **FACTUAL BACKGROUND**

A.     <u>Pre-trial</u>

1.     October 14, 1992

The Connecticut Appellate Court determined that the jury in Mr. Jones's 1995

criminal trial reasonably could have found the following facts.

Maleek Jones was a member of a group of about eight persons who sold narcotics in the Edgewood Avenue area of New Haven. The group was known by the name Red Line because of the color of the bags they used to sell narcotics. The group used a second floor apartment on the corner of Chapel and Beers Streets as its base of operation. The apartment was located a short distance from Saint Raphael's Hospital.

[Mr. Jones] was involved in a relationship with Teeba Henderson, who had previously had a long term relationship with Steven Gary. Gary did not take the break up of their relationship well and continued to pursue Henderson. [Mr. Jones] and Gary had argued and, subsequently, in April [ ] 1992, had a fight in which Gary was knocked unconscious.

There was animosity between the Red Line group and individuals friendly with Gary who lived in the area of Carmel Street. The animosity between the two groups had escalated to the point that members of the Red Line group had gone to Gary's neighborhood, and the groups exchanged gunfire.

On October 14, 1992, at approximately 1:30 a.m., Eddie Harp, a friend of Gary, was driving his station wagon in the vicinity of Saint Raphael's Hospital. Harp pulled the vehicle into the emergency room parking lot and parked in an area reserved for security vehicles. Louis Yanac, a security officer, approached Harp, who informed Yanac that he was visiting Sheila McCray, a hospital employee, during her lunch break. Yanac observed [Ms.] McCray and Harp conversing in the waiting area of the emergency room. Yanac left the area to make rounds and, when he returned to the emergency room area, he noted that Harp, [Ms.] McCray[,] and Harp's station wagon were gone. Harp returned to the hospital and dropped off [Ms.] McCray at the main entrance. At about 2:10 a.m., as Harp left the hospital driveway, shots were fired, and the vehicle rolled into a parking lot across from the hospital's main entrance.

When the police arrived at the scene, they found Harp's car running with Harp unconscious in the driver's seat. The victim was transported by ambulance to the hospital, where it was found that he had suffered three

gunshot wounds, one of which had penetrated his brain, resulting in his death about six hours after the shooting.

Several hours before the murder, [Mr. Jones] was in the apartment at the corner of Chapel and Beers Streets with Tyrone Spears, Gene John, who was known as Pepper, and two individuals from New York. [Mr. Jones] and Pepper left the apartment and returned about two hours later. [Mr. Jones] was excited and said that "the kid from Carmel Street is outside." He and Pepper immediately ran outside armed with .357 revolvers. Mr. Spears obtained a .357 revolver that was concealed in the ceiling of a closet in the common hallway of the building and joined [Mr. Jones] and Pepper outside.

As Mr. Spears exited the apartment building, Pepper and [Mr. Jones] were near the driveway leading to the main entrance of the hospital. When the victim's vehicle pulled out of the driveway, [Mr. Jones], Pepper and Mr. Spears began shooting at the vehicle. [Mr. Jones] and Pepper were about nine feet from the driver's side of the vehicle when they opened fire. They continued to fire at the vehicle as the car rolled slowly into the parking lot opposite the main entrance. After the shooting, the three individuals ran back to the Red Line apartment.[6]

2.      Warrant for Mr. Jones's Arrest

Mr. Jones was arrested pursuant to a warrant issued on October 23, 1992.[7] The

warrant was based on witness statements given by Ms. McCray, Jody Taylor ("Ms.

Taylor"), James Bailey ("Mr. Bailey").[8] None of these individuals were called to testify at

Mr. Jones's 1995 criminal trial.

a)      Sheila McCray

Ms. McCray was a childhood friend of Eddie Harp ("Mr. Harp") and was with him

mere minutes before he was shot.[9] Included in the prosecution's file, which—according

---

[6] State v. Jones, 46 Conn. App. 640, 642–44 (1997).

[7] Petitioner's Exhibit 66, Signed Application for Arrest Warrant ("Executed Warrant") (Doc. No. 97–66).

[8] See Petitioner's Exhibit 57 from Second State Habeas, Application for Arrest Warrant at 2–3 (Doc. No. 97–57).

[9] Jones, 46 Conn. App. at 654.

to the prosecutor—was "open to [defense] counsel from the very first day,"[10] was the

application for the arrest warrant[11] which stated:

> Investigators, while still at the scene, were approached by Shelia [sic]
> McCray, Black female, DOB [omitted], 8 Derby Avenue, New Haven, CT.,
> who claimed to have been in the company of the victim moments prior to
> the shooting and did observe the shooting.  Shelia [sic] McCray informed
> investigators that two (2) Black males, with handguns, were shooting at the
> vehicle driven by Eddie Harp.  [Ms.] McCray stated the shooting occurred
> in the area of Chapel and Beers Street and provided the following physical
> and clothing description[:]  Subject #1, Black male, approximately 6'1", black
> jeans, black sneakers, and black jacket with black knit cap/hood.  Subject
> #2, Black male, approximately 5'9", similar clothing as subject 1, however
> the jacket was longer than waist length without a hood.[12]

Ms. McCray provided multiple consistent statements in the days immediately following

Mr. Harp's death, including the additional information that both shooters were of slim

build.  These statements are discussed in further detail below.[13]

> b)   Jody Taylor and James Bailey

The court does not expound upon the witness statements of Ms. Taylor and Mr.

Bailey that were also included in the application for Mr. Jones's Arrest Warrant,[14]

because their statements are not material to the claims at issue in the instant Petition.

---

[10] March 28, 1995 Criminal Trial Transcript ("3/28/1995 CT Tr.") at 9:17–18 (Doc. No. 74–14).

[11] The application was amended before execution only to remove the sworn witnesses' names, addresses, and dates of birth.  Compare Application for Arrest Warrant at 2, with Executed Warrant at 2 (" . . . approached by a Black female witness, who claimed . . . .  Witness informed investigators . . . ."); see also March 31, 2015 Second State Habeas Transcript ("3/31/15 SSH Tr.") at 26:3–22 (testifying at the Second State Habeas, Detective Thomas Trocchio noted that two applications differed in that the signed version omitted the personal identifying information of witnesses, whereas the unsigned version did not) (Doc. No. 74–27).

[12] Application for Arrest Warrant at 2.

[13] See, infra, Section V.A.1.a.

[14] See Application for Arrest Warrant at 2–3.

3.      Pre-trial Investigation

Due to a "conflict of interest which prevent[ed] representation of [Mr. Jones] by the Office of the Public Defender" ("OPD"),[15] Attorney Ahern was appointed to represent Mr. Jones as a Special Public Defender on December 4, 1992.[16]  At Mr. Jones's first state habeas trial in 2009, he recalled "a couple of visits" with Attorney Ahern in the time between December 4, 1992, and the start of trial.[17]  Although Attorney Ahern was unable to recall, at the first habeas trial, the "steps [he] took to prepare for [Mr. Jones's] case",[18] he did remember discussing the case and potential witnesses with Mr. Jones as well as engaging the services of a private investigator.[19]

a)      Private Investigator: James Byrd

As a Special Public Defender—that is, a local defense attorney unaffiliated with the OPD—Attorney Ahern had, "[i]n the past, . . . used the services of [the OPD] . . . but felt that[,] given their caseload at the time, it would take some time for his requests [on behalf of Mr. Jones] to be completed."[20]  Allegedly believing that "investigative tasks would be completed more rapidly if [Mr. Jones's] family secured the services of a private

---

[15] Appendix A, Record from Direct Appeal at 8 (Doc. No. 24-1).

[16] Id.

[17] March 25, 2009 First State Habeas Trial Transcript ("3/25/2009 FSH Tr.") at 55:13–18 (Doc. No. 74-21).

[18] March 26, 2009 First State Habeas Transcript ("3/26/2009 FSH Tr.") at 127:8–10 (Doc. No. 74-22).

[19] Id. at 127:11–17, 128:6–12.

[20] Letter from Thomas J. Ullman, Office of the Connecticut Office of Public Defender ("Ullman OPD Letter") (Doc. No. 15 at 356).  Attorney Ullman sent this letter in response to a December 18, 1998 inquiry from Mr. Jones about "Attorney Ahern and investigative services and expenditures in [his] case." See id.  Mr. Jones' initial missive was sent after his unsuccessful direct appeals.

investigator",[21] Attorney Ahern directed Mr. Jones and his mother to hire Private

Investigator James Byrd ("Mr. Byrd").  According to his 1995 testimony, Mr. Byrd had

been a licensed private investigator for about eight years and had his own firm, J.B.I.

Investigative Services.[22]  In recommending Mr. Byrd, however, Attorney Ahern

"apparently was unaware that once a defendant was appointed a special public

defender, all requests for investigation services whether through [the OPD's]

investigator or through a private investigator had to be submitted to [the OPD]."[23]  Had

Attorney Ahern been aware of this policy, Mr. Jones's family would not have had to pay

Mr. Byrd's fee, and the investigation would not have ceased prematurely.

    Instead, Attorney Ahern failed to secure funding for Mr. Byrd, and it was left to

Mr. Jones and his family to compensate the private investigator.  On July 22, 1993, Mr.

Jones's mother received an invoice from JBI Investigative Services in which Mr. Byrd

claimed to have completed 16.5 hours of investigative work and charged $850.00 for his

work.[24]  Of the $850.00 demanded, $550.00 was deemed "past due".[25]  When Mr.

Jones's family was unable to pay, JBI Investigative Services requested that Mr. Jones

"contact [the] office[ ] when payment for [the] services [was] available", noting that the

office would "be glad to offer [Mr. Jones] any further services, after all invoices have

---

[21] Id.

[22] March 22, 1995 Criminal Trial Transcript ("3/22/1995 CT Tr.") at 93 (Doc. No. 74–10).

[23] See Ullman OPD Letter.

[24] Petitioner's Exhibit 74 from Second State Habeas, JBI Investigative Services Invoice ("JBI Invoice") at 1 (Doc. No. 97-74).

[25] Id.

been paid in full."[26]  With his family unable to pay Mr. Byrd's fees, Mr. Jones was

without an investigator from at least November 17, 1993, through his criminal trial in

March 1995 ("1995 criminal trial").[27]

> b)  Prosecution's File

State's Attorney David Gold ("Attorney Gold") addressed the availability of the

prosecution's file head on, telling the judge:

> I've had this file open to counsel from the very first day.  He's had every
> report I've had, long before he was entitled to any of it.  I've turned over
> reports, statements, everything.  Counsel says he didn't have that report --
> I don't know what to tell you.  I've turned over every single thing I've had,
> way in advance.  He's had this stuff for two years, if he's had it for a day.[28]

B.  1995 Criminal Trial: Prosecution

The prosecution's case against Mr. Jones primarily consisted of (1) Mr. Spears's

testimony placing Mr. Jones at the scene; (2) ballistics evidence that a shooting actually

occurred; and (3) three letters, written by Mr. Jones to Mr. Spears.

> 1.  Ballistics Testimony

Three bullet holes were found in the driver's side window of Mr. Harp's vehicle.[29]

A fourth hole was identified, also on the driver's side, "in the middle of the rear driver's

side door window at the very bottom where it meets the car itself[,]"[30] and a final bullet

---

[26] Petitioner's Exhibit 75 from Second State Habeas, JBI Investigative Services Letter ("JBI
Letter") at 1 (Doc. No. 97-75).

[27] Id.

[28] 3/28/1995 CT Tr. at 9:17–25.

[29] March 17, 1995 Criminal Trial Transcript ("3/17/1995 CT Tr.") at 58:9–17 (Doc. No. 74–7).

[30] Id. at 60:22–61:2.

hole was found in the back window.[31]  Officer Robert J. Losty, Jr. ("Officer Losty") testified to having searched "the area of the car itself and also . . . back along the route out to Chapel Street and across the street to the Saint Raphael's main exit[.]"[32]  He found no "spent shell casings", nor "any other type of ballistics evidence relevant to [the] case[.]"[33]  The fatal gunshot wound suffered by Mr. Harp was on the left side of his head, which was adjacent to the driver's side window.[34]  The bullet fragments recovered by the State were determined to have been fired from a single firearm.[35]

        2.        "Star Witness"[36]: Tyrone Spears

"It was [Mr.] Spears['] testimony at the petitioner's trial, as the only witness at the shooting, who testified,[37] which probably led to the petitioner's conviction."[38]  Indeed, "[t]he cornerstone of the state's case during the criminal trial was the testimony of

---

[31] 3/22/1995 CT Tr. 49:14–25.

[32] 3/17/1995 CT Tr. at 64:14–18.

[33] Id. at 64:23–65:1.

[34] Id. at 81:12–19.

[35] March 23, 1995 Criminal Trial Transcript ("3/23/1995 CT Tr.") at 17 (Doc. No. 74–11); see also Court Exhibit 2 from 1995 Criminal Trial, Firearms Identification ("1992 Ballistics Report") (Doc. No. 96-3) ("Items #1, #2a[,] and #3a were all fired from the same firearm."); but see also 1992 Ballistics Report ("Items #2b, #2c, #2d, #2e, #3b[,] and #3c lacked sufficient rifling stiae [sic] for any further comparison.").

[36] 3/23/1995 CT Tr. at 39.

[37] The First State Habeas Trial Court is correct that Mr. Spears was the only eyewitness who testified at the 1995 criminal trial, but he was not the only eyewitness to the shooting.  See, supra, Section II.A.2.

[38] Jones v. Warden, No. CV980411361S, 2009 WL 2961443, at *4 (Conn. Super. Ct. Aug. 13, 2009), aff'd sub nom. Jones v. Comm'r of Correction, 134 Conn. App. 905, 40 A.3d 344 (2012).

Tyrone Spears, who testified that he, Pepper[,] and [Mr. Jones] all fired shots at Eddie Harp's vehicle."[39]

Mr. Spears's testimony began with an acknowledgement that he had spent the prior two years in jail after pleading guilty to the charges of aiding manslaughter and assault for his role in the death of Mr. Harp.[40]  Mr. Spears then noted that he and Mr. Jones were members of a drug dealing operation, the Red Line Crew, and enjoyed a "really good friendship."[41]  On the night of Mr. Harp's death, Mr. Spears testified that he, Mr. Jones, Pepper, and two other individuals were together at an apartment affiliated with the Red Line Crew on the corner of Chapel and Beers Street.[42]  According to Mr. Spears, Mr. Jones and Pepper left the apartment for two hours and, upon their return, notified Mr. Spears and the other two individuals that a person associated with a former romantic partner of Mr. Jones's current girlfriend was nearby the apartment building.[43]  Mr. Spears testified that Mr. Jones and Pepper then went back outside, and that Mr. Spears grabbed a .357 revolver—just like Mr. Jones and Pepper possessed—and followed after them.[44]

---

[39] Jones v. Warden, No. CV124004861S, 2016 WL 921751, at *3 (Conn. Super. Ct. Feb. 11, 2016), aff'd sub nom. Jones v. Comm'r of Correction, 185 Conn. App. 906, 194 A.3d 905 (2018).

[40] See March 21, 1995 Criminal Trial Transcript ("3/21/1995 CT Tr.") at 7:9–8:19, 11:10–15 (Doc. No. 74-9).

[41] Id. at 13:18–20, 18:22–19:18.

[42] Id. at 32:14–18, 33:5–38:6.

[43] Id. at 24:9–25:22, 41:15–42:9.

[44] Id. at 43:2–12, 46:12–47:24.

The focal point of Mr. Spears's testimony was that all three individuals—himself, Pepper, and Mr. Jones—fired at Mr. Harp.[45]  He testified that Pepper and Mr. Jones were on the driver's side of the vehicle firing at Mr. Harp, while Mr. Spears fired from passenger's side.[46]  After the shooting, the three ran back to the apartment at Chapel and Beers Street.[47]  The three individuals stayed in the apartment for a few hours after the shooting, before heading to a friend's home where Mr. Spears was staying.[48]  Beyond detailing what occurred on the night of the shooting, Mr. Spears also discussed the aftermath.  In particular, he testified that, when he was later questioned by police, he told the officers that he was only with Pepper that night because law enforcement suspected that just he and Mr. Jones were the shooters.[49]  Mr. Spears also testified that, after he and Mr. Jones were arrested, Mr. Jones told him: "don't say nothing."[50]

Two key points stand out from Mr. Spears's testimony: (1) the number of shots that Mr. Spears testified to having fired, as well as (2) the location from which Mr. Spears testified he fired those shots.

a)      Shots Fired

Of particular importance to the defense in 1995 was Mr. Spears's testimony on cross examination regarding his own location when he allegedly fired four shots at the

---

[45] Id. at 8:23–24.

[46] Id. at 55:15–23.

[47] 3/21/1995 CT Tr. at 56:12–19.

[48] Id. at 40:14–19, 65:16–26.

[49] Id. at 73:2–74:20.

[50] Id. at 82:3–83:9.

car.[51]  Mr. Spears's testimony was in direct conflict with the ballistics evidence offered

by the State.  Mr. Spears initially testified to firing four shots at Mr. Harp's car from the

passenger side:

> [Attorney Gold:]  When the defendant and Pepper had their guns out initially, where were they shooting at, what part of the car?
>
> [Mr. Spears:]  The front.
>
> [Attorney Gold:]  Okay.  On which side, driver or passenger?
>
> [Mr. Spears:]  Driver.
>
> [Attorney Gold:]  What side of the car were you shooting -- what side of the car was actually closest to you?
>
> [Mr. Spears:]  The passenger.[52]

There was, however, no physical evidence of any shots being fired from the passenger

side of the vehicle: there were no bullet holes on the car where Mr. Spears claimed to

have aimed[53] nor was any ballistic evidence recovered from the surrounding area.[54]

This inconsistency became one of the strongest points in Attorney Ahern's

defense of Mr. Jones.  On cross examination, Attorney Ahern homed in on the apparent

incongruity between Mr. Spears's testimony and the ballistics evidence, which placed all

bullet holes on the driver's and rear sides of the vehicle:

> [Attorney Ahern:]  So your claim is that they had already advanced to the other side of the car when you first got out of the building onto the street, is that right?
>
> [Mr. Spears:]  Yeah.
>
> [Attorney Ahern:]  And you went ahead and you fired shots, isn't that correct?  Weren't you firing shots right after you're claiming they were --

---

[51] 3/21/1995 CT Tr. at 159:9–11.

[52] Id. at 54:15–23.

[53] Id. at 143:13–144:9.

[54] 3/22/1995 CT Tr. at 86:10–87:2.

[Mr. Spears:]  I was firing shots at the car.

[Attorney Ahern:]  But you're saying they were on the other side of the car, isn't that true?

[Mr. Spears:]  Yes.

[Attorney Ahern:]  So a straight bullet could have killed either one of your alleged friends very easily, isn't that right?

[Mr. Spears:]  No.[55]

. . .

[Attorney Ahern:]  And so apparently you didn't hit your two friends?

[Mr. Spears:]  No.

[Attorney Ahern:]  But you did shoot at the car, right?

[Mr. Spears:]  Yes.

[Attorney Ahern:]  . . . Take a look at State's Exhibit 2 [crime scene photo of Mr. Harp's car].  Do you see any bullet holes in the right hand [passenger] side of the car?

[Mr. Spears:]  Nope.

. . .

[Attorney Ahern:]  And that is the side that you were shooting at, is that correct?

[Mr. Spears:]  No.

[Attorney Ahern:]  Sir, how could you shoot at any other side?

[Mr. Spears:]  I was shooting from the front.

[Attorney Ahern:]  Oh, you were shooting from the front.  Okay.  Showing you State's Exhibit 12, does that appear to be the front of the car?

[Mr. Spears:]  Yes.

[Attorney Ahern:]  That you were shooting at?

[Mr. Spears:]  Yes.

[Attorney Ahern:]  Does it show any bullet holes there?

[Mr. Spears:]  No.[56]

. . .

---

[55] 3/21/1995 CT Tr. at 141:19–142:6.

[56] Id. at 143:13–21, 143:24–144:9.

[Attorney Ahern:]  You made no contact with the motor vehicle whatsoever, did you?

[Mr. Spears:]  No.

[Attorney Ahern:]  Were you aiming at the car?

[Mr. Spears:]  Yes.

[Attorney Ahern:]  How come you didn't hit it?

[Mr. Spears:]  I don't know.[57]

Attorney Ahern's cross examination of Mr. Spears emphasized the fact that the right passenger side and the front of the car—which, as Attorney Ahern repeatedly confirmed, was where Mr. Spears fired—were devoid of bullet holes.  Additionally, testimony was presented that no additional ballistic evidence was found at or near the scene.[58]  Attorney Ahern emphasized the logical impossibility of Mr. Spears's vanishing bullets in his closing statement.  After describing the "five bullet holes" in the car—"three in the window, there's one in the left rear, there's one by the radio"—and where the corresponding bullets were found—all of which "were from the same gun"—Attorney Ahern continued:

> This brings be [sic] full circle, ladies and gentlemen.  If you want to believe Tyrone Spears, and if you want to believe him beyond a reasonable doubt, and if you want to convict a man based on what Tyrone Spears has to say, and this is what you've got to swallow.  You've got to swallow that he came out of an apartment building, that he walked over to, right on over to, whatever he did, the middle of this particular street, Beers Street, and that he fired four shots from a .357 revolver at an automobile, and he's a good shot, I asked him, he told me he was, without any concern of hitting his two friends, who he claims were right there on the driver's side, right there on the driver's side.  I mean, think about it, ladies and gentlemen. . . .  You pull out your handgun.  You fire.  Jesus, if you miss, you may kill your blood brother.  You may kill your best friend.  No evidence of any missed shots.  No.  Nothing in the glass.  Nothing in the walls.  Nothing.  Nothing in the car.  You've got to believe that story.  And ladies and gentlemen, I'm telling you,

---

[57] Id. at 159:27–161:5.

[58] 3/22/1995 CT Tr. at 86:10–87:2.

as sure as I'm standing here, if that doesn't ring true to you, if that seems factually [in]accurate, that seems like too much to be believed, then you've got to bring back a verdict of not guilty.[59]

Indeed, Mr. Spears's testimony required jurors to believe that it was unremarkable that Mr. Spears left <u>no</u> physical evidence that he fired a gun from where he says he stood.[60]

### 3.    Mr. Jones's Letters to Mr. Spears

From 1993 to 1995, Mr. Jones wrote at least three letters to Mr. Spears in which Mr. Jones attempted to get Mr. Spears to "be <u>real</u>",[61] to "do the right thing",[62] and to "except [sic] <u>your</u> responsibility[.]"[63]  In one letter, Mr. Jones expressed that he "want[ed Mr. Spears] to know what [Mr. Jones] said so [Mr. Spears] can know what to say to [Mr. Jones's] P.I."[64]

While none of the letters contained admissions of guilt by Mr. Jones—in fact, Mr. Jones emphasized that he was "not responsible for what happened [n]or was [he present at the shooting] to stop [Mr. Spears]"[65] and that it was "wrong for [Mr. Jones] to

---

[59] 3/28/1995 CT Tr. at 57:22–58:21.

[60] <u>See</u>, <u>supra</u>, Section II.B.1; <u>infra</u>, Section V.D.1.a.

[61] State's Exhibit 14 from Criminal Trial, May 26, 1993 Letter from Mr. Jones to Mr. Spears ("5/26/1993 Letter to Mr. Spears") at 2 (Doc. No. 96-23) (emphasis in original).

[62] State's Exhibit 16 from Criminal Trial, Third Letter from Mr. Jones to Mr. Spears ("Third Letter to Mr. Spears") at 6, 7 (Doc. No. 96-25); <u>see also</u> 5/26/1993 Letter to Mr. Spears at 5.

[63] 5/26/1993 Letter to Mr. Spears at 2 (Doc. No. 96-23) (emphasis in original); <u>see also</u> Third Letter to Mr. Spears at 6 ("except [sic] it").

[64] State's Exhibit 15 from Criminal Trial, Second Letter from Mr. Jones to Mr. Spears ("Second Letter to Mr. Spears") at 1 (Doc. No. 96-24).

[65] Third Letter to Mr. Spears at 6.

be [incarcerated]"[66]—the letters were laced with racial insults[67] and contained instructions to lie.[68]  These letters were referenced at length by the State in an attempt to paint Mr. Jones as "pressur[ing] . . . the kid."[69]

C.    1995 Criminal Trial: Defense

There were two aspects of Attorney Ahern's defense of Mr. Jones, both of which were focused on innocence.  First, Attorney Ahern argued that Mr. Jones was not one of the two shooters.  Second, Attorney Ahern offered an alibi witness.

1.    Two Shooters

The defense hinged on the idea that there were only two shooters—Mr. Spears and Pepper—not three.  For example, a police report dated days after the shooting and written by the lead detective on the case, Detective Thomas Trocchio ("Detective Trocchio"), plainly noted that:

> [I]t was ascertained that Eddie Harp had sustained multiple gunshots to the upper body and head area as he was traveling on Chapel Street, New Haven, CT.  Harp had been the operator of a 1983 Plymouth station wagon, tan in color, . . . and while in the operation of the vehicle had received gunfire from two (2) Black male subjects in the area of the entrance to St. Rapheals [sic] Hospital[.][70]

---

[66] Id. at 6, 7.

[67] See, e.g., 5/26/1993 Letter to Mr. Spears at 5 ("[Y]o don't let those crackers persuade you and trick you").

[68] See, e.g., Second Letter to Mr. Spears at 2 ("If they ask you did you work for me you say no.").

[69] See 3/28/1995 CT Tr. at 40; 3/21/1995 CT Tr. at 91–113.

[70] Petitioner's Exhibit 9, Detective Trocchio's Police Report ("Det. Trocchio's Report") at 1–8 (Doc. No. 15 at 135–142).

Attorney Ahern sought to show that Mr. Jones was not one of the two shooters responsible for Mr. Harp's death by (1) discrediting the testimony of Mr. Spears;[71] and (2) presenting the statements of Mr. Spears and Pepper to illustrate that Mr. Jones was not present when Mr. Harp was killed.

a)    Tyrese White

The day before the defense was to begin its case, and outside the presence of the jury, Attorney Ahern cautioned, "[J]ust to remind the Court, I haven't had an opportunity to talk to these people, all of them are incarcerated.  So I would hope the Court would grant us a little bit of time in the morning to see what they want to say[.]"[72] Tyrese White ("Mr. White") was one such individual,[73] and prior to the morning of his testimony he had spoken to neither Attorney Ahern nor Mr. Jones's investigator.[74]  Mr. White testified that he had spoken with Mr. Spears, however, and that he had done so shortly after Mr. Harp's murder, before Mr. Spears was arrested.[75]  Mr. White's direct examination went as follows:

> [Attorney Ahern:]  Did [Mr. Spears] mention to you that he had been involved in the shooting of Edward Harp?
>
> [Mr. White:]  Yeah.
>
> [Attorney Ahern:]  All right.  Did he tell you who he was with at the time?
>
> [Mr. White:]  Yeah.
>
> [Attorney Ahern:]  Who did he tell you he was with?
>
> [Mr. White:]  My man, Pepper.

---

[71] See, supra, Section II.B.2.a.

[72] 3/23/1995 CT Tr. at 50–51.

[73] March 24, 1995 Criminal Trial Transcript ("3/24/1995 CT Tr.") at 2 (Doc. No. 74–12).

[74] 3/24/1995 CT Tr. at 22.

[75] See 3/24/1995 CT Tr. at 4–8.

. . .

[Attorney Ahern:]  So are you saying then that [Mr. Spears] told you that he and Pepper had shot Edward Harp?

[Mr. White:]  No, they said they was together that night, he said, he--we didn't go into that yet, but he was, I was like who was you with, he was just like, me and Pepper.

[Attorney Ahern:]  All right, did he tell you who shot Edward Harp?

[Mr. White:]  The way he was talking, he said, he was sounding like he did it.

[Attorney Ahern:]  Sounded like who did it?

. . .

[Mr. White:]  T.Y. [(Mr. Spears)].

[Attorney Ahern:]  All right.  Did he indicate to you whether he was involved with anybody else?

[Mr. White:]  No, I was just like, who was he with, he said it was me and Pepper, that's it.

[Attorney Ahern:]  Did he say he was with [Mr.] Jones?

[Mr. White:]  No.

. . .

[Attorney Ahern:]  So [Mr. Spears] indicated to you during this telephone call that he had been involved, is that fair to say, in the shooting of Edward Harp?

[Mr. White:]  Yeah.

[Attorney Ahern:]  And did he say at that time that somebody named Pepper was involved with him?

[Mr. White:]  Yeah.

[Attorney Ahern:]  He did not say anything about [Mr.] Jones. . .?

[Mr. White:]  No.[76]

On cross examination, Mr. White continued:

[Mr. White:]  It was on the phone.  I called, he picked up the phone, yeah, what's going on, I already heard about the murder, I knew what area it was from, know what I'm saying, so I'm like, Yo, what's going on, know what I'm saying, I was like, Yo, I heard about happened, he was like, word.  I was like, Yo, you ain't have nothing to do with that right, he was like, Yo, man.

---

[76] 3/24/1995 CT Tr. at 5–7.

He already knew.  I was like, Yo.  That was that.  I was like, Yo, who you was with, he was like, Yo, I was with Pepper.  I was like, when that was, he was like, Yo, I don't know.

[Attorney Gold:]  I'm sorry, what was the end of that?

[Mr. White:]  He was like where [Mr. Jones] was at, I was like, I asked him where [Mr. Jones] was at, he didn't know.

[Attorney Gold:]  Oh, so you specifically asked him that, of all the other people he might have been with, you asked him where was [Mr. Jones] at?

[Mr. White:]  Listen, it was only like after the raid there was only like three more people out, so there was only three of them: [Mr. Jones], [Mr. Spears], and Pepper.[77]

Thus, Mr. White provided testimony that Mr. Spears had, yet again, stated that Mr. Jones was not among the two shooters.  This time not to the police, but to another member of the Red Line Crew.  This is consistent with statements Mr. Spears gave to the police shortly after the murder, averring that he was with Pepper on the night of the shooting.[78]

        b)    Lee Bember

Lee Bember, an affiliate of Mr. Spears, Pepper, and Mr. White in the Red Line Crew,[79] was the next witness that Attorney Ahern sought to introduce.  Attorney Gold immediately objected, and Mr. Bember's proposed testimony was heard outside the presence of the jury:

Well, after the murder happened, well, I didn't know what really happened. Me and Pepper was at a pay phone at Orchard and Edgewood Avenue. Two girls approached me, two girls I never seen before and told me, Oh, you Red-Line mother fuckers killed my brother, and Boom, Pepper's like let's leave, let's leave, let's go get strapped, meaning let's go get our guns, which we did, when we got in my house he told me, Yo, um, last night me

---

[77] 3/24/1995 CT Tr. at 13.

[78] Det. Trocchio's Report at 4–6.

[79] 3/24/1995 CT Tr. at 33.

and [Mr. Spears] caught a body, meaning that we killed this dude last night.[80]

Unlike Mr. White, Mr. Bember did not specifically inquire as to whether Mr. Jones was

present for the shooting.  Attorney Ahern sought, nonetheless, to offer his testimony:

> [Attorney Ahern:]  This man, Pepper, did he make an admission to you?  Did he admit to being involved in this murder?
>
> [Mr. Bember:]  Yes, he did.
>
> [Attorney Ahern:]  Okay.  And did he say who his accomplice was, if any?
>
> [Mr. Bember:]  T.Y. [(Mr. Spears)].
>
> [Attorney Ahern:]  Did you inquire as to whether or not [Mr. Jones] was involved?
>
> [Mr. Bember:]  No.  His name never came up.
>
> [Attorney Ahern:]  Okay. And you knew all these people from being associated with them in a crew, is that correct?
>
> [Mr. Bember:]  Right.[81]

Attorney Gold challenged the admissibility of Pepper's statement, arguing that it was

"untrustworthy" because Detective Trocchio, who had taken Mr. Bember's statement

later that same day, had written it up in his Police Report, dated October 18, 1992,

differently.[82]

> [Attorney Ahern:]  . . .  Now, is it also true, sir, that you gave this information to the New Haven Police Department?
>
> [Mr. Bember:]  Yes, I did.[83]
>
> . . .
>
> [Attorney Gold:]  [Y]ou said you signed something, right?  With the police?
>
> [Mr. Bember:]  Yes, I did.

---

[80] Id. at 31–32.

[81] Id. at 33.

[82] See id. at 33, 38–39.

[83] Id. at 32.

19

[Attorney Gold:]  Where did the interview take place?

[Mr. Bember:]  Upstairs in the Union Avenue Police Department.[84]

After a brief recess and still outside the presence of the jury, Attorney Gold

argued to the 1995 Criminal Trial Court the following:

> Now, the defendant, I'm sorry, the witness, Bember is testifying as I understand it that Pepper said, Bember is saying that Pepper said that Pepper and [Mr. Spears] did it; but the report which memorializes what Bember said to the police and what I would like your honor to consider . . . is page two, of that statement, of that report.[85]
> . . .
> I have Detective Trocchio who could be here Monday morning to say that . . . Bember never told him that Pepper had made any statement against his own penal interest.  He was implicating [Mr.] Spears, but never implicating himself[.][86]

Detective Trocchio did appear in court the following Monday, and testified—outside the

presence of the jury—to the following:

> [Attorney Gold:]  [D]irecting your attention to October 14th[ ] of 1992, at approximately nine p.m., did you have occasion to interview one[ ] Leroy Bember?
>
> [Detective Trocchio:]  Yes, sir, I did.
>
> [Attorney Gold:]  All right, now did you speak to Mr. Bember about any knowledge he might have concerning the party, or parties responsible for the [d]eath of Edward Harp?
>
> [Detective Trocchio:]  I did, sir.
>
> [Attorney Gold:]  And did Mr. Bember provide you with information during the course of your interview of him, which indicated that earlier that day of the 14th, that he was in the company of a subject known to him by the name of Pepper?
>
> [Detective Trocchio:]  Yes, sir.
>
> [Attorney Gold:]  All right[.][87]

---

[84] Id. at 43.

[85] 3/24/1995 CT Tr. at 44–45.

[86] Id. at 47.

[87] March 27, 1995 Criminal Trial Transcript ("3/27/1995 CT Tr.") at 5 (Doc. No. 74–13).

20

. . .

[Attorney Gold:]  All right did Bember then tell you that after receiving that information [from two women on the street accusing Red Line members of killing Mr. Harp], that he . . . and Pepper went to a location at 61 Bears [sic] Street together?

[Detective Trocchio:]  Yes, sir.

. . .

[Attorney Gold:]  And at 61 Bears [sic] Street, did Pepper who was later identified as Gene John, tell Bember anything concerning who was responsible for the shooting of Edward Harp?

[Detective Trocchio:]  Yes, he did. . . .  He [ ] confirmed . . . that [ Mr. Spears] had been responsible for the shooting death.

[Attorney Gold:]  All right, and as you prepared your report of that interview, did you actually put the words used in quotes that according to Pepper, I'm sorry, according to Bember, Pepper told Bember, "Your [boy] [Mr. Spears] shot that dude last night."

[Detective Trocchio:]  Yes, sir.[88]

Finally, Attorney Gold directed the 1995 Criminal Trial Court's attention to the Detective Trocchio's Police Report, "second paragraph from . . . the bottom . . . on page two[,]"[89] which stated that Mr. Bember had said: "[u]pon entering the apartment of Bember, 61 Beers Street, second floor, 'Pepper'/Jean [sic] John also informed Bember, 'you're [sic] boy, [Mr. Spears], shot that dude last night'."[90]  This went to Attorney Gold's ultimate argument:

I don't think [Mr. Bember's statement, as offered by Attorney Ahern] has any--there has been no showing of reliability of a statement like this.  I think the preamble to the statement, "Let's go to my crib and strap up" is an insufficient showing of that and I think that the court need also take into account the fact that the witness at an earlier time indicated, in fact, at the time he reported this information to the police, which is what he did, he told

---

[88] Id. at 7–8.

[89] Id. at 8.

[90] Det. Trocchio's Report at 2.

the police that Pepper said that [Mr. Spears] had done it alone.  And if that is the fact, it is in no way against the [Pepper]'s penal interest.[91]

Attorney Ahern vehemently disagreed, and replied that:

Judge, that goes to cross-examination and weight, not to admissibility.  And I think on the issue of--you gotta remember that Tyrone Spears himself, the star witness for the State's case said that he was with Pepper that night.  So that's corroboration[92] right there, to the extent that we know these two people were together that night.  You have a man making a statement against his penal interest, it's corroborated by other facts in evidence, he's dead or unavailable as a declarant in this case, and I think it meets all the criteria.

Now, if Mr. Gold wants to get up, and he has every right to, and cross examine him on the issue of, well, isn't it true that you told the police something different, refresh his recollection with a report, or whatever, that goes to the weight, but not it's [sic] admissibility.[93]

The 1995 Criminal Trial Court was unpersuaded: "I don't find this evidence trustworthy, and I'm going to sustain the [State's] objection."[94]  Mr. Bember's testimony was, therefore, never heard by the jury.

c)    Ernestine Bember

In his closing statement, Attorney Gold described Ms. Bember to the jury as follows: "Ernestine Bember comes in, a record that enfolds literally like as long as your arm, she testifies to her great recollection."[95]  Ms. Bember ran the Red Line Crew—everyone worked for her.[96]  Attorney Ahern elicited testimony from Ms. Bember

---

[91] 3/24/1995 CT Tr. at 38–39.

[92] Corroboration is required by Connecticut's test for statements against penal interest, see, infra, Section V.C.2.

[93] Id. at 39.

[94] 3/27/1995 CT Tr. at 23.

[95] 3/28/1995 CT Tr. at 36:10–12 (Doc. No. 74-14).

[96] See 3/24/1995 CT Tr. at 60, 64.

regarding her conversations with both Mr. Spears and Pepper in the month following Mr.

Harp's death.  With regard to her conversation with Mr. Spears, Ms. Bember gave the

following testimony:

> [Attorney Ahern:]  Okay, after [Mr. Harp was killed], . . . did you have any conversations with [Mr. Spears] concerning the matter?
>
> [Ms. Bember:]  Yes.  I did.
>
> [Attorney Ahern:]  Can you remember or recollect a specific conversation you had with [Mr. Spears]?
>
> [Ms. Bember:]  I asked him, was he involved with the shooting, because everybody was talking about it, you know, rumors were going around about what happened, so I asked him, was he involved with it, and he explained to me what had happened.
>
> [Attorney Ahern:]  What did he explain to you, ma'am?
>
> [Ms. Bember:]  He told me that he didn't do the shooting, but he was there.
>
> [Attorney Ahern:]  Did he say who else was there?
>
> [Ms. Bember:]  Pepper.
>
> [Attorney Ahern:]  Did he say anything about Maleek Jones being there?
>
> [Ms. Bember:]  He didn't say he was there.[97]

According to Ms. Bember, Mr. Jones was not mentioned by Pepper when she spoke

with him, either.

Ms. Bember also testified that sometime in November 1992, "a few weeks before

Thanksgiving", she gave Pepper a ride to the train station.[98]  In the car on the way to

the station, Ms. Bember allegedly confronted Pepper about the October 14 shooting,

and he told her:

> [T]he shooting wasn't supposed to happen, that [it] was supposed to have been a robbery and that during the robbery process that the victim was reaching, and [Mr. Spears] apparently, thought he was reaching for a gun,

---

[97] Id. at 60–61.

[98] Id. at 64.

and he panicked and he told Pepper, "He's reaching for a gun!"  And Pepper fired.[99]

Thus, the jury heard testimony from Ms. Bember that both Mr. Spears and Pepper, on separate occasions, admitted their participation in the shooting, but that neither mentioned anything about Mr. Jones being involved.

### 2.    Alibi Witness: Terralyn Stephens

The second half of Mr. Jones's defense was his alibi.  Indeed, when asked at the 2009 state habeas trial what "steps [he took] in preparing for the actual trial" as it got closer, Attorney Ahern replied simply: "The only thing I remember is focusing on the alibi witness."[100]  Interestingly, however, Attorney Ahern only notified the prosecution, and the court, of the defense's intention to call this alibi witness—Terralyn Stephens ("Ms. Stephens")—the very day that he called her to the witness stand at the 1995 trial.[101] That day, Attorney Gold alerted the Judge to the issue outside the presence of the jury and the following colloquy ensued:

> [The Court:]  Was there, did the state file a [request for a] notice of alibi in this case?
>
> . . .
>
> [Attorney Gold:]  October 26th[ ] of 1992.  I filed a demand for notice of alibi in defense. . . .  I think that the least that can be done here is to have the

---

[99] Id. at 65.

[100] March 26, 2009 First State Habeas Transcript ("3/36/09 First State Habeas Tr.") at 130:19–23 (Doc. No. 74-22).

[101] 3/27/1995 CT Tr. at 24–25.  In this case, the State filed a demand for notice of alibi defense on October 26, 1992.  Id. at 24.  Despite section 763 of the Connecticut Practice Book requiring that Attorney Ahern file such a notice within days of that date, he did not file a notice of alibi until March 27, 1995.  Id. at 25.  At trial, Attorney Ahern argued that, although his initial investigation into the case turned up a variety of leads, he had only just learned that one of the leads was an alibi witness.  Id. at 25–26.  As such, he justified the late disclosure by representing to the court that his notice was filed in accordance with section 765 of the Connecticut Practice Book, which sets forth defense counsel's continuing duty to disclose an alibi witness.  Id. at 26.

witness, who I understand is Tara Lynn Stevens [sic] come into court now, and perhaps counsel could indicate why it is that it's filed now.[102]

. . .

[The Court:]   Concerning the testimony, contemplated testimony of one, Tara Lynn Stevens [sic].  All right, not timely filed, is it in accordance with 7-63, we can agree on that.

[Attorney Ahern:]  Well, I believe so, Judge, but there is, it's et sec. so if you give me a moment, I'll show you and I think be able to state a cogent case for what I'm doing.  7-65 says: defensive alibi continuing duty to disclose.  If prior to or during the trial a party learns of an additional witness whose identity, if known, should have been included in the information furnished, the party shall promptly notify the other party or his counsel of the existence and identify such additional witnesses.

[The Court:]  When did you first learn of this?

[Attorney Ahern:]  Well, this is what I want to get into in my statement to the Court.

[The Court:]  Go ahead.

[Attorney Ahern:]  All right.  We've had an initial investigation in this case, and that is I think attorney work product. . . .   [A]nd we turned up a variety of leads of all kinds, at that point in time I had to make [a] judgment call as to what was going on.

[The Court:]   Did you disclose the names of any of those people at that point, after you developed--

[Attorney Ahern:]  No, no I didn't because I didn't think any of them was a per-se alibi witness.

. . .

[The Court:]  Now apparently one of these people is?

[Attorney Ahern:]  Well, maybe, because it depends on the tenor of their testimony.[103]  In other words, I think what she is going to say, this would be my offer of proof, is that on the evening in question, that Mr. Jones was in her apartment, she's not here.

[Attorney Gold:]  No.

[Attorney Ahern:]  And that for about an hour, apparently was in her men's room.  Okay, that doesn't mean she saw him, doesn't know whether he existed [sic] or entered, or whatever else.  Uh, so I don't, there is a period

---

[102] Id. at 24.

[103] This is puzzling, given that Ms. Stephens had been in contact with Attorney Ahern since at least July 29, 1994.  See Petitioner's Exhibit 70, July 29, 1994 Letter from Ms. Stephens to Attorney Ahern ("7/29/94 Letter from Ms. Stephens to Attorney Ahern") (Doc. No. 97-70).

of an hour that would be, I would think approximately the time surrounding the crime where she really can't place him anywhere else but, I guess in her men's room.[104]

On March 27, 1995, Ms. Stephens testified that, in 1992, she and Mr. Jones were "friends" and that they had never been lovers.[105]  She also admitted to knowing that Mr. Jones was seeing Teeba Henderson.[106]  At Mr. Jones's 1995 criminal trial, Ms. Stephens testified that, on October 14, 1992, at "about one o'clock [a.m.]" she let Mr. Jones into her apartment and that Mr. Jones "went straight to the bathroom."[107]  She testified that Mr. Jones left the bathroom about an hour later, at "[a]bout two, quarter after two[,]" at which point she and Mr. Jones "sat down and [ ] talked . . . about [her] kids, [and] after that [they] went and watched t.v." until he left shortly thereafter.[108]

In 2015, at Mr. Jones's second state habeas trial, Ms. Stephens explained that she "told [the jury] that [Mr. Jones] was in the bathroom for an hour.  It was more like 20, 25 minutes" before he went to Ms. Stephens's room.[109]  When asked why she had lied, Ms. Stephens explained that Mr. Jones was her "friend with benefits, and [she] didn't want the world to know that."[110]  Indeed, Ms. Stephens also admitted to being in a relationship with someone else in October 1992.[111]

---

[104] 3/27/1995 CT Tr. at 25–27.

[105] Id. at 51–52.

[106] Id. at 52.

[107] 3/27/1995 CT Tr. at 49.

[108] Id. at 51.

[109] 4/2/15 SSH Tr. at 93:10–11, 94:18–20.

[110] Id. at 94:21–22.

[111] April 2, 2015 Second State Habeas Transcript ("4/2/15 SSH Tr.") at 95:1–2 (Doc. No. 74–28).

3.    Missing Witness Charges

Despite Mr. Jones's request,[112] Attorney Ahern did not attempt to call any of the

witnesses—including Ms. McCray—whose statements were used to procure Mr.

Jones's arrest warrant.  Instead, he "filed a proper request with the trial court seeking a

charge to the jury as to [Ms.] McCray and [Mr.] Bailey as missing witnesses. . . ."[113]

Submitted on March 27, 1995, the charge for Ms. McCray read:

> The witness[,] Tyrone Spears, indicated in response to counsel's questions
> that he was aware that one Sheila McRae [sic], was a witness to the
> shooting of Edward Harp.  The failure of a party to produce a witness who
> is within its power and who would naturally have been produced by, in this
> case, the State, permits the inference that the person[,] if called as a
> witness[,] would have given unfavorable evidence to the State's case.  If the
> likely subject matter of the testimony of the absent witness was so related
> to the whole proof in the case that one of the parties, in this case the State,
> would be expected to produce her, an inference would be justified that her
> testimony, if she had been produced as a witness, would be unfavorable to
> the State.[114]

The 1995 Criminal Trial Court did not grant the missing witness charge, to which

Attorney Ahern took exception.[115]

4.    Mr. Jones's Self-Advocacy

Both before and during his trial, Mr. Jones made several attempts to contribute to

his own defense.  He reached out to Attorney Ahern on at least two occasions to raise

potential avenues of defense.  He also attempted to bring his unaddressed concerns to

the attention of the 1995 Criminal Trial Court.

---

[112] See Petitioner's Exhibit 77, February 16, 1995 Letter from Mr. Jones to Attorney Ahern ("2/16/1995 Letter from Mr. Jones to Attorney Ahern") at 2–3 (Doc. No. 97–77).

[113] Jones, 46 Conn. App. at 655 (internal citation omitted).

[114] Appendix B, Defendant's Request to Charge ("McCray Secondino Charge") ¶ 1 (Doc. No. 24-2 at 316).

[115] 3/28/1995 CT Tr. at 118:5–120:23.

a)      Mr. Jones's Attempted Correspondence

At the 1995 criminal trial, the prosecution spent a fair amount of time on letters that Mr. Jones sent to Mr. Spears while Mr. Jones was incarcerated.[116]  Also worthy of mention, however, are two letters that Mr. Jones sent to Attorney Ahern before the 1995 criminal trial began.  The letters not only provide insight into the nature of the relationship between Attorney Ahern and Mr. Jones; they are also two instances wherein—if Attorney Ahern received them—Attorney Ahern was alerted to (1) the possible utility of Ms. McCray's testimony and (2) the need for a ballistics expert, a crime scene analyst, or both.

i.      December 14, 1993 Letter

More than a year before Mr. Jones's Criminal Trial, on December 14, 1993, Mr. Jones sent a letter to Attorney Ahern in which he claimed that he was "beginning to wonder whether or not [he] ha[d] an attorney."[117]  He explained that he "had asked [Attorney Ahern] for copies[ ] of the bond hearing [(transcript)], [he] ask[ed] for a speedy trial[,] and [he had] been completely ignored."[118]  Mr. Jones asserted that he was "told on numerous occasions that [he] would get a legal visit but they never happened and none of [his] mail was ever returned."[119]  The letter further expressed Mr. Jones's wish

---

[116] See, supra, Section II.B.3.

[117] Petitioner's Exhibit 76, December 14, 1993 Letter from Mr. Jones to Attorney Ahern ("12/14/1993 Letter from Mr. Jones to Attorney Ahern") at 1 (Doc. No. 97-76).

[118] Id. at 1–2.

[119] Id. at 2.

28

for new counsel and to "discuss with the judge" the fact that Mr. Jones's "family had to

pay for a private investigator when [Attorney Ahern] was supposed to hire one. . . ."[120]

Mr. Jones continued his December 14, 1993 letter by inquiring:

> If we couldn't afford a lawyer what made you think that we could afford a
> P.I., when you suggested we hire Jim Byrd.  If I'm correct or not what wasn't
> that part of your expenditure?  We claimed to be indigent.  Being that my
> family [was] having trouble paying the man you referred us to, knowing that
> you was [sic] supposed to take care of that.  Leo[,] I don't know everything
> but I believe you been playing me fool.[121]

ii.    February 2, 1995 Letter

On February 2, 1995—less than a month before the 1995 criminal trial—Mr.

Jones sent another letter to Attorney Ahern "to go over some details" of his case.[122]  In

pertinent part, the letter read:

> I'm incarcerated for a crime that I didn't commit. . . .  Leo their [sic] is some
> things that I would like for you to do that might be helpful to my defense
> . . . .  I want to know from ballistics the findings of the bullet fragments found
> in the victims [sic] vehicle/the victim.  Do they match, are they the same it's
> important because this would prove that only one person could've shot the
> victim.  Also how many bullets were recovered in all and are they the same
> material.  I want private analysis. . . .
>
> . . .
>
> Now their [sic] was no bullet holes in the right side of the victim[']s vehicle,
> or the victim. . . .  Now the police searched the entire area . . . and th[e]y
> did'nt [sic] find any shell casings. . . .  James Bailey[']s description of what
> took place does'nt [sic] corroborate with the description of what Sheila
> McCray gave, who claim[ed] to have been with the victim and witnessed the
> actual shooting.
>
> I would like the following people to be subpoenaed: . . . Sheila McCray. . . .
> I also would like a copy of all the statements and findings obtained by J.B.I.

---

[120] Id. at 2.

[121] Id. at 2–3.

[122] See 2/16/1995 Letter from Mr. Jones to Attorney Ahern at 1.

. . . .  I would like for you to hire a[n] investigator to check out the scene where the crime took place because I [can't] afford a private investigator.

. . .

I would appreciate it if you would go over this carefully and get me the things I requested.  I would really like to talt [sic] to you in person so we can discuss my case in further detail.[123]

There is nothing in the record to support that Attorney Ahern took any of the steps suggested by Mr. Jones in his letters, as detailed by the Instant Petition.

> b)      Mr. Jones's In-court Statement

On the final day of his trial and outside the presence of the jury, Mr. Jones attempted to apprise the 1995 Criminal Trial Court of several perceived injustices in both his pre-trial investigation and his trial representation:

[Mr. Jones:]  Now, the police, they used this guy saying he seen us commit a crime or whatever, and he was the person that they got probable cause to get an arrest warrant, or whatever, and now they not using him in the trial, and I don't feel like that's right, you know.  And then he's saying that we have to call him as a witness.  He was a State witness, not a defense witness.  Also, this girl, Sheila McCray was supposed to have been with the victim at the time that this crime took place and she saying she seen exactly what happened and the State didn't call her neither.  I don't feel like that's fair.

The Court:  Well, Mr. Jones, you've been represented by counsel here, competent counsel, and we've been going through this trial.  And if you have any problems with what has been produced or what hasn't been produced, you're going to have time to reflect on that, and consider it.  And then you can take any appropriate action that you feel suits your purpose.  But we're not going to get into that now.

[Mr. Jones:]  So that's going to be after my case is heard to the jury, or whatever.[124]

Mr. Jones also pointed out that his letters to Attorney Ahern failed to spur action:

---

[123] Id. at 2–3.

[124] 3/28/1995 CT Tr. at 15:10–16:6.

[Mr. Jones:]  I had wrote my lawyer many letters asking him could he get ballistics findings and stuff like that.  For me now, I went through this whole course of the trial without nobody investigating my case.  You know.  So, I feel like I'm not being -- . . . I'm not having a fair trial here.  I don't feel that that's right.   That I had to go through my whole trial without nobody investigating or nothing.  You know.  That's all I wanted to say.[125]

The 1995 Criminal Trial Court flatly responded: "All right.  Now, I'm told."[126]

On direct appeal, the Connecticut Appellate Court (the "1997 Appellate Court") addressed the colloquy above as follows:

We have long held that the proper forum in which to address claims of ineffective representation of counsel is in the habeas forum or in a petition for a new trial, rather than on direct appeal. . . .  We have also consistently recognized that the constitutional right to adequate assistance of counsel subsumes a competent pretrial investigation. . . .  We conclude, thus, that the defendant's claim is one of ineffective assistance of counsel since it raises an issue of the competency of the pretrial investigation.   In accordance with our prior precedent, we further conclude that this issue must first be resolved in a habeas corpus proceeding.[127]

Following this guidance from the 1997 Appellate Court, Mr. Jones proceeded to file two separate state habeas petitions.[128]

D.     Direct Appeal

On March 29, 1995, Mr. Jones was convicted, after a jury trial, on charges of murder, conspiracy to commit murder, and carrying a pistol without a permit.[129]  He was sentenced to sixty-five years of imprisonment.[130]  Mr. Jones timely appealed this

---

[125] Id. at 16:19–17:1.

[126] Id. at 17:2.

[127] Jones, 46 Conn. App. at 660–61.

[128] See, infra, Section II.E–F.

[129] See Jones, 46 Conn. App. at 641.

[130] State v. Jones, No. CR6362355, 2005 WL 1670821, at *1 (Conn. Super. Ct. June 16, 2005).

conviction on four grounds, claiming that the trial court improperly (1) excluded a confession made by a participant in the crime (Pepper) to a third party, thereby depriving Mr. Jones of his constitutional right to present a defense; (2) permitted the state to present prejudicial misconduct evidence concerning Mr. Jones's drug-dealing activities and a violent dispute with his girlfriend's former boyfriend; (3) refused to give the missing witness charge for Ms. McCray and Mr. Bailey; and (4) failed to inquire into a claim that Mr. Jones made midtrial that he was denied his due process rights to effective assistance of counsel, a fair trial, and his right to equal protection of the laws because his indigency resulted in inadequate investigation and preparation.[131]  The Connecticut Appellate Court affirmed Mr. Jones's conviction and, on November 5, 1997, the Connecticut Supreme Court denied certification.[132]

While his direct appeal was pending, Mr. Jones sought review of his sentence under state law.  The sentence was affirmed on June 16, 2005.[133]

E.    First State Habeas ("FSH")

Mr. Jones's FSH trial centered on claims of actual innocence and ineffective assistance of trial counsel, Attorney Ahern.[134]  At that trial, which took place on March 25, 26, and April 17, 2009, Mr. Spears recanted his 1995 criminal trial testimony and testified that Mr. Jones was not present when Mr. Harp was killed.[135]  The 2009 FSH

---

[131] Jones, 46 Conn. App. at 641–42.

[132] Id. at 642, cert. denied, 243 Conn. 941 (1997).

[133] Jones, 2005 WL 1670821, at *2.

[134] Jones v. Warden, No. CV980411361S, 2009 WL 2961443, at *2 (Conn. Super. Ct. Aug. 13, 2009).

[135] Id. at *4–*5.

32

court acknowledged that "[i]t was Mr. Spears'[s] testimony at [Mr. Jones]'s trial, as the only witness at the shooting, who testified, which probably led to [Mr. Jones]'s conviction."[136]  However, after comparing Mr. Spears's testimony at the two trials, the FSH court found Mr. Spears's recantation of his initial testimony was not credible, in large part because Mr. Spears's testimony at the criminal trial was much more detailed than the one Mr. Spears gave nearly a decade and a half later at the 2009 FSH Trial.[137] The FSH Trial Court characterized Mr. Spears's recantation as a mere "attempt by Mr. Spears to end his being regarded as a 'snitch' by his peers in jail and his community once out of jail[.]"[138]  The Trial Court therefore denied Mr. Jones's FSH Petition.[139]

Mr. Jones subsequently appealed the 2009 FSH Trial Court's decision.  In a per curium opinion published on April 3, 2012, the Connecticut Appellate Court summarily affirmed the 2009 Trial Court's judgment and, on July 18, 2012, the Connecticut Supreme Court denied certification.[140]

F.    Second State Habeas ("SSH")

Later that same year, on August 2, 2012, Mr. Jones filed a second Petition for a Writ of Habeas Corpus in state court and a second habeas trial was held on March 30, 31, April 2, 27, and 28, 2015.[141]  At trial, Mr. Jones argued that his FSH counsel—

---

[136] Id. at *4.

[137] Id. at *5.

[138] Id.

[139] Id. at *1, *6.

[140] Jones v. Comm'r of Corr., 134 Conn. App. 905, cert. denied, 305 Conn. 924 (2012).

[141] Jones v. Warden, No. CV12400486S, 2016 WL 921751, at *2 (Conn. Super. Ct. Feb. 11, 2016).

Attorney Bruce McIntyre ("Attorney McIntyre")—was ineffective by failing to (1) "conduct

an adequate investigation", (2) "prepare for trial", (3) produce certain evidence,[142] and

(4) plead and present evidence that, at the 1995 criminal trial, Attorney Ahern "failed to

present ballistic and/or crime scene evidence."[143]  Following the SSH trial, at which Mr.

Spears once again appeared and recanted his testimony from the 1995 criminal trial,

the SSH Trial Court denied Mr. Jones's second state Petition.[144]  The Connecticut

Appellate Court summarily affirmed the 2015 SSH Trial Court's decision in a per curium

opinion published on October 30, 2018 and, on April 10, 2019, the Connecticut

Supreme Court denied certification.[145]

> G.    Federal Habeases: 2013 and Today

On July 15, 2013, Mr. Jones filed his first federal habeas corpus action ("2013

Federal Habeas").  However, his Petition was dismissed for failure to exhaust state

court remedies on all grounds included in the Petition.[146]

---

[142] Specifically, Mr. Jones alleged that Attorney McIntyre should have "produc[ed] evidence to corroborate [Mr.] Spears'[s] recantation[,]" which was a cornerstone of his 2009 appeal.  Id. at *6.  Among the evidence that Mr. Jones alleged that Attorney McIntyre should have produced was testimony by Ms. McCray, who had allegedly witnessed the murder for which Jones was convicted.  Id. at *7–*9.  Mr. Jones claimed that this testimony was necessary, inter alia, in order to corroborate Mr. Spears's testimony that Mr. Jones was not at the scene of the crime.  Id. at *8–*9.  Ms. McCray testified for the first time in this SSH trial, and the SSH Trial Court compared the contents of her testimony in 2015, nearly "a quarter of a century" after the initial crime, to those of a security guard's testimony given, "two and one-half years after the shooting", at Mr. Jones's criminal trial.  Id. at *8–9.  The SSH Trial Court concluded that Ms. McCray was unreliable in light of this comparison.  Id. at *9; see also, infra, Section V.A.1. (discussing Ms. McCray's testimony and this comparison at greater length).

[143] Jones, 2016 WL 921751, at *2.

[144] Id. at *4, *11.

[145] See Jones v. Comm'r of Corr., 185 Conn. App. 906 (2018), cert. denied, 331 Conn. 917 (2019).

[146] See Jones v. Comm'r of Corr., 13-cv-1003, slip. op. at 7 (JCH) (D. Conn. Apr. 7, 2014).

Mr. Jones commenced a second federal habeas action by a Petition filed on October 28, 2019, raising a total of sixteen grounds for relief.[147]  This court again dismissed Mr. Jones's Petition on the basis that several claims were unexhausted.[148] The court granted leave, however, for Mr. Jones to file an amended petition pursuing the claims that the Ruling identified as fully exhausted.[149]  Mr. Jones timely filed the instant Second Amended Petition (hereinafter referred to as "the Petition") on September 23, 2021.[150]  The court held oral argument on the Petition on July 31, 2023. See Notice (ECF No. 100).

III.        **LEGAL STANDARDS**

Federal courts may grant a petition for writ of habeas corpus only if the petitioner is in custody in violation of the United States Constitution or federal law.[151]  Accordingly, a federal court cannot grant a petition for a writ of habeas corpus, filed by a person in state custody, on the basis of any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[152]

---

[147] See Petition for Writ of Habeas Corpus (Doc. No. 1).

[148] See Ruling Granting Respondent's Motion to Dismiss ("2021 Ruling") at 26–27 (Doc. No. 43).

[149] 2021 Ruling at 26–27.

[150] See Pet. at 1.

[151] 28 U.S.C. § 2254(a) (2016).

[152] 28 U.S.C. § 2254(d).

Clearly established federal law, as defined by the Supreme Court, "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context."[153]  Moreover, the clearly established federal law that governs derives from the holdings, not dicta, of the Supreme Court.[154] Second Circuit law that does not have a counterpart in Supreme Court jurisprudence cannot provide a basis for federal habeas relief.[155]

Section 2254(d)(1) provides two bases upon which claims in a federal habeas petition must be examined before relief may be granted.  The first basis is a decision "contrary to" clearly established federal law, that is, did the state court apply a rule different from that set forth by the Supreme Court or did it decide a case differently than the Supreme Court on essentially the same facts.[156]  The second basis is did a state court use an "unreasonable application" of Supreme Court law.  This occurs when the state court has correctly identified the governing law, but unreasonably applies that law to the facts of the case.[157]  Such a state court decision must be more than incorrect; it must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[158]

---

[153] Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909 (2002).

[154] White v. Woodall, 572 U.S. 415, 419 (2014).

[155] See Renico v. Lett, 559 U.S. 766, 778–79 (2010) (holding that the Sixth Circuit Court of Appeals erred in relying on its own decision in a federal habeas action).

[156] See Bell v. Cone, 535 U.S. 685, 694 (2002).

[157] See id.

[158] Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Burt v. Titlow, 571 U.S. 12, 20 (2013) (stating that federal habeas relief is an appropriate remedy where the state criminal justice system has experienced an "extreme malfunction"); Schriro v. Landrigan, 550 U.S. 465, 473, (2007) (stating that objective unreasonableness is "a substantially higher threshold" than incorrectness).

That is, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[159]

When reviewing a habeas petition, the federal court presumes that the factual determinations of the state court are correct.[160]  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.[161]  The presumption of correctness, which applies to "historical facts, that is, recitals of external events and the credibility of the witnesses narrating them," will be overturned only if the material facts were not adequately developed by the state court or if "the factual determination is not fairly supported by the record."[162]  Moreover, legal conclusions by state courts based on these facts can only be overturned if a federal court, examining that same record, concludes that the state court reached its conclusion based upon an unreasonable determination of the facts before that court at the time.[163]

In addition, the federal court's review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.[164] Because collateral review of a conviction applies a different standard than the direct

---

[159] Richter, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, (2004)).

[160] 28 U.S.C. § 2254(e)(1).

[161] Id.; see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (stating that the standard for evaluating state court rulings where constitutional claims have been considered on the merits is "highly deferential" and difficult for the petitioner to meet, as the state court decision must be given "the benefit of the doubt").

[162] Smith v. Mann, 173 F.3d 73, 76 (2d Cir. 1999) (internal quotation marks and citation omitted).

[163] See 28 U.S.C. § 2254(d)(2).

[164] See Pinholster, 563 U.S. at 181–82.

appeal, an error that may have supported reversal on direct appeal will not necessarily be sufficient to grant a habeas petition.[165]

## IV.        EXHAUSTION

A federal court cannot evaluate the merits of a habeas claim unless it has been fully exhausted in the state courts.[166]

### A.    Legal Standards

#### 1.    Exhaustion of State Remedies – 28 U.S.C. § 2254(b)(1)(A)

The "exhaustion doctrine" is born out of considerations of comity as well as a desire to promote positive relations between state and federal courts.[167]  Indeed, it recognizes that "state courts, 'no less than federal courts, are bound to safeguard the federal rights of state criminal defendants.'"[168]  Codified in section 2254(b)(1)(A), this doctrine requires that federal courts exercise habeas review of a state conviction only after federal claims were "fairly presented" to state courts.[169]  Doing so affords states the first opportunity to review and redress any alleged violations of federal law in their courts.[170]

A federal claim is "fairly presented" in state court only if the petitioner has "informed the state court of both the factual and the legal premises of the claim he

---

[165] See Brecht v. Abrahamson, 507 U.S. 619, 634 (1993).

[166] 28 U.S.C. § 2254(b)(1)(A).

[167] Daye v. Att'y Gen. of State of N.Y., 696 F.2d 186, 191 (2d Cir. 1982).

[168] Jones v. Keane, 329 F.3d 290, 294 (2d Cir. 2003) (quoting Daye, 696 F.2d at 191).

[169] See id.

[170] Daye, 696 F.2d at 191.

asserts in federal court."[171]  This requires that the petitioner's claim in state court

contain "all of the essential factual allegations" as well as "essentially the same legal

doctrine" as is asserted in any subsequent federal petition.[172]

A petitioner's failure to exhaust state remedies for a claim may be excused only

where "there is an absence of available State corrective process; or . . . circumstances

exist that render such process ineffective to protect the rights of the applicant."[173]

Implicit in the exhaustion requirement and its exceptions are the concepts of (a)

adequate and independent state grounds, (b) the doctrine of procedural default, and (c)

adjudication on the merits.

a)       Adequate and Independent State Grounds

It is well established that federal courts will not consider a question of federal law

in a case where the decision of the state court also "rests on a state law ground that is

<u>independent</u> of the federal question and <u>adequate</u> to support the judgment."[174]  In the

direct appeal context, the United States Supreme Court lacks jurisdiction to review a

state court judgment that rests on independent and adequate state grounds.[175]

However, the basis for applying the adequate and independent state grounds doctrine is

somewhat different in the context of a federal habeas.

---

[171] <u>Keane</u>, 329 F.3d 294–95 (quoting <u>Dorsey v. Kelly</u>, 112 F.3d 50, 52 (2d Cir. 1997)).

[172] <u>McKinney v. Artuz</u>, 326 F.3d 87, 96–97 (2d Cir. 2003) (quoting <u>Daye</u>, 696 F.2d at 191).

[173] 28 U.S.C. § 2254(b)(1)(B)(i)–(ii).

[174] <u>Cruz v. Arizona</u>, 143 S. Ct. 650, 658 (2023) (quoting <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002) (emphasis added in <u>Kemna</u>).

[175] <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991) (emphasis added).

39

In reviewing a section 2254 petition, the federal court must decide "whether the petitioner is [held] 'in custody in violation of the Constitution or laws or treaties of the United States.'"[176]  That is, a federal habeas court is considering the lawfulness of the petitioner's custody rather than reviewing the underlying judgment for error.[177]  This is necessary because:

> Without the rule, a federal district court would be able to do in habeas what th[e United States Supreme] Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.[178]

As such, federal habeas courts are required, with rare exceptions, to apply this doctrine and safeguard the state's interest in enforcing its laws and correcting errors made in their courts.[179]

### b)    Procedural Default

Logically extending from the independent and adequate state ground doctrine is the habeas doctrine of procedural default.  This doctrine bars federal courts from reviewing federal claims "that the state court denied based [not on the merits of the claim itself, but] on an adequate and independent state procedural rule."[180]  Procedural default is a vital "corollary" to the requirement of exhaustion because it also concerns situations where a state court has not had the opportunity to rule on the merits of a

---

[176] Id. at 730 (quoting 28 U.S.C. § 2254(a)).

[177] See id.

[178] Id. at 730–731.

[179] See id. at 732.

[180] Davila v. Davis, 137 S. Ct. 2058, 2064 (2017) (emphasis added).

claim.[181]  "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance."[182]  The procedural default doctrine, therefore, advances the same interests as the exhaustion doctrine: "comity, finality, and federalism".[183]

> c)      "Adjudication on the Merits" (28 U.S.C. § 2254(d))

The concept of adjudication on the merits complements the exhaustion requirement and procedural default doctrine.[184]  If the state court denies a claim on the merits, a federal court may only grant the habeas petition if one of the exceptions within section 2254(d)(1) and (2) applies.[185]  In this context, a federal habeas court extends "considerable deference" even to "deficient reasoning, at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated."[186]  On the other hand, if the state court does not adjudicate the claim on the merits, the federal court "appl[ies] the pre-[Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996] standards, and review[s] de novo the state court

---

[181] See Dretke v. Haley, 541 U.S. 386, 392 (2004).

[182] Davila, 137 S. Ct. at 2064 (quoting Coleman, 501 U.S. at 731–732).

[183] Id. (internal citation omitted).

[184] Richter, 562 U.S. at 103.

[185] Id.

[186] McCray v. Capra, 45 F.4th 634, 640 (2d Cir. 2022).

disposition of the petitioner's federal constitutional claims."[187]  That is, where the state court decision rests on adequate and independent state procedural grounds—and is not excused by a showing of cause and prejudice or miscarriage of justice—then, as previously discussed, federal review is barred.[188]  Accordingly, whether a state court decision "adjudicated" the petitioner's claim "on the merits" greatly impacts the federal court's analysis.

Generally, a claim is "adjudicated on the merits" if "the state court ruled on the substance of the claim rather than on a procedural ground."[189]  More specifically, this requires that the state court "(1) dispose[d] of the claim 'on the merits,' and (2) reduce[d] its disposition to judgment."[190]  To do so, "the state court need not mention the argument raised or cite relevant case law, . . . or even explain its reasoning process[.]"[191]

The Second Circuit adopted the Fifth Circuit's three-factor analysis to determine whether a decision disposing of a claim has done so "on the merits" for the purposes of triggering AEDPA deference under section 2254(d):

"[Courts] determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits;

---

[187] Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir.2001) (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir.2001)).

[188] Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006).

[189] Jordan v. Lamanna, 33 F.4th 144, 150 (2d Cir. 2022) (citing Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).

[190] Sellan, 261 F.3d at 312.

[191] Eze v. Senkowski, 321 F.3d 110, 121 (2d Cir. 2003) (internal quotations and citations omitted).

and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits."[192]

Often, this is a simple test to apply, but not always.  Additionally, a "conclusive presumption" that the state court decision adjudicated a federal claim on the merits applies to rulings "fairly appearing to rest primarily on federal law or to be interwoven with federal law . . . [a]bsent a clear and express statement of reliance on a state procedural bar."[193]

>    2.    Ground One

Neither Mr. Jones nor the State contend that Mr. Jones's First Ground for relief was not fully exhausted in the state courts.[194]  However, this court must determine whether there has been an "adjudication on the merits" in order to apply the appropriate standard of habeas review.  Both Mr. Jones and the State contend that an "adjudication on the merits" of Mr. Jones's claim was rendered by the SSH Trial Court and summarily affirmed by the Connecticut Appellate Court.[195]

While the SSH Trial Court did reach the issue of Attorney Ahern's ineffectiveness under the Strickland test, it did so indirectly.[196]  Attorney Ahern's ineffectiveness was argued to the SSH Trial Court as a necessary predicate to Mr. Jones's claim of

---

[192] Sellan, 261 F.3d at 314 (quoting Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir.1999)).

[193] Jimenez, 458 F.3d at 138.

[194] See generally Pet.; Respondent's Response to Order to Show Cause ("Resp't's Resp.") (Doc. No. 65); Pet'r Reply to Respondent's Response to Order to Show Cause ("Pet'r's Reply") (Doc. No. 71).

[195] Pet. ¶ 172; Resp't's Resp. at 11.

[196] See Jones, 2016 WL 921751 at *9 ("The court . . . fails to see how [Ms. McCray's] testimony in any way undermines confidence in the outcome of the prior habeas and the criminal trial itself.").

ineffective assistance of FSH counsel, Attorney McIntyre.[197]  Mr. Jones argued to the

SSH Trial Court that "Attorney McIntyre's failure to investigate and locate [Ms.] McCray

prejudiced the Petitioner in establishing Attorney Ahern's ineffective investigation of

her.[198]  But for this failure, the Petitioner would have established [in the FSH] that the

results of the [criminal] proceedings would have been drastically different."[199]

For the reasons that follow, this court agrees with the parties that the Appellate

Court's affirmance of the SSH Trial Court's decision—which denied Mr. Jones's claim of

ineffective assistance of habeas counsel for failure to establish the ineffectiveness of

Attorney Ahern—constitutes an "adjudication on the merits" on Ground One, thus

triggering deferential review under section 2254(d).[200]

---

[197] See id. at *5 ("[A] petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy Strickland twice: he must 'prove both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective.'").

[198] This argument was only partially pursued in the FSH Trial.  Paragraphs 9a and 9b of Mr. Jones's operative FSH Petition broadly alleged ineffectiveness of trial counsel for Attorney Ahern's failure to conduct adequate "pretrial investigation into the factual issues for trial" and "investigation into the state's case."  Fifth Amended Petition ¶¶ 9a–9b (Doc. No. 86–7).  During the FSH trial itself, Attorney McIntyre questioned Attorney Ahern about his failure to call Ms. McCray in 1995.  See, e.g., 3/26/2009 FSH Tr. at 137:2–6 ("[Attorney McIntyre:]  And what was your legal strategy in not bringing [Ms. McCray,] a witness in who would testify that, in fact, the persons she saw she could not later identify as having been Mr. Jones? [Attorney Ahern:]  I don't know, maybe—maybe it was a mistake on my part.").

In his post-trial brief, however, Jones did not argue that Attorney Ahern was ineffective for failing to investigate Ms. McCray.  In fact, in the full forty-six pages of the brief, Ms. McCray's name does not appear once.  See generally Petitioner's FSH Trial Brief (Doc. No. 86-5).

[199] Respondent's Appendix N, Petitioner's SSH Post-Trial Brief ("Pet.'s SSH PT Br.") at 15 (Doc. No. 24–15).

[200] In light of the post-trial brief submitted to the FSH Trial Court, see id., and that court's Ruling on Mr. Jones's claim, it is unlikely that the FSH decision could be construed as an "adjudication on the merits" of Mr. Jones's Ground One claim before this court.  Presumably after considering Mr. Jones's post-trial brief, the FSH Trial Court issued its decision, only briefly mentioning "Petitioner's claims in 9a, [and] b . . . in his petition" and holding simply that it could not find prejudice from Attorney Ahern's generalized failures because "the petitioner ha[d] not identified any helpful evidence which would have aided his cause[.]"  Jones, 2009 WL 2961443 at *4.

It is therefore unclear, at best, whether the FSH Trial Court's decision addressed the specific claim that Attorney Ahern was ineffective for the specific reason of failing to investigate Ms. McCray.  The

Here, the court must determine whether the state court's resolution of the ineffective assistance of habeas counsel claim entails a merits adjudication of the predicate ineffective assistance of trial counsel claim for purposes of satisfying the exhaustion requirement.  While the Second Circuit has not squarely addressed the question, opinions from the Sixth and Seventh Circuits are persuasive.

In Flint v. Carr, the Seventh Circuit was faced with a similar issue.[201]  Petitioner Antwon Flint, incarcerated after a jury found him guilty of armed robbery, challenged his conviction in Washington state court alleging a violation of the Double Jeopardy clause of the Fifth Amendment.[202]  Flint's first trial was cut short when the judge granted the prosecutor's motion for a mistrial after Flint's trial counsel gave an opening statement containing inadmissible hearsay.[203]  Flint's second trial proceeded after the new judge raised, sua sponte, the issue of double jeopardy and concluded that it was not implicated as the mistrial was granted out of "manifest necessity".[204]  Flint unsuccessfully moved for postconviction relief on grounds that included double jeopardy.[205]  The Wisconsin Court of Appeals determined that Flint's double jeopardy claim was waived because he failed to explicitly raise the claim in a motion to dismiss at the second trial.[206]  However, because Wisconsin state law permitted a review of such

---

court therefore focuses on whether, as both Mr. Jones and the State presume in their briefing, see Pet. ¶ 172; Resp't's Resp. at 11, the SSH Trial Court's ruling constitutes an adjudication on the merits of this claim.

[201] 10 F.4th 786 (7th Cir. 2021).

[202] Id. at 790–91.

[203] Id.

[204] Id. at 791.

[205] Id.

[206] Id.

forfeited claims through the lens of ineffective assistance of counsel, the court considered whether Flint was entitled to relief on the ground that his second trial counsel was ineffective for failing to raise the double jeopardy claim in a motion to dismiss in the second trial.[207]  The court denied Flint's motion for relief, holding that Strickland's prejudice prong was unsatisfied because a "motion to dismiss on double jeopardy grounds likely would have failed" anyway, and "an attorney is not ineffective for failing to make meritless arguments."[208]

After concluding that Flint's double jeopardy claim was not procedurally defaulted,[209] the Seventh Circuit turned to whether its review was subject to AEDPA deference.[210]  Ultimately, the Seventh Circuit determined that AEDPA applied because "resolution of Flint's ineffective assistance of counsel claim turned on the intrinsic right or wrong of his double jeopardy claim".[211]  As the Washington Court of Appeals explained, Flint's double jeopardy argument was a core part of his appellate argument, even if it was considered through the Strickland framework.[212]  "In that way, the Wisconsin Court of Appeals heard and evaluated his argument on double jeopardy within Strickland's first prong of prejudice—and it disagreed."[213]

---

[207] Flint, 10 F.4th at 791–792.

[208] Id. at 792 (quotation marks, citations and alterations omitted).

[209] See id. at 793–95.

[210] Id. at 796.

[211] Id. (emphasis added).

[212] Id. at 796.

[213] Id.

In his Second State Petition, Mr. Jones claimed that Attorney McIntyre rendered ineffective assistance by failing to investigate and call Ms. McCray in the FSH Trial because her testimony would have evidenced Attorney Ahern's ineffectiveness.  Like that of Flint in the Seventh Circuit, Mr. Jones's claim that Attorney McIntyre was ineffective "turned on the intrinsic right or wrong"[214] of his underlying claim that Attorney Ahern was ineffective for failing to call Ms. McCray at the 1995 criminal trial.  As the State argued in its post-trial brief to the SSH Trial Court, to succeed on his Attorney McIntyre ineffective assistance claim, Mr. Jones needed to "prove that, but for [Attorney McIntyre]'s errors as well as [Attorney Ahern]'s mistakes, there exists a reasonable likelihood that [Mr. Jones] would have succeeded at the first state habeas."[215]  After all, an attorney can only be found constitutionally ineffective under Strickland if the evaluating court finds both deficiency and prejudice: but for the attorney's professional deficiency, there is a reasonable probability that the outcome would have been different.[216]  Moreover, the outcome of a trial is unlikely to change based on an argument that lacks merit.

The Sixth Circuit has also held that a state court's decision—denying a claim of ineffective assistance of counsel for the attorney's failure to raise a separate constitutional claim—constitutes an "adjudication on the merits" of the predicate claim if

---

[214] Id.

[215] Respondent's Appendix N, Respondent's SSH Post-Trial Brief ("Resp't's SSH PT Br.") at 6 (Doc. No. 24–15 at 51) Resp't's SSH PT Brief at 6 (internal citation omitted) (emphasis in original).

[216] See Strickland, 466 U.S. at 694.

the state court denies the ineffective assistance claim on the basis of prejudice.[217]  In

Smith v. Warden, the respondent ("Smith") was convicted of charges stemming from a

robbery at a local store.[218]  At trial, the prosecution presented an expert who testified

that a co-conspirator's DNA—but not Smith's—was found on the disguise used by the

perpetrator.[219]  However, it was not until after the trial that Smith received the DNA

testing notes, which show the extent to which a person's DNA is present on an item.[220]

The notes indicated that the co-conspirator—who was allegedly the getaway driver for

the robbery, had testified against Smith, and was the person Smith pointed to as the

sole culprit of the crime—left "DNA at every locus (a spot on the human genome) on the

t-shirt and almost every locus on the wig" worn by the actual perpetrator.[221]  Smith

moved for a new trial, arguing that the withholding of these notes constituted a Brady

violation.  Specifically, these notes "provid[ed] more evidence that [the co-conspirator]

wore the wig and t-shirt found with the abandoned [car]", as they "were consistent with

[him] wearing the items for an extended period rather than simply touching them."[222]

The trial court denied the motion, concluding that no Brady violation occurred and that

the DNA notes were not material.[223]

---

[217] See, e.g., Smith v. Warden, Toledo Corr. Inst., No. 20-3472, 2022 WL 601860, at *3 (6th Cir. Mar. 1, 2022).

[218] Id. at *1.

[219] Id.

[220] Id. at *1–*2.

[221] Id. at *2.

[222] Id.

[223] Smith, 2022 WL 601860, at *2.

On appeal, Smith did not raise the Brady claim and his conviction was affirmed.[224]  Smith then proceeded to move "to reopen his appeal due to ineffective assistance of appellate counsel, including the failure to raise the Brady claim."[225]  The Ohio First District Court of Appeals denied his motion, reasoning that there was no Brady violation because "the undisclosed evidence was not material in that it could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[226]  The court concluded that Smith "failed to demonstrate a genuine issue as to whether he received ineffective assistance" where the Brady claim itself "would not have presented a reasonable probability of success if it had been advanced on appeal[.]"[227]  Smith then filed his federal section 2254 petition alleging, inter alia, a Brady violation warranting habeas relief.[228]

On remand from the Sixth Circuit, the District Court for the Southern District of Ohio determined that the ineffective assistance of appellate counsel claim excused the procedural default of Smith's Brady claim.  The court therefore evaluated the ineffective assistance claim—for appellate counsel's failure to raise the Brady claim on direct appeal from Smith's conviction—on the merits and granted Smith's petition.[229]  The state appealed.[230]  The record before the Sixth Circuit arguably contained two merits

---

[224] Id.

[225] Id.

[226] Id. (internal quotation marks and citation omitted).

[227] Id. (internal quotation marks and citation omitted).

[228] Id.

[229] Smith, 2022 WL 601860, at *2–*3.

[230] Id. at *3.

adjudications of Smith's <u>Brady</u> claim: one by the state trial court[231] denying Smith's motion for a new trial; and a later one by the Ohio Court of Appeals denying Smith's separate motion to reopen his appeal.  The trial court was presented directly with the <u>Brady</u> claim, while the appellate court was presented only with an ineffective assistance of appellate counsel claim, which alleged a failure to raise the <u>Brady</u> claim on direct appeal from Smith's conviction.  So the Sixth Circuit had to determine "[w]hat was the last state-court adjudication on the merits of the <u>Brady</u> claim[.]"[232]

The Sixth Circuit assessed that the last merits adjudication was the Ohio Court of Appeals decision "in which he argued that his appellate counsel failed to provide effective assistance when his attorney did not appeal the trial court's rejection of his <u>Brady</u> claim."[233]  The Sixth Circuit explained that the Ohio "Court of Appeals' 'legal reasoning' expressly addressed the underlying claim in finding no prejudice and made clear that its decision turned on its view of the merits of the <u>Brady</u> claim."[234]  "The court ruled in straightforward terms that the <u>Brady</u> claim failed on the merits, precluding the possibility that Smith's counsel committed ineffective assistance by opting not to raise it."[235]  Indeed, "[o]nce the Ohio Court of Appeals addressed the <u>Brady</u> claim," the Court reasoned that it, "would be acting contrary to Congress's intent if we simply ignored the

---

[231] Because Smith abandoned the <u>Brady</u> claim on appeal, the trial court was the only court to entertain the merits of Smith's <u>Brady</u> claim in isolation.  <u>Smith</u>, 2022 WL 601860 at *2.

[232] <u>Id.</u> at *3 (internal quotation marks omitted).

[233] <u>Id.</u>

[234] <u>Id.</u> (internal alteration adopted, quotation marks and citations omitted).

[235] <u>Id.</u> (internal alteration adopted, quotation marks and citations omitted).

court's view and reconsidered it on our own fresh terms [without applying AEDPA deference]."[236]

Smith's argument that the appellate court was considering an ineffective-assistance claim rather than a <u>Brady</u> claim did not alter the Sixth Circuit's conclusion.[237] The Sixth Circuit conceded that Smith's argument was "[t]rue enough", but that:

> [T]he [Ohio Court of Appeals] did what appellate courts frequently do. It resolved the underlying claim first. Put another way[,] it resolved a necessary premise of the ineffective-assistance claim. A lawyer does not provide ineffective assistance of counsel by opting not to bring a losing claim. Under time-tested principles, a Sixth Amendment claim of ineffective assistance of counsel requires the criminal defendant to show (1) representation outside professional norms and (2) prejudice from failing to raise the claim. . . . No prejudice results from failing to bring a defective claim.[238]

In sum, the Ohio Court of Appeals ruled on the merits of an underlying <u>Brady</u> claim when it determined that a related ineffective assistance of counsel claim failed due to lack of prejudice in light of the fact that the predicate <u>Brady</u> claim lacked merit. As such, the Sixth and Seventh Circuits have made clear that "[n]othing requires a state court to conduct its analysis under the heading of a specific federal constitutional right to adjudicate it on the merits", triggering AEDPA's deferential review.[239] The same is true in Mr. Jones's case, where his claim that Attorney McIntyre was ineffective turned on the merits of the underlying claim that Attorney Ahern was ineffective for failing to call Ms. McCray at the 1995 criminal trial.

---

[236] <u>Id.</u>

[237] <u>Smith</u>, 2022 WL 601860 at *3.

[238] <u>Id.</u>; <u>see also</u> <u>Fleming v. Metrish</u>, 556 F.3d 520 (6th Cir. 2009) ("[O]ur dissenting colleague's distinction between federal constitutional issues that a state 'merely addresses' on the merits and those that are '"adjudicated" on the merits' . . . appears to us to be a distinction without a difference.").

[239] <u>Smith</u>, 2022 WL 601860 at *4 (internal citation omitted).

The court therefore agrees with Mr. Jones and the State that Ground One has been fully exhausted, and that the Connecticut Appellate Court's 2018 decision, affirming the SSH Trial Court's ruling, constitutes an "adjudication on the merits" of Mr. Jones's First Ground of habeas relief.

### 3.  Ground Two

Section 2254(b)(2) grants federal courts the power to deny habeas claims on the merits, even if the claim itself has not been exhausted in state courts or is otherwise procedurally barred.[240]  The court will do so here, with respect to Mr. Jones's Second Ground.[241]

### 4.  Ground Three

Like Ground One, there is not a dispute between the parties that Ground Three has been fully exhausted.[242]  On direct appeal from his 1995 criminal trial, Mr. Jones unsuccessfully argued that his due process rights were violated when the trial court excluded Mr. Bember's testimony regarding Pepper's statement against penal interest, which would have strengthened Mr. Jones's defense.[243]  Following the 1997 Appellate Court's denial of his direct appeal, Mr. Jones advanced the same claim to the

---

[240] Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even if we assume that no procedural bar exists, we agree with the District Court that the claim cannot succeed on the merits."); United States v. Doe, 66 F. App'x 249, 252 (2d Cir. 2003) ("However, because the merits of the petition are easily resolved, we look beyond the possible procedural default and address the merits."); Salvagno v. Williams, 2019 WL 109337, at *8 (D. Conn. Jan. 4, 2019) ("'[T]he doctrine of procedural default is based on considerations of comity and finality, and not on a jurisdictional limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation.'") (quoting Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000)).

[241] See, infra, Section V.B.

[242] See generally Pet. ¶¶ 205–214; Resp't's Resp. at 29–38.

[243] Jones, 46 Conn. App. at 644.

Connecticut Supreme Court, which denied certification.[244]  The 1997 Appellate Court

affirmed the 1995 Criminal Trial Court's exclusion of Mr. Bember's testimony by holding

both that (1) the statement was not "admissible as a third party declaration against

penal interest"; and (2) the "exclusion of the evidence of the statement allegedly made

by Pepper to [Mr.] Bember [did not] implicate[ Mr. Jones]'s due process right to present

a complete defense."[245]  Indeed, the court was "not persuaded" that Mr. Jones's

"constitutional rights were compromised in any way by the exclusion of th[e]

evidence."[246]

> 5. Ground Four

In its 2020 Motion to Dismiss, the State characterized Mr. Jones's exhaustion of

Ground Four as follows:

> In his second state habeas proceedings, [Mr. Jones] may have presented
> this claim in his petition seeking discretionary review by the Connecticut
> Supreme Court.  Within his claim asserting a due process violation, he
> mingled allegations that his trial counsel was ineffective for "failing to
> investigate and subsequently failing to preserve the car."
> . . .

---

[244] In dissent, Associate Justice Robert I. Berdon expressed that he would have granted certification to address, <u>inter alia</u>, the following question:

> Whether the Appellate Court correctly held that the trial court did not abuse its discretion
> in excluding defense witness Lee Bember's testimony of a third party's confession that he
> shot the victim, and that the defendant's constitutional right to present a defense was not
> compromised by this exclusion?

<u>State v. Jones</u>, 243 Conn. 941 (1997) (Berdon, J., dissenting) (citing <u>Siemon v. Stoughton</u>, 184 Conn. 547, 555 (1981) ("A defendant may give evidence concerning a third party's involvement with the crime, as long as there is some evidence which directly connects the third party with the crime.")).

[245] <u>Jones</u>, 46 Conn. App. at 644, 645.

[246] <u>Id.</u> at 645.

As for his assertion that counsel failed to investigate the crime scene, <u>it appears that he may have exhausted this claim.</u>[247]

Unless the State has "expressly waived" a claim of failure to exhaust, a reviewing court may consider such a claim for the first time on appeal.[248]  In fact, although "AEDPA does not explain how a state 'expressly waives' the exhaustion requirement," the Second Circuit has emphasized that AEDPA "disfavors a state waiver of exhaustion" and asks whether the State's waiver can be construed as an "intentional relinquishment or abandonment of a known right."[249]  "This is a stringent requirement. . . .  [E]xpress waiver would seem to require" the State to "ma[ke] manifest" their "intentional relinquishment . . . of [the] known right" to challenge exhaustion.[250]

At oral argument, the State did exactly that and expressly abandoned its argument that Ground Four is unexhausted.[251]  As such, the court proceeds to the merits on this claim.

## V.        DISCUSSION

Mr. Jones alleges four grounds upon which he is entitled to federal habeas relief. In Ground One, Mr. Jones argues that Attorney Ahern provided ineffective assistance of counsel for failing to investigate and introduce testimony from Ms. McCray.[252]  Mr. Jones alleges in Ground Two that the State violated Mr. Jones's due process rights by

---

[247] Respondent's Memorandum of Law in Support of Motion to Dismiss ("Resp't's Mem.") at 14 (Doc. No. 24-22) (emphasis added) (internal citations omitted).

[248] <u>Carvajal v. Artus</u>, 633 F.3d 95, 105 (2d Cir. 2011) (emphasis in original).

[249] <u>Id.</u> at 105–06 (internal citations omitted).

[250] <u>Id.</u> at 105, 106.

[251] <u>See</u> July 31, 2023 Oral Argument Transcript ("7/31/23 Oral Arg. Tr.").

[252] Pet. ¶ 168.

withholding <u>Brady</u> evidence that Mr. Spears testified in exchange for a promise of a lesser sentence as well as by eliciting perjured testimony from Mr. Spears.[253]  In Ground Three, Mr. Jones asserts that he was deprived of his right to a fair trial and right to present a defense when the trial court erroneously excluded Mr. Bember's testimony that Pepper confessed to shooting the victim with Mr. Spears.[254]  Finally, Mr. Jones alleges as Ground Four that Attorney Ahern provided ineffective assistance of counsel by failing to retain and introduce testimony from an expert in ballistics or crime scene reconstruction.[255]

A.    <u>Ground One</u>

In his First Ground for federal habeas relief, Mr. Jones argues that he received ineffective assistance of counsel as a result of Attorney Ahern's failure to "investigate and present testimony from Sheila McCray, the only eyewitness to the shooting without a stake in the matter."[256]  In opposition, the State argues that, "[g]iven the [second] state habeas [trial] court's finding that [Ms.] McCray's testimony is unreliable, [Mr. Jones] cannot demonstrate that he was prejudiced by [Attorney Ahern]'s decision not to present her as a witness[,]" and, therefore, Mr. Jones's claim "must fail."[257]

---

[253] <u>Id.</u> ¶¶ 186–88.

[254] <u>Id.</u> ¶¶ 208, 212.

[255] <u>Id.</u> ¶ 221.

[256] <u>Id.</u> ¶ 168.

[257] Resp't's Resp. at 11; <u>see also</u> <u>Jones</u>, 2016 WL 921751, at *9 ("[T]he court finds that [Ms.] McCray's testimony is unreliable. . . .").

1.    SSH Appellate Court's "Adjudication"

AEDPA instructs a federal habeas court to "train its attention on the particular

reasons—both legal and factual—why state courts rejected a state prisoner's federal

claims."[258]  Indeed, a federal court may grant habeas relief "[o]nly if the state court's

decision 'was contrary to, or involved an unreasonable application of, clearly

established Federal law' or 'was based on an unreasonable determination of the facts in

light of the evidence presented[.]'"[259]  "This task is straightforward when the last state

court to decide a claim has issued an opinion explaining its decision.  In that situation, a

federal habeas court simply evaluates deferentially the specific reasons set out by the

state court."[260]

Before addressing the SSH Trial Court's "adjudication" of Ground One, the court

begins by reviewing some of the evidence pertinent to the SSH Trial Court's ruling.

a)    Criminal Trial Record

"In nearly every case that concludes that counsel conducted a constitutionally

deficient investigation, the courts point to readily available evidence neglected by

counsel."[261]  This court is no different.

It is clear from the 1995 criminal trial's exhibit list that Attorney Ahern possessed,

and had presumably reviewed, two critical documents: (1) Mr. Yanac's October 14,

---

[258] Wilson v. Sellers, 138 S. Ct. 1188, 1191–92 (2018) (quoting Hittson v. Chatman, 576 U.S. 1028 (2015) (Ginsburg, J., concurring)).

[259] Hittson, 576 U.S. at 1028 (Ginsburg, J., concurring) (quoting 28 U.S.C. § 2254(d)).

[260] Id.

[261] Greiner v. Wells, 417 F.3d 305, 322 (2d Cir. 2005) (collecting cases).

1992 Case/Incident Report ("Mr. Yanac's Report"),[262] and (2) Detective Trocchio's

Police Report ("Detective Trocchio's Report") dated October 18, 1992.[263]  Attorney

Ahern submitted copies of both reports to the 1995 Criminal Trial Court as defense

exhibits, <u>albeit</u> for identification purposes only.[264]

      Mr. Yanac's Report included Ms. McCray's full name and where she worked at

the hospital.[265]  It explained that Mr. Harp was at the hospital "to take Sheila McCray to

lunch[,]" and that, "while walking through Center Lobby, [Ms. McCray] observed a

station wagon on Chapel Street, approached by two unknown black male assailants,

during which one began rapid fire shooting into [the] vehicle, turned and both assailants

ran (direction unknown)."[266]  The report also stated that Ms. McCray had agreed to

"share [this] information with authorities" and that "security would arrange such [a]

meeting."[267]

      Detective Trocchio's Report, which contained Ms. McCray's address, indicated

that "two (2) Black male subjects" had opened fire on Mr. Harp's vehicle and that "[a]

witness, Sheilla [sic] McCray, had provided [the on-scene patrol officer] with a statement

regarding the events prior to and after the murder of Eddie Harp."[268]  At Mr. Jones's

---

[262] <u>See</u> Defendant's Exhibit 1, Security Department — Case/Incident Report ("Mr. Yanac's Report") (Doc. No. 96-5).

[263] <u>See</u> Det. Trocchio's Report; <u>see also</u> Notice of Filing of Exhibit (Doc. No. 98) (identifying Defendant's Exhibit 4 in the 1995 criminal trial as Detective Trocchio's October 18, 1992 police report).

[264] <u>See</u> List of Exhibits (Doc. No. 96-1)

[265] Mr. Yanac's Report at 1.

[266] <u>Id.</u> at 1, 2.

[267] <u>Id.</u> at 2.

[268] Det. Trocchio's Report at 1–2; Transcript of Ms. McCray's Statement to New Haven Police ("Second Statement") at 3 (Doc. No. 15 at 131).  This court has scoured the SSH trial record and is

FSH trial on March 25, 2009, that on-scene patrol officer—Officer Losty—testified to having received and then disseminated on police radio Ms. McCray's description of the two suspects.[269]  Suspect one was "a [B]lack male, dark skin, . . . 6'1", 130 to 140 pounds, thin to medium build, clean-shaven, and wearing a black knit cap, a black waist length jacket (with no hood) . . . over a white tee shirt, black jeans and black sneakers."[270]  Suspect two was similarly attired but for a "black waist length jacket with snaps along the back collar . . . [where] a hood could be attached[.]"[271]  He was also described as "a [B]lack male, dark skinned, . . . 5'9" to 5'11", 130 to 140 pounds, thin build, clean shaven, short corn-braided hair[.]"[272]  According to Mr. Yanac's Report, Ms. McCray stated that one of the suspects "began rapid fire shooting into [Mr. Harp's] vehicle" before both suspects fled.[273]

b)      2015 Testimony of Ms. McCray

Ms. McCray testified about Mr. Harp's death for the first time in 2015, at Mr. Jones's SSH trial.[274]  Her recollection in 2015 matched the statements she gave in 1992.  Indeed, Mr. Jones's SSH attorney, James Fraguela ("Attorney Fraguela"),

---

unable to find a copy of the Second Statement, nor is a copy included in the briefs to the SSH Appellate Court nor the Connecticut Supreme Court.  Indeed, at oral argument, the petitioner conceded that this statement was not in the record before any court considering the second state habeas.  See 7/31/23 Oral Arg. Tr.

This court is limited to the record before the adjudicating courts and, therefore, it cannot consider the Second Statement on Ground One.

[269] 3/25/2009 FSH Tr. at 109:10–13, 110:12–25.

[270] Id. at 111:11–16.

[271] Id. at 111:20–21.

[272] Id. at 111:17–19.

[273] Mr. Yanac's Report at 2.

[274] See 3/31/15 SSH Tr. at 78:24–26.

58

confirmed as much by showing Ms. McCray a copy of Detective Trocchio's October

1992 field notes, which were "incorporated into" his police report:[275]

> [Attorney Fraguela:]  Is there anything that's in that description there that differs from what you told police that evening?
>
> [. . .]
>
> [Ms. McCray:]  They didn't have braids.
>
> [Attorney Fraguela:]  Everything else is exactly how you recall remembering, telling the . . . detective that night?
>
> [Ms. McCray:]  Pretty much.[276]

Ms. McCray was also shown the version of her statements contained in Mr. Jones's

Arrest Warrant:[277]

> [Attorney Fraguela:]  Is there anything that's described there as it pertains to your statement that's different from what you remember?[278]
>
> [Ms. McCray:]  I wasn't -- I wasn't -- I didn't approach officers.  They approached me.  So this is stating that I approached them.
>
> [Attorney Fraguela:]  Is there anything else in that statement that -- to the best of your recollection did not occur that evening?
>
> [Ms. McCray:]  The description is wrong.
>
> [Attorney Fraguela:]  How so, Ms. McCray?
>
> [Ms. McCray:]  The black -- they had black jackets and black -- it was, like, army fatigue clothing dark stuff.
>
> [Attorney Fraguela:]  Is there anything else in that statement that's different from your recollection?
>
> [Ms. McCray:]  I think the height and weight might be -- the height might be wrong.  I don't want to start a guessing game here.

---

[275] Id. at 35:18–21.

[276] Id. at 74:1–9.

[277] Id. at 74:15–18.

[278] It bears noting that, despite giving several statements to police near the time of the shooting, Ms. McCray was not asked to write her own statement or to sign and verify the accuracy of any statement she made that is before this court.  This can very well explain any small differences between her later recollections and her earlier memory as captured in others' reports.

[Attorney Fraguela:]  And I'm not asking you to.  If you recall, and if not, just say.

[Ms. McCray:]  I don't --

[Attorney Fraguela:]  Okay.  Let's move on.[279]

Ms. McCray also testified to being shown a photo array by New Haven police officers:

[Attorney Fraguela:]  Out of the photo array, were you able to identify anyone?

[Ms. McCray:]  No.

[Attorney Fraguela:]  Do you recall why you couldn't identify anyone from the photo array?

[Ms. McCray:]  No.  They just were -- they were trying to ask me to identify someone, and the person that they were trying to get me to identify wasn't the individual that I saw.

[Attorney Fraguela:]  Do you recall the individual that you did see?

[Ms. McCray:]  Yeah.

[Attorney Fraguela:]  Is he Mr. Maleek Jones?

[Ms. McCray:]  No.[280]

Finally, Ms. McCray testified that she received no contact from anyone representing Mr. Jones between the date of Mr. Harp's death and 1995.[281]  As a follow up, Attorney Fraguela asked, "if someone from Mr. Jones' defense team had come and talked to you between 1992 and '95, would you have told them the same things" she testified to at the SSH trial?[282]  Ms. McCray replied: "[D]uring that time, would I have

---

[279] Id. at 74:19–75:11.

[280] Id. 76:1–12; see also id. at 15:2–11 (according to Detective Trocchio's testimony, Ms. McCray was not able to positively identify a suspect within the photo arrays shown to her).

[281] 3/31/15 SSH Tr. at 76:20–27.

[282] Id. at 77:1–4.

come forward to do what was right to tell the truth?  Absolutely."[283]  Thus, had she been called in 1995, Ms. McCray would have offered testimony describing the <u>two</u> perpetrators—both of slim build[284] and wearing dark clothes[285]—including her belief that Mr. Jones was not one of the two shooters she saw on October 14, 1992.

c)      Arguments Made in SSH Proceedings

The SSH Trial Court received, <u>inter alia</u>, copies of the complete transcripts and exhibit lists from Mr. Jones's 1995 criminal trial and his 2009 FSH trial, as well as the exhibits submitted to the courts in both proceedings.[286]  Pointing to portions of both, Mr. Jones argued in his post-trial brief to the SSH Trial Court that Attorney Ahern rendered deficient representation at the criminal trial by failing to call Ms. McCray: she was "the first person police interviewed at the scene immediately after the shooting, which is even indicated in [Detective Trocchio's] notes and the arrest warrant.  [Detective Trocchio's] notes reference her three times.  [Ms.] McCray's identity as a witness to the shooting was known immediately."[287]  Mr. Jones added that "Attorney Ahern did 'not search [Ms.] McCray out' and admitted that 'was a mistake.'"[288]  Mr. Jones established

---

[283] <u>Id.</u> at 77:19–21.

[284] <u>Compare</u> Petitioner's Exhibit 3 at FSH, Mugshot of Mr. Jones ("Mr. Jones's Mugshot") (Doc. No. 86-43) (showing Mr. Jones's skin tone and describing him as being 5'11" and weighing 200 pounds), <u>with</u> 3/25/2009 FSH Tr. at 109:10–111:19 (testifying at the First State Habeas, Ms. McCray identified the two shooters as weighing between 130 and 140 pounds).

[285] 3/31/15 SSH Tr. at 74:19–75:11.

[286] <u>See</u> List of Exhibits for the 2015 SSH Trial at 1 (Doc. No. 97 at 2).

[287] Pet.'s SSH PT Br. at 15 (internal citations omitted).

[288] <u>Id.</u> at 16 (citing Attorney Ahern's testimony at the 2009 FSH trial).

her availability by explaining that Ms. McCray "maintained a Connecticut license and

resided in the New Haven area."[289]  Mr. Jones stressed that,

> [h]ad either [the 1995 criminal trial or 2009 FSH] counsel's investigation
> been adequate, they would have found [Ms.] McCray and she would have
> testified at either or both previous trials.  That fact, in and of itself,
> establishes ineffective representation. . . .  [Ms.] McCray "absolutely" would
> have would have testified . . . that Mr. Spears shot the victim and that [Mr.
> Jones] was not there that night.[290]

Mr. Jones's SSH post-trial brief also contained an argument that Attorney

Ahern's failure to investigate and call Ms. McCray prejudiced him in both the FSH Trial

and his 1995 criminal trial:

> [Ms.] McCray's testimony provides a reasonable doubt that [Mr. Jones] was
> not where [Mr.] Spears said he was.  As Attorney Ahern admitted, "[t]o me
> the issues lay with who's the identity of [the shooters]," and [Ms.] McCray
> would have provided unbiased eyewitness testimony that [Mr. Jones] was
> not there that night.  An adequate investigation would have found [Ms.]
> McCray in 1995.[291]

The SSH Trial Court denied Mr. Jones's SSH Petition on February 11, 2016.[292]

At the SSH Appellate Court, Mr. Jones challenged the SSH Trial Court's

dismissal, arguing that it "erred in its conclusions with regard to Sheila McCray [where it]

only briefly acknowledg[ed] Ms. McCray's potential to have added to the first habeas

proceedings and [made] no mention of the implications her testimony could have had [at

trial] if [Attorney] Ahern had called her as a witness."[293]

---

[289] Id.

[290] Id. (internal citations omitted); see also Mr. Jones's Mugshot (showing that Mr. Jones was 5'11" and weighed 200 pounds).

[291] Id. at 16–17 (internal citations omitted).

[292] Jones, 2016 WL 921751, at *11.

[293] Respondent's Appendix N, Brief of Petitioner-Appellant ("Pet'r's SSH Appellate Court Brief") at 16 (Doc. No. 24-14) (internal citation omitted).

The Appellate Court summarily affirmed the SSH Trial Court's decision.[294]

        d)      SSH's <u>Strickland</u> Holdings

The SSH Trial Court and, by way of summary affirmance, the SSH Appellate Court,[295] analyzed the constitutional effectiveness of Attorney Ahern's representation in Mr. Jones's 1995 criminal trial by employing the test articulated by the United States Supreme Court in <u>Strickland v. Washington</u>.[296]  As to the first <u>Strickland</u> prong, deficient performance, the SSH Court held that Mr. Jones did not show at the 2015 SSH trial that Attorney Ahern's pretrial investigation was deficient:

> Prior to the criminal trial, Attorney Ahern informed the petitioner and his mother that they needed to hire an investigator instead of having the Office of the Public Defender pay for an investigation.  The petitioner's mother then hired Byrd, who conducted an investigation.  Although the petitioner in this second habeas presented testimony from Public Defender Ullman about the policies for retained counsel's use of investigators and how funds are approved, such evidence does not show that Attorney Ahern's investigation itself was deficient.[297]

The SSH Court also held that Mr. Jones failed to satisfy the second <u>Strickland</u> prong, prejudice, "because he ha[d] not shown what [additional pretrial] investigation or

---

[294] <u>Jones</u>, 185 Conn. App. at 906.

[295] With the exception of Ground Three, this court will always be considering the trial court's articulation of its merits adjudication and imputing that reasoning onto the appellate court.  Thus, rather than repeatedly stating some iteration of "by way of affirmance", the court refers simply to both as a singular "SSH Court".  This court will otherwise specify if referring only to the SSH Trial Court or Appellate Court.

[296] <u>See Jones</u>, 2016 WL 921751, at *4 (quoting <u>Johnson v. Comm'r of Correction</u>, 285 Conn. 556, 575 (2008) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984)) ("[P]etitioner has the burden to establish that '(1) counsel's representation fell below an objective standard of reasonableness, <u>and</u> (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance.").

[297] <u>Jones</u>, 2016 WL 921751, at *6.

preparation would have revealed."[298]  Further, the SSH Court "also fail[ed] to see how [Ms. McCray's] testimony in any way undermines confidence in the outcome of the prior habeas and the criminal trial itself."[299]

2.    <u>Strickland</u> Prong 1: Deficient Performance

Mr. Jones argues that Attorney Ahern's performance was constitutionally deficient because he failed to "investigate or present testimony from [Ms. McCray,] the only eyewitness without a stake in the matter[.]"[300]  Alternatively, Mr. Jones alleges Attorney Ahern was constitutionally deficient in failing to "conduct an adequate investigation to support a reasonable strategic decision not to further investigate or present [her] testimony . . . ."[301]  This court agrees.

Constitutionally effective representation requires that an attorney adhere to an "objective standard of reasonableness"—that is, the attorney's performance must be reasonable "under prevailing professional norms."[302]  The Supreme Court has "long referred to . . . ABA Standards as guides to determining what is [professionally] reasonable."[303]  At the time of Mr. Jones's 1995 criminal trial, the ABA Standards advised criminal defense attorneys to:

[C]onduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case. . . .

---

[298] <u>Id.</u> at *7.

[299] <u>Id.</u> at *9.

[300] Pet. ¶ 179.

[301] <u>Id.</u>

[302] <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003) (quoting <u>Strickland</u>, 466 U.S. at 688).

[303] <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005) (internal alterations in original adopted; internal quotation marks and citations omitted); <u>see also</u> <u>Strickland</u>, 466 U.S. at 688 (recognizing "ABA Standards for Criminal Justice", in particular, as a guide to reasonable professional conduct).

> The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.[304]

Attorneys have a general duty to investigate, which requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[305]  Sometimes, this will require that the attorney "speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes,"[306] or to "obtain those 'readily available file[s]' that 'the State has and will use against the defendant".[307] These requirements, however, only apply when counsel does not otherwise have "reason to believe that pursuing certain investigations would be fruitless or [ ] harmful".[308]

> a)      SSH Court's Articulated Reasoning

The SSH Court held that evidence of Attorney Ahern's unawareness of the OPD's "policies for retained counsel's use of investigators and how funds are approved

---

[304] ABA Standards for Criminal Justice: Prosecution and Defense Function 4–4.1 (3d ed.1993); see also Rompilla, 545 U.S. at 387 n.6 (comparing the quoted text of the Third Edition of the ABA Standards with that of the Second Edition and seeing "no material difference between [the] two phrasings, and in any case [being unable to] think of any situation in which defense counsel should not make some effort to learn the information in the possession of the prosecution and law enforcement authorities.").

[305] Strickland, 466 U.S. at 691.

[306] Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (quoting Pavel v. Hollins, 261 F.3d 210, 221 (2d Cir. 2001); see also Burger v. Kemp, 483 U.S. 776, 794 (1987) (concluding that counsel's limited investigation "was supported by reasonable professional judgment" where it "appear[ed] that he did interview all potential witnesses who had been called to his attention").

[307] Greiner, 417 F.3d at 321 (quoting Rompilla, 545 U.S. at 385, 387).

[308] Strickland, 466 U.S. at 691.

. . . d[id] not show that [his] investigation itself was deficient."[309]   This court agrees that

Attorney Ahern's ignorance of the policy alone does not mean that his investigation was

deficient,[310] but that conclusion does not impact Mr. Jones's specific allegation that trial

counsel's pretrial investigation was deficient because of his failure to seek out and

speak with Ms. McCray.  Attorney Ahern's testimony at both the FSH and SSH trials

were devoid of any claim that <u>his</u> failure to investigate the disinterested witness—who

described only two shooters that each weighed at least sixty pounds less than Mr.

Jones[311]—was a result of the OPD policy.[312]  Further, nothing in the record before the

SSH Court provides a basis to conclude that investigation of Ms. McCray would be

"fruitless" or "harmful."  Attorney Ahern's unfamiliarity with OPD practices was evidence

offered to support Mr. Jones's claim that Attorney Ahern's investigation into Ms. McCray

was deficient, but it was not the only evidence.

   Mr. Jones presented the SSH Court with copies of his arrest warrant, Detective

Trocchio's Report, and Detective Trocchio's field notes—which were used to compose

the Report—all of which contained statements that Ms. McCray provided shortly after

---

[309] <u>Jones</u>, 2016 WL 921751, at *6.

[310] At the same time, the court would be remiss not to emphasize just how perplexing Attorney Ahern's unawareness of this OPD policy was.  His failure cost Mr. Jones's family money they did not have and left his client without a much-needed investigator from November 1993 through the 1995 criminal trial.  <u>See</u> JBI Letter at 1.  As Mr. Jones aptly noted in a letter to Attorney Ahern, "[i]f we couldn't afford a lawyer[,] what made you think that we could afford a [private investigator?]"  12/14/1993 Letter from Mr. Jones to Attorney Ahern at 2.

[311] <u>Compare</u> Mugshot of Mr. Jones (identifying Mr. Jones as weighing 200 pounds), <u>with</u> 3/25/2009 FSH Tr. at 109:10–111:19 (testifying at the First State Habeas, Ms. McCray identified the two shooters as weighing between 130 and 140 pounds).

[312] <u>See, e.g.</u>, 3/26/2009 FSH Tr. at 135:6–137:6, 145:24–148:16; April 17, 2009 First State Habeas Transcript ("4/17/2009 FSH Tr.") at 14:11–16, 18:27–19:15 (Doc. No. 74–23); March 30, 2015 Second State Habeas Transcript ("3/30/2015 SSH Tr.") at 13:26–14:16, 17:13–20:24 (Doc. No. 74–26).

the 1992 shooting.[313]  All three documents contain consistent eyewitness statements that the crime was committed by only two shooters.  Moreover, the physical descriptions of the shooters provided by Ms. McCray were different enough from Mr. Jones that no reasonable jurist could believe that "pursuing [further] investigation" by contacting Ms. McCray would be "fruitless" or "harmful" to Mr. Jones's case.[314]  Indeed, Ms. McCray's statements were strong evidence that the State's version of what happened was wrong: that there were only two shooters, neither of whom were Mr. Jones.

Mr. Jones also pointed out that an adequate investigation would have easily uncovered Ms. McCray's location between 1992 and 1995.  She lived in New Haven and West Haven in the time between the shooting and Mr. Jones's criminal trial, and Ms. McCray has maintained a Connecticut driver's license consistently for the past "thirty years or so."[315]  Additionally, she would "absolutely" have been willing to speak about what she had witnessed.[316]

In an opinion published over six months before Mr. Jones's SSH decision was affirmed by the Appellate Court, the Connecticut Supreme Court made plain:

> [A] decision by counsel to forgo an investigation into the possible testimony of a potentially significant witness is constitutionally impermissible unless counsel has a sound justification for doing so; speculation, guesswork or uninformed assumptions about the availability or import of that testimony

---

[313] See List of Exhibits for the 2015 SSH Trial at 1.

[314] Strickland, 466 U.S. at 691.

[315] 3/31/15 SSH Tr. at 108:20–109:5; cf. Pet.'s SSH PT Br. at 16 ("Had Attorney McIntyre inquired with our department of motor vehicles, he would have learned that [Ms.] McCray maintained a Connecticut license and resided in the New Haven area").

[316] 3/31/15 SSH Tr. at 77:19–21.

will not suffice.  Instead, counsel must seek to interview the witness to determine the value of any testimony that he may be able to provide.[317]

The SSH Court concluded that testimony about OPD practices did not establish that Attorney Ahern's investigation itself fell below professional norms at the time.  However, the record unquestionably supports the conclusion that Attorney Ahern's investigation was wholly deficient.  Even if Attorney Ahern did not have an investigator due to his unawareness of OPD policy and Mr. Jones's indigence, Attorney Ahern still could have sought out Ms. McCray and interviewed her directly.  To the extent that the SSH Court's conclusion constitutes an adjudication on the merits of Mr. Jones's claim under the first Strickland prong, no "fairminded jurist could have reached the same judgment as the state court" as to the constitutional sufficiency of Attorney Ahern's investigation.[318]

b)      Attorney Ahern's Articulated Strategy

The Strickland Court was clear that, in considering the professional reasonableness of an attorney's representation, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"[319]  However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[320]

---

[317] Skakel v. Comm'r of Correction, 329 Conn. 1, 34–35 (2018) (citing, inter alia, Pavel, 261 F.3d at 221 ("defense counsel never contacted potentially favorable witness because counsel was 'confident as to what [that] witness would say,' but 'counsel's anticipation [of that testimony] does not excuse the failure to find out'").

[318] Shinn v. Ramirez, 142 S. Ct. 1718, 1732 (2022) (internal quotations omitted; internal alterations accepted; internal citations omitted).

[319] Strickland, 466 U.S. at 690.

[320] Id. at 690–91.

The Second Circuit instructs that, "except in highly unusual circumstances," district courts "facing the question of constitutional ineffectiveness of counsel should . . . offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."[321]  Indeed, the Connecticut Appellate Court expressed the same sentiment when it declined to consider Mr. Jones's ineffective assistance of counsel claim in 1997: "As our Supreme Court has stated, an ineffective assistance claim 'should be resolved, not in piecemeal fashion, but as a totality after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify.'"[322]

The SSH Court "heard" from Attorney Ahern both through the transcripts of his 2009 FSH Trial testimony[323] and his live testimony given on March 30, 2015.[324]  At the FSH trial, Attorney Ahern provided the following testimony about Ms. McCray's possible utility in the 1995 criminal trial:

> [Attorney McIntyre:]  [W]hat was your legal strategy in not bringing a witness in who would testify that, in fact, the persons saw she could not later identify as having been Mr. Jones?
>
> [Attorney Ahern:]  I don't know, maybe- maybe it was a mistake on my part.[325]
>
> . . .
>
> [Attorney McIntyre:]  Okay, would you consider [Ms. McCray's] potential testimony at a trial important to substantiate your client's position?
>
> [Attorney Ahern:]  Well, that's a close one, because she gave descriptions that don't necessarily leave him out of the picture.  So, you know, you don't-

---

[321] Greiner, 417 F.3d at 320 n.16 (quoting Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998)).

[322] Jones, 46 Conn. App. at 660 (quoting State v. Leecan, 198 Conn. 517, 542 (1986)).

[323] 3/26/2009 FSH Tr. at 126:1–157:19; 4/17/2009 FSH Tr. at 3:1–42:3.

[324] 3/30/2015 SSH Tr. at 11:1–56:16.

[325] 3/26/2009 FSH Tr. at 137:2–6.

in some of these cases, one of the problems you have is, you can call witnesses that can hurt you. Now I'm not saying that was my thinking at this particular juncture, but, sometimes witnesses come on and say things you don't want them to say. So, it's better, I think, to some degree, to have some knowledge of what you're trying to get across. But, as I said before, perhaps, it was a mistake on my part, not to search her out and find out more.[326]

. . .

[Attorney Ahern:]  Well, just because you don't pick somebody out, you know, doesn't exclude them from having done it. I don't think [Ms. McCray] really indicated that she particularly knew who did it. She was able to give a generalized description of height, I think that may also be in [Detective] Trocchio's note, but, I could be wrong on that, braids of the hair, things like that. So, you know. I suppose it's good to say that the photo was shown to somebody who was on the scene and didn't pick it out. So, like I said, my other answer to you earlier, maybe it was a mistake on my part.[327]

Rather than explain Attorney Ahern's failure to investigate Ms. McCray, his entirely hypothetical justifications underscore why an investigation was so critical. The only way to assess whether an eyewitness might be helpful or harmful on the witness stand is by seeking her out and evaluating her potential testimony. Accordingly, Attorney Ahern's explanation in 2009 falls well short of being a "reasonable professional judgment", especially in light of his overall strategy in the case. As he told the FSH Trial Court, his strategy for the defense was to argue that there were two shooters—Mr. Spears and Pepper—and to present Mr. Jones's alibi.[328] Thus, his articulated strategy for the case cannot be squared with his stated strategy in failing even to seek out an unbiased eyewitness who would testify that there were only two shooters, neither of whom she could identify as Mr. Jones.

---

[326] Id. at 146:1–12.

[327] Id. at 147:4–13 (Doc. No. 74-22).

[328] 3/30/2015 SSH Tr. at 36:1–23.

70

By 2015, Attorney Ahern's recollection of Ms. McCray's potential utility at the trial thirty years prior was practically nonexistent.  At that time, he testified that he did not remember whether he sought out Ms. McCray before the 1995 trial, did not know whether she testified, and that he "couldn't tell [the court] right now who Sheila McCray is."[329]

Despite beginning with the required "presumption that [Attorney Ahern] was effective[,]"[330] this court is unable to conclude that Attorney Ahern's wholly speculative justifications for his failure to investigate Ms. McCray amount to a reasonable decision that such an investigation was unnecessary.[331]  Indeed, they demonstrate his ineffectiveness by underscoring that he had no reason not to investigate an eyewitness who had no interest in the case and was local to the area.  Attorney Ahern's testimony was pure conjecture, inventing out of whole cloth concerns that Ms. McCray's testimony might hurt Mr. Jones's case, even though the only evidence he had would suggest the opposite.  As the Connecticut Supreme Court has explained in the <u>Strickland</u> context, "counsel's anticipation of what a potential witness would say <u>does not excuse the failure to find out</u>; speculation cannot substitute for certainty."[332]  Here, Attorney Ahern never

---

[329] <u>Id.</u> at 30:16–21.

[330] <u>Greiner</u>, 417 F.3d at 320.

[331] <u>Strickland</u>, 466 U.S. at 691.

[332] <u>Skakel</u>, 329 Conn. at 35 (emphasis added); <u>see also</u> <u>Wiggins</u>, 539 U.S. at 526 ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); <u>Ramonez v. Berghuis</u>, 490 F.3d 482, 489 (6th Cir. 2007) ("Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation"); <u>Pavel</u>, 261 F.3d at 221 ("[I]t will almost always be useful for defense counsel to speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes.").

sought out Ms. McCray to find out what she would say, despite her comments to police that indicated the strength of her potential testimony. No fairminded jurist could have reached the same conclusion as the SSH Court on this point. Indeed, in its Ruling, the SSH Court failed to even acknowledge Attorney Ahern's testimony, which three separate times included an admission to having made a possible mistake in failing to call Ms. McCray. The record is clear that his only strategic basis for not investigating Ms. McCray is baseless conjecture as to what she might have said in court. That is not a reasonable justification for failing to investigate her exculpatory testimony.[333] Ultimately, this was not "maybe" a mistake, but a clear error of constitutional dimension.

c)    Possible Unarticulated Strategy

District courts considering an ineffective assistance of counsel claim are instructed to "turn to the challenged conduct . . . and look for legitimate justifications for that conduct, including justifications transparent on the record".[334] On the record that was before the 2015 SSH Court, this court is unable to detect a reasonable justification for Attorney Ahern's failure to investigate Ms. McCray.

One potential justification for failing to call Ms. McCray is that counsel preferred to introduce her version of events through the various police reports that documented her statements—and were disclosed by the prosecution—rather than through live testimony. However, Ms. McCray's recollection of the shooting, including the number of shooters and their physical appearances, as set forth in those materials would have

---

[333] See, e.g. Pavel, 261 F.3d at 221 (concluding that defense counsel's failure to contact a potentially favorable witness "because the attorney was confident as to what [that] witness would say" did not "excuse the failure to find out" (internal quotation marks omitted)).

[334] Greiner, 417 F.3d at 320 (emphasis added).

been inadmissible as hearsay and only could have been introduced through Ms.

McCray's direct testimony.  Indeed, Attorney Ahern's attempt to reference Ms. McCray's

descriptions of the two shooters in his cross examination of Mr. Spears was immediately

blocked by the 1995 Criminal Trial Court:

> [Attorney Ahern:]  Are there two people to your knowledge who claim to
> have witnessed this shooting?
>
> [Mr. Spears:]  Yes.
>
> [Attorney Ahern:]  All right.  Then who are they?
>
> [Mr. Spears:]  Sheila McCray and James Bailey.
>
> [Attorney Ahern:]  Isn't it true, sir, that neither Sheila McCray nor James
> Bailey described either one of the perpetrators as wearing a burgundy jeans
> suit –
>
> [Attorney Gold:]  I'm going to object.
>
> The court:  Sustained.[335]

Without her in-court testimony, Ms. McCray's descriptions of the shooters are

clearly hearsay.  Any reasonably effective attorney would know that and would seek to

introduce her descriptions by means of in-court testimony, barring some countervailing

strategic concern about calling Ms. McCray to the witness stand.  However, Attorney

Ahern could not have harbored such a concern, as he completely failed to seek her out.

Thus, he had no basis for assessing her potential utility beyond the statements she

made to investigators, which plainly support Mr. Jones's defense.

Another possible justification for Attorney Ahern's failure to call Ms. McCray could

be that he planned to avoid the introduction of her testimony altogether by filing a

Missing Witness Charge pursuant to Secondino v. New Haven Gas Co., 147 Conn. 672

---

[335] 3/21/1995 CT Tr. at 166:1–10.

(1960).[336]  A Missing Witness Charge would have instructed the jury that it could infer

that Ms. McCray was a favorable witness to Mr. Jones because the State did not call

her, despite her being a witness "who would naturally have been produced by, in this

case, the State[.]"[337]  But the reasonableness of this justification is foreclosed by

Attorney Ahern's failure to investigate Ms. McCray in any way.  As the Connecticut

Appellate Court explained:

> The defendant <u>failed to offer any evidence to establish that [Ms.] McCray
> was available as a witness at the time of trial</u>.  The fact that [Ms.] McCray
> had been employed at St. Raphael's Hospital at the time of the murder,
> more than two years before trial, does not constitute evidence of availability
> as a witness at the time of trial.  The defendant, therefore, was not entitled
> to a missing witness instruction as to [Ms.] McCray.[338]

Moreover, a Missing Witness Charge request was far from a sound strategy, as that

would only result in an inference that she was a favorable witness for Mr. Jones without

the benefit of a live witness who can convey the details of her account to the jury.  Ms.

McCray's exculpatory testimony, which buttressed Attorney Ahern's overall strategy,

would still go unheard.

Quite simply, there is no sound reason for Attorney Ahern not to have

investigated this clearly significant eyewitness.  In light of the apparent absence of any

reasonable strategy to justify his failure to investigate Ms. McCray and present her

testimony at Mr. Jones's criminal trial under then-prevailing professional norms, the

SSH Court's application of the first <u>Strickland</u> prong "is so erroneous that there is no

---

[336] <u>See</u>, <u>supra</u>, Section II.C.3.

[337] <u>See</u> McCray <u>Secondino</u> Charge ¶ 1.

[338] <u>Jones</u>, 46 Conn. App. at 656 (emphasis added) (internal citation omitted).

possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'"[339]

> 3.   <u>Strickland</u> Prong 2: Prejudice

In his Petition, Mr. Jones also argues that he was prejudiced by Attorney Ahern's failure to investigate and present the testimony of Ms. McCray.  Under the second prong of the <u>Strickland</u> test, a habeas petitioner is required to establish that his case was actually prejudiced by his counsel's failures.  To show the requisite prejudice, a petitioner must show "a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings."[340]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[341]

Mr. Jones argues that "[t]here is a reasonable probability that the outcome of the criminal trial would have been different if the jury had heard [Ms.] McCray's version of events, which refuted [Mr.] Spears's version and excluded Mr. Jones as one of the shooters."[342]  Mr. Jones cites the fact that "[Ms.] McCray's account of the shooting and shooters was consistent with all of her prior statements, unlike Mr. Spears[,]" and that she, as "a friend of the victim, had no reason to lie, unlike Mr. Spears."[343]  Mr. Jones concludes that "[Ms.] McCray's testimony would almost certainly have resulted in an acquittal, which is likely why the State did not present testimony from the only witness to

---

[339] <u>Duhs v. Capra</u>, 639 F. App'x 691, 694 (2d Cir. 2016) (quoting <u>Nevada v. Jackson</u>, 569 U.S. 505, 508–09 (2013) (per curiam)).

[340] <u>Pham v. United States</u>, 317 F.3d 178, 182 (2d Cir. 2003).

[341] <u>Strickland</u>, 466 U.S. at 694.

[342] Pet. ¶ 180.

[343] <u>Id.</u>

the shooting without a criminal record or a stake in the matter."[344]   In opposing the Mr.

Jones's Petition, the State argues that, "[g]iven the state habeas court's finding that

[Ms.] McCray's testimony is unreliable, [Mr. Jones] cannot demonstrate that he was

prejudiced by counsel's decision not to present her as a witness.  As a result, his

ineffectiveness claim must fail."[345]

> a)   SSH Court's Grasp of the Criminal Trial Record

It is axiomatic that a fairminded jurist would need to be familiar with the

arguments and evidence put forth in a habeas petitioner's criminal trial in order to

reasonably determine whether the outcome would be affected by additional testimony.

Here, the SSH Court's determination that Mr. Jones was not prejudiced by the failure to

present Ms. McCray's testimony would be undermined if it appeared that the Court's

grasp of the criminal trial was deficient.[346]  Before examining the reasonableness of the

SSH Court's determination, this court notes an error in the SSH Trial Court's description

of Attorney Ahern's cross examination of the State's key witness at the 1995 trial:

> Attorney Ahern conducted a rigorous cross examination of [Mr.] Spears
> during the criminal trial.  The cross examination attacked [Mr.] Spears'
> credibility and drew attention to his motivations for resolving his own case
> with a highly favorable plea agreement, for which he still faced sentencing.
> Attorney Ahern also cast doubt on [Mr.] Spears' description of where the
> petitioner was standing and shooting at the vehicle by emphasizing that
> there was no evidence of any shots being fired from the passenger's side,
> which is where [Mr.] Spears placed the petitioner.[347]

---

[344] Id.

[345] Resp't's Resp. at 11.

[346] See, e.g., Wiggins, 539 U.S. at 528 (finding the "unreasonableness of [a] state court's decision" was "further highlight[ed] by "the [state] court['s having] based its conclusion, in part, on a clear factual error—that the social service records recorded instances of sexual abuse[ . . . where] the records contain no mention of sexual abuse").

[347] Jones, 2016 WL 921751, at *3 (emphasis added).

In that description, the SSH Court misrepresents one of the key points of Mr. Spears's version of events. Mr. Spears placed himself—not Mr. Jones, as the SSH Court wrote—at the passenger's side of Mr. Harp's car. This is a crucial detail because the shot that killed Mr. Harp pierced through the <u>left</u> side of his head, which means it was fired from the driver's—not the passenger's—side of the vehicle.[348] Moreover, there was no ballistics evidence to support that any shots were fired from the passenger's side, despite Mr. Spears's testimony.[349] And while the SSH Court's mistake may seem easy to make, it is not a one-word typo. The issue of who fired the shot, and from where, was perhaps one of the most critical points Attorney Ahern was able to make during the 1995 criminal trial, especially given his failure to call Ms. McCray as well as the trial court's exclusion of Mr. Bember's testimony. A complete reading of the trial transcripts should have made this abundantly clear. While not dispositive of the issue of prejudice on this deferential habeas review, it "further highlights the unreasonableness of the state court's decision."[350]

> b) SSH Court's "Reasonable" Determinations

The State's entire argument against Mr. Jones's claim that Attorney Ahern's failure to investigate and call Ms. McCray resulted in prejudice is rooted in the SSH Court's factual determination that Ms. McCray's 2015 testimony is unreliable.[351]

---

[348] 3/17/1995 CT Tr. at 81:12–19 (emphasis added).

[349] <u>See</u>, <u>infra</u>, Section V.D.1.

[350] <u>Wiggins</u>, 539 U.S. at 528.

[351] Resp't's Resp. at 11 ("Given the state habeas court's finding that [Ms.] McCray's testimony is unreliable, [Mr. Jones] cannot demonstrate that he was prejudiced by counsel's decision not to present her as a witness.").

District courts considering habeas corpus petitions filed by state prisoners are required to defer to the state courts' factual determinations by presuming that they are correct, unless a petitioner rebuts this presumption with clear and convincing evidence.[352]  This deference, however, "does not imply abandonment or abdication of judicial review."[353]   Indeed, "[d]eference does not by definition preclude relief."[354]  In fact, "[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude [that] the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."[355]

The SSH Court determined that Ms. McCray's 2015 testimony was unreliable by contrasting that testimony with the testimony of St. Raphael security guard, Mr. Yanac, from Mr. Jones's 1995 criminal trial.[356]  Ms. McCray testified to visiting the crime scene with Mr. Yanac before police arrived, while Mr. Yanac testified that, when he and Ms. McCray went to look at Mr. Harp's car, an "ambulance and several police vehicles were already there."[357]  The SSH Court concluded:

> While [Ms.] McCray may well be able to recall events of that tragic evening, the accuracy of her recollection of events almost a quarter of [a] century ago is highly questionable.   [Ms.] McCray's testimony is at odds with Yanac's, which was given about twenty years prior to [Ms.] McCray's. Although such differences are not surprising given the elapse of nearly a

---

[352] 28 U.S.C. § 2254(e)(1).

[353] Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

[354] Id.

[355] Id.

[356] Jones, 2016 WL 921751, at *9.

[357] Id. at *8–*9.

quarter of a century since the shooting, they underscore that lack of reliability this court assigns to Ms. McCray.[358]

The SSH Court cited this unreliability as one of the reasons for its puzzling failure "to see how [Ms. McCray's] testimony in any way undermines confidence in the outcome of the . . . criminal trial itself."[359]

The SSH Court's reliability determination was not based on Ms. McCray's demeanor,[360] but rather on a flawed analysis of the witness's testimony.  Rather than comparing Mr. Yanac's 1995 testimony to determine the reliability of Ms. McCray's 2015 testimony, the SSH Court should have compared Ms. McCray's 2015 testimony to her 1992 statements.  Then, the SSH Court could have properly ascertained whether there is a reasonable probability that, if Ms. McCray's 1992 statements were presented at Mr. Jones's criminal trial in 1995, he would have been found not guilty.

Mr. Jones has provided clear and convincing evidence to the SSH Court and to this court that supports a factual finding that (1) in 1992, Ms. McCray made multiple consistent and detailed eyewitness statements within days of Mr. Harp's death, and (2) these statements were both known and readily available to Attorney Ahern prior to the

---

[358] Id. at *9.

[359] Id.  Moreover, the undersigned fails to grasp the momentousness of this "difference" on the minor detail of when police arrived.  Id.  This strikes the court as exactly the type of difference one might expect "given the elapse of nearly a quarter of a century since the shooting."  Id.  Especially in contrast with the shooting itself, which is far more likely to be ingrained in a witness's memory after the passage of two decades.  And, on this, Ms. McCray's testimony is consistent with her account more than twenty years earlier.  3/31/15 SSH Tr. at 74:1–9.  That is precisely why the Connecticut Judicial Branch Criminal Jury Instructions specifically note that, in considering a witness's credibility, jurors should consider "whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether the contradiction has to do with an important fact or with only a small detail."  CONN. JUDICIAL BRANCH, CRIM. JURY INSTRUCTIONS § 2.4–2, available at https://perma.cc/2FTK-9FM7 (last visited August 8, 2023).

[360] This is notable, as this court must afford "particular deference" to "demeanor-based credibility determinations."  In re Payne, 707 F.3d 195, 201 (2d Cir. 2013).  On the other hand, "somewhat lesser deference" is owed "to credibility findings based on an analysis of a witness's testimony."  Id.

1995 trial, through documents such as Detective Trocchio's Report and Mr. Yanac's Report.  Indeed, Mr. Jones argued to the SSH Trial Court that, in light of those facts, Attorney Ahern was constitutionally ineffective for failing to investigate and present Ms. McCray's testimony in 1995.[361]  Moreover, Mr. Jones argued to the SSH Appellate Court that the SSH Trial Court erred in failing to consider what the impact of Ms. McCray's testimony would have been at the criminal trial.[362]

In light of Ms. McCray's 1992 statements and her 2015 testimony, this court concludes that Mr. Jones was prejudiced by Attorney Ahern's failure to investigate and present her testimony to the 1995 Criminal Trial Court.[363]  In 2015, Ms. McCray testified that she would have been willing, between 1992 and the 1995 criminal trial, to speak to Attorney Ahern and to testify at the trial.  She maintained—just as she did multiple times in 1992—that there were only two shooters, and that Mr. Jones was not one of them. She confirmed that she did not know Mr. Jones, Mr. Spears, or Pepper, and that she was a friend of Mr. Harp.[364]

In addition to her statements, which were memorialized in Detective Trocchio's Report and Mr. Yanac's Report, Ms. McCray also did not identify Mr. Jones as one of the shooters when presented with a photo array.[365]  The SSH Court characterized this

---

[361] See, supra, Section V.A.1.c.

[362] Pet'r's SSH Appellate Court Brief at 16 (internal citation omitted).

[363] There is simply no basis to presume that the testimony Ms. McCray would have offered at the criminal trial in 1995—had she been called—would differ from the account she provided to investigators in 1992.

[364] 3/31/15 SSH Tr. at 57:27–58:10.

[365] 3/31/15 SSH Tr. at 76:1–12; see also id. at 15:2–11 (according to Detective Trocchio's testimony, Ms. McCray was not able to positively identify a suspect within the photo arrays shown to her).

as Ms. McCray being unable to "identify the individuals in the photo array",[366] however,

Ms. McCray made clear that she did not point out the shooter because "the person that

they were trying to get me to identify wasn't the individual that I saw."[367]  As such, her

failure to identify Mr. Jones was not a function of her poor memory of the perpetrators,

but rather was valuable exculpatory evidence that Mr. Jones was not one of the

shooters.

> As Mr. Jones argues:
>
> The state court's decision that [Ms.] McCray's testimony at the 2015 habeas trial—which with respect to all material facts was consistent with her contemporaneous descriptions of the shooting and shooters, which squarely refuted the State's only eyewitness, and which excluded Mr. Jones from being the shooter—was unreliable and did not undermine confidence in the outcome of the trial misconstrued and unreasonably applied Strickland.  The proper inquiry is whether there is a reasonable probability of a different outcome if the jury had heard McCray's testimony in 1995, not twenty years later.[368]

This court agrees and concludes that the SSH Court merely determined that, based on

a flawed comparison, Ms. McCray's 2015 testimony was not as reliable as Mr. Yanac's

1995 testimony.[369]  That Mr. Yanac's 1995 testimony appears to more accurately depict

the timeline of the police officers' arrival than Ms. McCray's testimony two decades

later, however, fails to support a legal conclusion that her 2015 testimony does not

undermine confidence in the outcome of the 1995 criminal trial.  That is the crux of Mr.

---

[366] Jones, 2016 WL 921751, at *8.

[367] 3/31/15 SSH Tr. at 76:7–8.

[368] Pet. ¶ 174.

[369] Jones, 2016 WL 921751, at *8; c.f. Wiggins, 539 U.S. at 528–29 (explaining that the Court's "hands [were not] tied, under § 2254(d), by the state court's factual determinations" that some investigation was done and the petitioner's trial attorneys were aware of some relevant information, and that it could award the petitioner relief where it found that the state court had unreasonably applied Strickland by concluding that the "scope of [the] investigation . . . met [Strickland's] legal standards).

Jones's claim—that there is a reasonable probability that the jury would have reached a different verdict had it heard Ms. McCray's 2015 testimony, including her statements regarding the number of shooters, what they looked like, and her certainty that Mr. Jones was not one of them.

This court concludes that the SSH Court's determination that Mr. Jones was not prejudiced by Attorney Ahern's failure to investigate and present the testimony of Ms. McCray was an "unreasonable application of" constitutional law, i.e., Strickland's second prong.[370]

B.      Ground Two

As his Second Ground for habeas relief, Mr. Jones alleges that the "State failed to disclose the details of the agreement with [Mr.] Spears, i.e., that [Mr.] Spears was promised a lesser sentence in exchange for his testimony against Mr. Jones[, and that] [t]he State elicited perjured testimony from [Mr.] Spears."[371]  According to Mr. Jones, Mr. "Spears testified in 2015 that he was promised a lesser sentence in exchange for his testimony against Mr. Jones and was threatened with a harsher sentence if he did not testify."[372]

The State's Opposition focuses on its view that Mr. Jones's claim has been procedurally defaulted and that Mr. Jones cannot demonstrate the cause and prejudice necessary to overcome that hurdle.[373]  Even assuming arguendo that Mr. Jones could

---

[370] Id. § 2254(d)(1); Strickland, 466 U.S. at 694.

[371] Pet. ¶¶ 186–87.

[372] Id. ¶ 191.

[373] See Resp't's Resp. at 19–25.

demonstrate cause and prejudice,[374] the State argues that Mr. Jones's Second Ground must fail because the SSH Court found that Mr. Spears's "plea agreement did not include an agreement as to the specific amount of incarceration that he would receive", despite Mr. Spears's 2015 testimony alluding to such an agreement.[375]

Even if this court assumes no procedural bar exists,[376] Mr. Jones's Second Ground fails on the merits because (1) the SSH Court made a factual finding—which Mr. Jones has not disproven through clear and convincing evidence, as required by section 2254(e)—that there was no agreement that Mr. Spears receive a specific sentence in exchange for his testimony; and, even if such an agreement did exist, (2) he has failed to demonstrate that there is a "reasonable probability" that the outcome of the trial would have been different if the agreement had been disclosed at the 1995 criminal trial.[377]

---

[374] In an attempt to overcome the procedural default, the Petitioner maintains that he has demonstrated cause and prejudice and that, in the alternative, his actual innocence is sufficient to bypass this procedural hurdle.  Pet. ¶¶ 199–200.

[375] Resp't's Resp. at 26 (quoting Jones, 2016 WL 921751 at *3).

[376] See, supra, Section IV.A.3.; Zarvela, 364 F.3d at 418 ("Even if we assume that no procedural bar exists, we agree with the District Court that the claim cannot succeed on the merits."); Doe, 66 F. App'x at 252 ("However, because the merits of the petition are easily resolved, we look beyond the possible procedural default and address the merits."); Salvagno, 2019 WL 109337, at *8 ("'[T]he doctrine of procedural default is based on considerations of comity and finality, and not on a jurisdictional limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation.'") (quoting Spence, 219 F.3d at 170).

[377] United States v. Cacace, 796 F.3d 176, 184 (2d Cir. 2015) (quoting United States v. Rodriguez, 496 F.3d 221, 227 (2d Cir. 2007); see also Strickler v. Greene, 527 U.S. 263, 280 (1999) (defining evidence as "material" under Brady where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different") (internal quotation marks omitted).

1.      Favorable and Material Evidence

In Brady v. Maryland, the Supreme Court held that the suppression, by the prosecution, of evidence that is favorable to the accused violates due process if the suppressed evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[378]  Undisclosed or suppressed evidence may be favorable "either because it is exculpatory, or because it is impeaching[,]"[379] and it is "material [ ] if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[380]  Critical to Mr. Jones's claim is the "well-established rule that 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"[381]

2.      Section 2254(e)(1)

Section 2254(e)(1) codifies the deference federal courts have long afforded state court factual findings:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

---

[378] 373 U.S. 83, 87 (1963); see also United States v. Hunter, 32 F.4th 22, 30–31 (2d Cir. 2022) ("There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused . . .; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.") (quoting Strickler, 527 U.S. at 281–82).

[379] Strickler, 527 U.S. at 281–82.

[380] United States v. Bagley, 473 U.S. 667, 682 (1985).

[381] Id. at 678 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976).

The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.[382]

> a)      SSH Court's Factual Finding

At the 2015 SSH trial, Mr. Jones's Attorney, Attorney Fraguela, questioned Mr. Spears about his guilty plea and his 1995 criminal trial testimony:

> [Attorney Fraguela:]  Do you recall that State Attorney Gold at the time said . . ., I believe, that you had entered the plea of aiding and abetting at some time and at that time of the plea, it was the [S]tate's position that the [S]tate would make no recommendation as to what sentence you would get.  When you were sentenced that day, did you think you were going to get the max twenty?
>
> [Mr. Spears:]  No.
>
> [Attorney Fraguela:]  Why not?
>
> [Mr. Spears:]  Because [Attorney] Gold told me I wasn't.
>
> . . .
>
> [Attorney Fraguela:] [At the 1995 Criminal Trial, Attorney Ahern questioned you and you testified that] there was [no] agreement [between you and the State].  Did you think that you had an agreement with the [S]tate to testify for a lesser sentence?
>
> [Mr. Spears:]  Yeah.
>
> [Attorney Fraguela:]  Did you answer Attorney Ahern honestly that day?
>
> [Mr. Spears:]  No.[383]

Despite the above testimony, the SSH Court's Ruling made a factual finding that "[Mr.] Spears'[s] plea agreement did not include an agreement as to the specific amount of incarceration that he would receive.  Although [Mr.] Spears faced the maximum sentence, the sentencing court had the discretion to impose less than the maximum by taking into account [Mr. Spears's] cooperation with the state."[384]  This finding is

---

[382] 28 U.S.C. § 2254(e)(1).

[383] 3/31/2015 SSH Tr. at 162:13–23, 164:12–17.

[384] Resp't's Resp. at 26 (quoting State v. Jones, 2016 WL 921751 at *3).

presumed correct, and the burden is on Mr. Jones to rebut that presumption with clear and convincing evidence.

The record before this court, however, tends to support the SSH Court's finding: it certainly does not provide clear and convincing evidence to the contrary. This is true of both Mr. Spears's Change of Plea Hearing as well as the Sentencing itself. At the Change of Plea Hearing on August 4, 1994, Mr. Spears and the court were specifically advised by Attorney Gold that no one had "made any representations to counsel or to Mr. Spears as to what sentence he would receive."[385] Attorney Gold emphasized that "all the State has agreed to do is bring to the sentencing [c]ourt's attention at the appropriate time any relevant factors of which the [c]ourt should be made aware" and that the court would impose a sentence it "deems appropriate."[386] Later in the hearing, the court explicitly told Mr. Spears that "there's no agreement here with respect to what the sentence will be. It will be up to the [c]ourt."[387]

Mr. Spears was sentenced to aiding and abetting manslaughter on July 13, 1995.[388] At Sentencing, Attorney Gold spoke about Mr. Spears's cooperation, and Attorney Gold's statements provide further support for the fact that there had been no specific agreement as to the sentence Mr. Spears would receive:

> [Attorney] Gold: Your Honor, some time ago Mr. Spears entered a plea of guilty to a charge of aiding and abetting manslaughter in the first degree. At the time of that plea it was the [S]tate's position that the [S]tate would make no recommendation as to the sentence Mr. Spears would receive

---

[385] See Petitioner's Exhibit 61, Change of Plea Transcript for Mr. Spears ("Mr. Spears COP Tr.") at 8:13–16 (Doc. No. 97-61).

[386] Id. at 8:19–26.

[387] Id. at 15:3–5.

[388] See Petitioner's Exhibit 62, Sentencing Hearing Transcript for Mr. Spears ("Mr. Spears Sentencing Tr.") at 1 (Doc. No. 97-62).

from that and that continues to be the position I've taken today. . . .  Mr. Sears did cooperate with the [S]tate's efforts in that case and I did agree at the time of his plea, Mr. Spears'[s] plea, that I would bring to the Court's attention now the cooperation that I received from Mr. Spears. . . .  Mr. Spears, as your Honor knows, pled guilty to manslaughter and then testified in court against Mr. Jones. . . .  As far as Mr. Spears'[s] cooperation is concerned, I met with Mr. Spears on perhaps maybe a half dozen occasions.  [He] was I think forthcoming at all of those meetings providing us with the information I would need to prepare my case for trial.  I think that he answered all of the questions posed to him both by myself and by defense, the defense attorney in that case, in a forthright manner as well.

So, I would feel that he did provide the [S]tate with substantial cooperation and assistance and without Mr. Spears'[s] testimony it would have been far more difficult to obtain conviction of Mr. Jones on the charge of murder. . . .  I do think that Mr. Spears'[s] cooperation with both pretrial and in providing the testimony at trial is worthy of some consideration, something your Honor should take into consideration in fashioning an appropriate sentence."[389]

Mr. Jones relies on the record of Mr. Spears's Change of Plea and Sentencing to support his claim, but the court views these transcripts as supporting the SSH Court's findings.  The underlying factual assumption of Mr. Jones's Second Ground for habeas relief—that Mr. Spears had a favorable agreement in exchange for testimony—has been foreclosed by the SSH Court's factual finding, and the record evidence before this court does not provide clear and convincing evidence to overcome the SSH Court's finding.  Thus, the court is bound by the SSH Court's determination that there was no specific agreement as to the sentence Mr. Spears would receive in exchange for his cooperation.  Accordingly, this court denies Mr. Jones's Second Ground of relief.

3.      Confidence in the Trial's Outcome

Even if this court were to find that a plea deal specifically conditioned on Mr. Spears's inculpating testimony existed, this court's confidence in the outcome of the

---

[389] Id. at 1–3 (Doc. No. 97-62).

1995 criminal trial would not be undermined by the failure to disclose such an

agreement.  The court believes that between (1) Attorney Ahern's handling of the plea

agreement issue through cross examination and his closing arguments at the 1995

criminal trial and (2) the 1995 Criminal Trial Court's Jury Instructions on the issue, the

jury was sufficiently apprised of the possibility of an agreement when it rendered its

verdict.

a)    Cross Examination

Several times throughout his cross examination of Mr. Spears, Attorney Ahern

sought to impeach Mr. Spears on his testimony that there was no plea agreement

promising a lesser sentence.  For example, Attorney Ahern pointed out that Mr.

Spears's charge was reduced from murder to manslaughter and suggested that his

testimony was further tailored to garner the lowest possible sentence:

> [Attorney Ahern:]  Going back to 1994, when you made a decision to apparently cooperate with the State's Attorney's Office in this matter -- at that point what was your understanding of the deal?
>
> [Mr. Spears:]  There was no deal.
>
> [Attorney Ahern:]  There was no deal.  In other words, here you are, you're charged with murder.  Do you know what murder carries in the State of Connecticut, the potential sentence?
>
> [Mr. Spears:]  Sixty years.
>
> . . .
>
> [Attorney Ahern:]  But you entered a plea to manslaughter, is that right?
>
> [Mr. Spears:]  Yes.
>
> [Attorney Ahern:]  Aiding a manslaughter?
>
> [Mr. Spears:]  Yes.
>
> [Attorney Ahern:]  What's the maximum penalty there?
>
> [Mr. Spears:]  Twenty.
>
> [Attorney Ahern:]  And you did this for what reason, sir?
>
> [Mr. Spears:]  Cause I wanted to.

88

[Attorney Ahern:]   You did this with the hope and the favor that your testimony would allow you to spend less time in jail, isn't that correct?

[Mr. Spears:]  There was no favor.  Spend less time in jail, yes.

[Attorney Ahern:]  And you're hoping to get that out of today's testimony as well, is that true?

[Mr. Spears:]  Yes.[390]

An additional attempt by Attorney Ahern to impeach Mr. Spears's testimony—on the basis that it was tainted by Mr. Spears's stated hope of receiving a lower sentence in exchange for helping the State secure a conviction of Mr. Jones—is captured below:

[Attorney Ahern:]  Do you have any idea at what you're expecting to receive as a sentence if you testify?

[Mr. Spears:]  No.

[Attorney Ahern:]  Did you discuss this matter with [Attorney] Gold at all?

[Mr. Spears:]  No.

[Attorney Ahern:]  David Gold made no promises to you?

[Mr. Spears:]  No.

[Attorney Ahern:]  Did he make any threats to you?

[Mr. Spears:]  No.

[Attorney Ahern:]  What did he tell you?

[Mr. Spears:]  He told me by testifying I may get a lesser sentence.

[Attorney Ahern:]  And that's what you hope to accomplish, isn't that right?

[Mr. Spears:]  Yes.[391]

Attorney Gold made no effort to hide this, eliciting this information himself during his direct examination of Mr. Spears:

[Attorney Gold:]   How much time did you face as a result of your admitting your involvement in the crime?

[Mr. Spears:]  Twenty-one years.

---

[390] 3/21/1995 CT Tr. at 144:10–19, 144:26–145:15.

[391] Id. at 157:20–158:8.

[Attorney Gold:]  Twenty-one years.  And do you know how much you're going to get?

Mr. Spears:]  No.

[Attorney Gold:]  Do you hope by testifying you're going to get something less than the twenty-one [years you face]?

[Mr. Spears:]  Yes.

[Attorney Gold:]  Do you have any assurance, do you have any promise that's going to happen?

[Mr. Spears:]  No.[392]

> b)  Closing Arguments

Attorney Gold pre-empted Attorney Ahern's Closing Argument in his own by

emphasizing the lack of an agreement with respect to Mr. Spears's sentence:

> Tyrone Spears, you'll hear all about the fact he got a great deal.  And I remember when I questioned each of you in voir dire, I told you about the situation [that] could develop that you'd hear a witness who came in that posture.  And I'm sure each of you thought that this was going to be some sort of sweetheart deal, only this sweetheart deal is the maximum for manslaughter, twenty years he faces, and guess what, that's as long as Tyrone Spears has been on this good earth.  That's the deal he gets.  So, the defense may stand up here and say this was some sort of sweetheart deal, but I urge you to consider what kind of deal it is for a twenty-year-old kid to be told, if you testify, you face, as long as you've been on earth in prison. . . .  [W]hat did he face if he didn't testify?  Twenty years.  What does he face if he does testify?  The defense talked to you about whether or not that witness, [Mr.] Spears, has an interest in the outcome of the case.  Well, if he has no interest in the outcome, as Mr. Spears told you, if the defendant's convicted, [Mr.] Spears still faces twenty years.  If you find this man not guilty, [Mr.] Spears still faces twenty years.[393]

In Attorney Ahern's Closing Argument, he nonetheless reminded jurors of the

likelihood that Mr. Spears's testimony was tainted by his desire for a lesser sentence:

> [I]f you think that Tyrone Spears is going to do twenty years in jail if Maleek Jones is convicted of murder in this case, I got some swamp land in New Jersey that I want to sell to you.

---

[392] Id. at 10:5–16.

[393] 3/28/1995 CT Tr. at 30:13–31:1, 31:4–12.

. . .

> Tyrone Spears faced on [sic] murder charge along, sixty years in prison.  By cutting a deal in September of 1994, he cut his exposure one-third.  His maximum exposure is twenty years.  I asked him, do you know whether or not PSI has been begun.  What's a PSI?  That's a probationary report.  No, it hasn't been.  What are you waiting for?  We're waiting for Attorney Gold to make his report, to see how did he do.  Was he cooperative?  Did we gain a conviction?  And if you believe he's trying to save six months off his sentence, or six weeks off his sentence, you got another think [sic] coming.  He's trying to save a substantial amount of time, and I'm telling you ladies and gentlemen, he would give up you, you, me, or anybody else in an effort to keep his time in prison down, to cut it down as dramatically as possible.[394]

The jurors were therefore apprised of the fact that Mr. Spears's PSI was not ordered until after his testimony in Mr. Jones's case, though Attorney Gold countered with the following:

> [B]y the way, the defense stands up here and says he knows how much time, or I'm going to decide it.  Let's talk about what a pre-sentence investigation is.  I don't do the pre-sentence investigation.  The Judge is going to decide what the sentence is, and no more than this attorney can tell a judge what to do, can I.  And it's great to stand up here and make all these accusations about what I've got doing up my sleeve, but, you know, that's exactly what we're not supposed to do in a courtroom.  But that's what the defense is trying to do.  Have you start speculating.  I've got some back room deal with Mr. Spears, he's never going to do twenty years in prison.  Well, I'll tell you what.  The Judge is going to decide, and if you think that I suddenly have the ability by being the prosecutor to tell the Judge that's not going to happen.  All that I can do is tell the Judge he testified, he didn't testify, and the Judge is going to say I could give you twenty if you did, I can give you twenty if you didn't.[395]

Ultimately, it was up to the jurors to decide for themselves.  The 1995 Criminal Trial Court gave the following Jury Instruction:

> Tyrone Spears, a witness called by the State, testified that he participated in the criminal conduct charged by the [S]tate in this case.  He also testified that he had been charged with murder in this case, but had, as part of a case disposition, pled guilty to manslaughter in the first degree.  And that

---

[394] Id. at 41:20–24, 45:9–26.

[395] Id. at 74:25–75:18.

he in his own mind is hoping for some favorable treatment in his own case so that his testimony may have been colored by that fact.  Therefore, you must look at [sic] particular care at the testimony of Tyrone Spears and scrutinize it very carefully before you accept it.[396]

Both the prosecution and the defense sought to use Mr. Spears's cooperation in their favor.  And while this court is unconvinced that Mr. Jones's trial was fair in other respects, the undersigned cannot conclude that there is a reasonable probability that the outcome would have been changed by the disclosure of a plea agreement.  Such a conclusion is only strengthened by this court's above-discussed determination that the record evidence does not provide clear and convincing evidence to overcome the SSH Court's finding that there was no specific agreement as to the sentence Mr. Spears would receive in exchange for his cooperation.  Mr. Spears acknowledged that he "hope[d]" that by testifying, he would get a "less[er]" sentence.[397]  The jury heard that. The court therefore denies Mr. Jones's Petition for Habeas Relief with regard to Ground Two.

C.     Ground Three

Mr. Jones's Third Ground for relief asserts that he was deprived of his right to a fair trial and right to present a defense by the 1995 Criminal Trial Court's erroneous exclusion of the testimony of Mr. Bember.  Attorney Ahern proffered that Mr. Bember would testify that Pepper confessed to shooting Mr. Harp with Mr. Spears.  Mr. Jones argues that the 1997 Appellate Court's decision affirming the exclusion of Mr. Bember's testimony was "contrary to, or involved an unreasonable application of, clearly

---

[396] Id. at 94:26–95:10.

[397] 3/21/1995 CT Tr. at 10:11–13.

92

established Federal law, as determined by the Supreme Court of the United States."[398]

The State argues that the 1995 Criminal Trial Court's "application of its evidentiary rule"

to exclude Mr. Bember's testimony as inadmissible hearsay "was neither arbitrary nor

disproportionate" because the statement was untrustworthy.[399]  Thus, the State

contends that Mr. Jones is not entitled to relief on this third claim.[400]  Because this court

concludes that there was an error of constitutional dimension, it rejects each of the

State's contentions, including that the statement at issue was untrustworthy, that it was

inadmissible hearsay, and that Mr. Jones has not demonstrated his entitlement to relief

on this Ground.

      1.      Habeas Standard for Claims of Error in State Evidentiary Rulings

"In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States."[401]  As such,

to succeed on Ground Three, Mr. Jones must show that the 1995 Criminal Trial Court's

erroneous evidentiary ruling constituted an error of constitutional dimension.[402]

---

[398] Pet. ¶ 213.

[399] Resp't's Resp. at 37.

[400] Id.

[401] Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).

[402] See, e.g., Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) ("The [habeas] court must determine whether the exclusion [of testimony] was an error of constitutional dimension. . . ."); Taylor v. Curry, 708 F.2d 886, 890–91 (2d Cir. 1983) ("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ would issue only where petitioner can show that the error deprived [him] of a fundamentally fair trial." (emphasis in original).

The first step in analyzing such claims is to determine the propriety of the state trial court's evidentiary ruling.[403]  Of course, habeas relief cannot be granted for mere error of state law,[404] but there can be no evidentiary error of a constitutional dimension if the state court correctly applied a constitutional, evidentiary rule.[405]  Additionally, "[t]he inquiry . . . 'into possible state evidentiary law errors at the trial level' assists . . . in 'ascertain[ing] whether the appellate division acted within the limits of what is objectively reasonable.'"[406]  Thus, this court must—unusually—address whether the state court erred in applying its evidentiary rule in the first instance.

The second step is to identify the constitutional right implicated by the state evidentiary error.  Where, as here, the petitioner asserts that the evidentiary error violated his right to due process, he must show that the exclusion of evidence denied him a fundamentally fair trial.[407]  The test for fundamental fairness is whether the excluded evidence was "material," meaning that it "'creates a reasonable doubt that did not otherwise exist' as evaluated 'in the context of the entire record.'"[408]  It is worth

---

[403] Scrimo v. Lee, 935 F.3d 103, 115 (2d Cir. 2019); Bell v. Ercole, 368 F. App'x 216, 218 (2d Cir. 2010) (citing Hawkins v. Costello, 460 F.3d 238, 242–44 (2d Cir. 2006)).

[404] Griggs v. Lempke, 797 F. App'x 612, 615 (2d Cir. 2020) ("Merely showing that the state court admitted evidence in violation of state rules of evidence is not enough, for such a state court decision on state law, even if erroneous, is not an independent ground for the writ of habeas corpus to issue under AEDPA.").

[405] See, e.g., Jamison v. Griffin, 2016 WL 1698350, at *35 (S.D.N.Y. Apr. 27, 2016), report & recommendation adopted by, 2016 WL 4030939 (S.D.N.Y. July 27, 2016) (collecting cases).  The court also notes that in the Instant Petition, Mr. Jones challenges the constitutionality of the 1995 Criminal Trial Court's decision in applying the statement against penal interest exception to the hearsay rule, not the constitutionality of the evidentiary rule itself.  See Pet. ¶¶ 205–14.

[406] Bell, 368 F. App'x at 218 (quoting Hawkins, 460 F.3d at 242–44).

[407] Jimenez, 458 F.3d at 146; Rosario, 839 F.2d at 925.

[408] Id. (quoting Agurs, 427 U.S. at 112–13).

94

noting that the constitutional standard for materiality—which is used in assessing fundamental fairness—imposes a higher burden on the petitioner than the error analysis otherwise applicable in a habeas proceeding.[409]

Next, this court must apply AEDPA deference to the 1997 Appellate Court's determination that Mr. Jones's right to present a defense was not abridged by the 1995 Criminal Trial Court's evidentiary decision.  As the Second Circuit has acknowledged, this creates "a doubly difficult challenge" for Mr. Jones, as prongs two and three require him to show "that the effect of the [evidentiary error] was so prejudicial to his defense that he was deprived of due process and he must identify a Supreme Court case that clearly establishes that the [evidentiary error] constitutes a violation of the Fourteenth Amendment."[410]

### 2.    1995 Trial Court Erred in Excluding Mr. Bember's Testimony

The 1995 Criminal Trial Court erred in determining that Mr. Bember's testimony concerning Pepper's statement against penal interest was inadmissible hearsay.[411]  In 1980, in the case of State v. DeFreitas, the Connecticut Supreme Court adopted a rule creating a hearsay exception for statements against a declarant's penal interest, specifically "in accord with the Federal Rules of Evidence".[412]  The rule "is [also]

---

[409] Kyles v. Whitley, 514 U.S. 419, 436 (1995) ("Agurs . . . opted for its formulation of materiality . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos[/Brecht]."); Washington, 255 F.3d at 56–57 ("The creation of otherwise non-existent reasonable doubt [under Agurs] satisfies the 'substantial and injurious' standard" under Brecht.) (quoting Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000)).

[410] Evans v. Fischer, 712 F.3d 125, 133 (2d Cir. 2013) (emphasis in original).

[411] 3/27/1995 CT Tr. at 23.

[412] See State v. DeFreitas, 179 Conn. 431, 451–52 (1980).

consistent with the United States Supreme Court decision in <u>Chambers v. Mississippi</u>,

. . . providing that trustworthy third party statements against penal interest exculpatory

to a defendant are admissible if the declarant is unavailable."[413]  At the time that the

1995 Criminal Trial Court made its ruling to exclude Mr. Bember's testimony, courts in

Connecticut had "extracted from <u>Chambers</u> four general considerations relevant" to a

determination of the trustworthiness of a third party confession:

> (1) the time of the declaration and the party to whom the declaration was
> made;
> (2) the existence of corroborating evidence in the case;
> (3) the extent to which the declaration is really against the declarant's penal
> interest; [and]
> (4) the availability of the declarant as a witness.[414]

It is pellucidly clear that Pepper's statement—as Mr. Bember was prepared to testify to

it—was a statement against penal interest, satisfied the four <u>DeFreitas</u> factors, and

should have been admitted as a trustworthy exception to the hearsay rule.

As Mr. Jones argued to the 1997 Appellate Court, the first factor—the time of the

declaration and the party to whom the declaration was made—was met here:

> There was virtually no delay here.  Pepper's confession to Lee Bember was
> made on the <u>day</u> of the shooting, right after two women connected to [Mr.]
> Harp accusingly confronted [Mr.] Bember and Pepper.  In <u>Gold</u>, . . . [the
> Connecticut Supreme] Court held a declaration against interest made even
> three months after the crime to be 'relatively close' to the time when the
> crimes occurred.  Here, the timing of Pepper's declaration supported a
> finding of trustworthiness, since it was made not only mere hours after the

---

[413] <u>State v. Sanchez</u>, 200 Conn. 721, 724–25 (1986) (citing, <u>inter alia</u>, <u>Chambers v. Mississippi</u>, 410 U.S. 284, 300–01 (1973)).

[414] <u>Sanchez</u>, 200 Conn. at 725 (quotation marks and citation omitted); <u>State v. Lopez</u>, 239 Conn. 56, 72–73 (1996) (same); <u>see also</u> <u>U.S. v. Guillette</u>, 547 F.2d 743, 754 (2d Cir. 1976) ("To guide our review[,] we turn to the Supreme Court's decision in <u>Chambers v. Mississippi</u>, . . . which sets forth four general considerations relevant to an investigation of the trustworthiness of third party confessions.").

shooting, but immediately on the heels of an accusation by the two women.[415]

The fact that the declaration was made hours after the shooting strongly supports the reliability of the statement, as it means Pepper lacked time "for reflection and contrivance."[416]  Further, the circumstances provide additional support for the finding of trustworthiness: the admission was made shortly after the shooting and in response to an accusatory confrontation on the street.  Indeed, at the 1995 criminal trial, the State conceded that timing weighed in favor of the declaration's trustworthiness.[417]

Moreover, there was evidence in the record supporting the fact that the declaration was made to someone in whom Pepper would "naturally confide", and that Mr. Bember and Pepper shared a "close, confidential relationship."[418]  In particular, the record reflects that Mr. Bember and Pepper were members of the same gang, the Red Line Crew, and that both individuals reported to Mr. Bember's relative, Ernestine Bember.[419]  This is especially relevant in light of the Connecticut Supreme Court's decision in Gold—a case discussed at length[420] at the 1995 criminal trial—which held that the threshold level of trustworthiness was met where the declarant was in the same motorcycle club as the person to whom the declaration was made, and "the statement

---

[415] Brief of Defendant-Appellant with Separately Bound Appendix ("Mr. Jones's DA Brief") at 11–12 (Doc. No. 76-1) (emphasis added) (citing State v. Gold, 180 Conn. 619, 634 (1980)).

[416] State v. Bryant, 202 Conn. 676, 699 (1987).

[417] See 3/24/1995 CT Tr. at 53 ("I agree that it was made at a good time[.]").

[418] State v. Hernandez, 204 Conn. 377, 392–93 (1987).

[419] 3/24/1995 CT Tr. at 31, 41, 59.

[420] See id. at 48–53; 3/27/1995 CT Tr. at 16–23.

was made the day following the murders."[421]  In addition, as Attorney Ahern argued to the 1995 Criminal Trial Court, the two individuals were "personal friend[s]."[422]  This appears to be precisely the kind of relationship that the United States Supreme Court recognized as providing an assurance of a confession's trustworthiness in <u>Chambers</u>.[423]  That is likely why the State conceded this point as well at the 1995 criminal trial.[424]

The second factor—the presence of independent evidence or circumstances corroborating the third-party statement against penal interest[425]—similarly weighs in favor of the trustworthiness of Pepper's confession.  First, Mr. Bember was with Pepper the day after the shooting when two women approached them on the street and accused the Red Line Crew of killing "[their] brother."[426]  This initially prompted Pepper to tell Mr. Bember that the two men needed to leave and arm themselves and, once safely in Mr. Bember's home, provoked Pepper's spontaneous confession that "last night [he] and [Mr. Spears] caught a body[.]"[427]  Second, Mr. Spears consistently told police that he and Pepper were together the night that Mr. Harp was killed, without mentioning Mr. Jones.[428]  This was also substantiated by the testimony of Tyrese White,

---

[421] <u>Gold</u>, 180 Conn. 619, 644.

[422] 3/27/1995 CT Tr. at 21.

[423] <u>Chambers</u>, 410 U.S. at 287, 300 (concluding that confessions made to "close acquaintances" or "friend[s]" offered "considerable assurance of their reliability").

[424] <u>See</u> 3/24/1995 CT Tr. at 53 ("I'll even agree it was made to somebody you might expect it to be made[.]").

[425] <u>See, e.g.</u>, <u>Sanchez</u>, 200 Conn. at 726.

[426] 3/24/1995 CT Tr. at 31; <u>see also</u> Mr. Jones's DA Brief at 12.

[427] 3/24/1995 CT Tr. at 31–32; <u>see also</u> Mr. Jones's DA Brief at 12.

[428] <u>See</u> Police Report at 5 (noting that in an interview with police on October 16, 1992, Mr. Spears said that that night he had been "in the company of 'Pepper' . . . when he heard the gunshots."); Police

who discussed Mr. Spears's admission that he and Pepper were together the night of the shooting.[429]  Further, Mr. Spears's testimony at the 1995 criminal trial explicitly identified Pepper as someone who, like him, shot at Mr. Harp.[430]  Third, Ms. Bember testified at the 1995 criminal trial that Mr. Spears told her that Pepper had shot Mr. Harp, and that he had been there when it happened.[431]  Ms. Bember also testified that, in November 1992, Pepper confessed to her that the shooting "was supposed to have been a robbery and that during the robbery process that the victim was reaching, and [Mr. Spears] apparently, thought he was reaching for a gun, and he panicked and he told Pepper, 'He's reaching for a gun!'  And Pepper fired."[432]

At the 1995 criminal trial, the State offered the testimony of Detective Trocchio, who spoke about his interview of Mr. Bember hours after Pepper made the declaration at issue to Mr. Bember.[433]  Detective Trocchio testified that, during his interview, Mr. Bember stated that Pepper did not implicate himself.[434]  Detective Trocchio further testified that, in memorializing the interview for the police report, he put quotation marks around the words that Mr. Bember attributed to Pepper: "Your [boy] [Mr. Spears] shot that dude last night."[435]  "[G]iven that information", the State argued, "the Court has to

---

Report at 7 (mentioning that in an interview with police on October 23, 1992, Mr. Spears again stated that on the night in question "he had been . . . with 'Pepper'").

[429] 3/24/1995 CT Tr. at 5–7, 13.

[430] See, e.g., 3/21/1995 CT Tr. at 8:20–24.

[431] 3/24/1995 CT Tr. at 60–61.

[432] Id. at 65.

[433] See 3/27/1995 CT Tr. at 4–8.

[434] Id. at 8.

[435] Id. at 7–8.

consider that and weigh the witness, [Det.] Trocchio's credibility against that of [Mr.] Bember."[436]

This argument, however, focuses on the wrong declaration.  The issue for the 1995 Criminal Trial Court was whether Pepper's declaration to Mr. Bember was admissible, not whether Mr. Bember's alleged recollection of the declaration to police, as recalled by Detective Trocchio, was.[437]  The State could argue that Mr. Bember's statement to police, as remembered by Detective Trocchio, suggests that Mr. Bember's recollection of Pepper's declaration is unreliable.  However, that goes to the weight the factfinder should place on Mr. Bember's testimony rather than undermining the above-described corroboration.  More importantly, the State's argument misconstrues the corroboration prong of DeFreitas and encouraged the court to usurp the role of the jury by making its own credibility determination of Mr. Bember as opposed to Detective Trocchio.  The trustworthiness examination under DeFreitas is about the declaration itself, not the person testifying to it.  Put differently, the court must consider whether the declaration is trustworthy as a result of other corroborating evidence, not whether the

---

[436] Id. at 20.

[437] Although it cannot factor into the court's analysis because it was not in evidence before the 1997 Appellate Court, the court uses the word "alleged" here because Detective Trocchio's 1995 testimony was later undermined by the unearthing of his field notes from October 1992.  See Detective Trocchio's Field Notes at 4 (Doc. No. 15 at 112).  Detective Trocchio's notes from his interview of Mr. Bember say, "Pepper/[Mr. Spears] shot this dude last night."  Id.  Based upon the court's reading—which the State disputes, see 7/31/23 Oral Arg. Tr.—the note plainly substantiate Mr. Bember's proposed testimony.

person testifying about the declaration is more trustworthy than another witness.[438]
That is the purpose of cross examination.[439]

Ultimately, there were "a myriad of corroborating circumstances . . . indicative of reliability"[440] for the declaration at issue before the trial court: "last night me and [Mr. Spears] caught a body[.]"[441]

The third factor—the extent to which the declaration is really against the declarant's penal interest—also strongly supports a finding that the declaration meets the threshold level of trustworthiness required of statements against penal interest.  As the Gold Court noted, a confession to murder "could not have been more against [the declarant's] penal interest."[442]  Pepper's declaration to Mr. Bember was a confession to murder and was clearly against Pepper's penal interest.  At the 1995 criminal trial, the State argued that Pepper never implicated himself in the murder[443] but, again, this contention relies on the wrong declaration.  When evaluating the correct declaration, however, it is clear that the statement at issue—Pepper's admission to "kill[ing] this dude last night"[444]—is undeniably against his penal interest.  That is the statement the

---

[438] Hernandez, 204 Conn. at 391 ("The defendant claims that the third party statement to [the in-court witness] met the threshold of trustworthiness, and that the trial court improperly considered the credibility of the in-court witness . . . in excluding his testimony.  . . . [W]e agree with the defendant that the trial court improperly determined that it must evaluate the credibility of the in-court witness[.]").

[439] Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness . . . [is] tested. "); State v. Milum, 197 Conn. 602, 608 (1985) (same).

[440] Gold, 180 Conn. at 635.

[441] 3/24/1995 CT Tr. at 32.

[442] Gold, 180 Conn. at 636–37.

[443] 3/24/1995 CT Tr. at 53 ("I'm claiming this was not, in fact, anything that implicated Pepper.").

[444] Id. at 32.

defendant sought to introduce; not what Detective Trocchio remembered Mr. Bember conveying to police later.

The fourth and final factor is the easiest to analyze. It was undisputed during the 1995 criminal trial that Pepper, the declarant, was unavailable as a witness because he was deceased.[445]

It is also worth emphasizing that the Connecticut Supreme Court does not apply a standard of absolute reliability for third party statements against penal interest. "[F]or a statement to be admissible[,] it does not have to be absolutely trustworthy. If this were the requirement, the province of the jury as the finder of fact and weigher of credibility would be entirely invaded."[446] Treating the DeFreitas factors as means of assessing whether the declaration meets the "threshold level of trustworthiness",[447] this court concludes that Pepper's statement against penal interest more than bore the requisite indicia of trustworthiness, and the 1995 Criminal Trial Court's decision to exclude Mr. Bember's testimony on it was incorrect as a matter of Connecticut evidentiary law.

3.      Exclusion Violated Mr. Jones's Due Process Rights

Next, the court must assess whether the 1995 Criminal Trial Court's erroneous evidentiary decision rises to the level of a violation of Mr. Jones's constitutional rights. In his Petition, Mr. Jones asserts that the 1995 Criminal Trial Court's evidentiary

---

[445] Jones, 46 Conn. App. at 647; see also Gold, 180 Conn. at 631 (acknowledging that unavailability was satisfied where the declarant was deceased prior to trial).

[446] Gold, 180 Conn. at 632 (emphasis added).

[447] Id. at 634.

decision impeded his right to present a defense and deprived him of a fundamentally fair trial.[448]

The United States Supreme Court has repeatedly held that a criminal defendant has a constitutional right to present a complete defense.[449]  In particular, the <u>Chambers</u> Court held that a Mississippi court violated the defendant's constitutional right to a fair trial in accordance with "traditional and fundamental standards of due process" by: (1) applying the state's "voucher" rule to preclude cross examination of a witness by the defendant, and (2) excluding as hearsay the testimony of three close friends of a third party, Gable McDonald, who had confessed to the three individuals that he had committed the crime.[450]  It is the latter part of the holding that is relevant to the case at bar, namely that, in some cases, a defendant's due process rights to a fair trial and to present witnesses in his defense is violated by the exclusion of properly admissible hearsay testimony offered by the defendant.[451]  In reaching that conclusion, the <u>Chambers</u> Court explained that constitutional due process rights may be violated where the "testimony rejected by the trial court . . . [(1) bears] persuasive assurances of

---

[448] Pet. ¶ 206.

[449] <u>See, e.g.</u>, <u>Chambers</u>, 410 U.S. at 302 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted)); <u>California v. Trombetta</u>, 467 U.S. 479, 486 n.6 (1984) ("[C]riminal defendants are entitled to call witnesses on their own behalf and to cross-examine witnesses who have testified on the government's behalf.").

[450] <u>Chambers</u>, 410 U.S. at 302.

[451] <u>Id.</u>; <u>see also</u> <u>Evans</u>, 712 F.3d at 134 ("<u>Chambers</u> stands for the . . . proposition[ ] that in some cases the exclusion of hearsay proffered by a defendant in a correct application of state rules of evidence can violate the guarantee of due process by denying a defendant his right to present witnesses in his own defense.").

trustworthiness and thus [falls] within the basic rationale of the [hearsay] exception for declarations against interest" and (2) is "critical to [the defendant]'s defense."[452]

This court has already assessed that Pepper's declaration bore the indicia of trustworthiness such that it was admissible under Connecticut law as an exception to the hearsay rule for statements against penal interest.  As such, whether the exclusion of this evidence violated Mr. Jones's due process rights depends on whether the testimony was "material."[453]  Key to this inquiry is "whether the omitted evidence would have introduced reasonable doubt where none otherwise existed."[454]  Importantly, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."[455]

Here, the State's case against Mr. Jones was thin.  It hinged solely on the testimony of Mr. Spears, a self-interested witness whose account of the shooting— including that there were three shooters—was nearly impossible to square with the ballistics evidence.[456]  According to Mr. Spears's testimony, he was a "good" shot[457] but fired four bullets—from a position that would have placed his two alleged co-

---

[452] Chambers, 410 U.S. at 302; see also Bowman v. Racette, 661 F. App'x 56, 59 (2d Cir. 2016) ("In Chambers, the Supreme Court held that a correct application of state evidentiary rules can violate due process where the excluded evidence bore indicia of reliability and where exclusion prevents the defendant from mounting an effective defense.").

[453] Jimenez, 458 F.3d at 146 (citing Agurs, 427 U.S. at 112–13).

[454] Scrimo, 935 F.3d at 120; see also Agurs, 427 U.S. at 112–13 ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.").

[455] Agurs, 427 U.S. at 113.

[456] See, infra, Section V.D.1.a.

[457] 3/21/1995 CT Tr. at 143:9–12.

conspirators and fellow Red Line Crew members in the line of fire[458]—that hit neither his target nor anything in the vicinity of his target.[459]  The inconsistency within Mr. Spears's testimony extends even further, having told police shortly after the shooting a different account of that night from what he testified to three years later at the 1995 criminal trial.[460]

Having never recovered the murder weapon, the State's case pitted Mr. Spears's word against that of Ms. Bember, Mr. White, and Ms. Stephens.  That is part of the reason why Mr. Bember's testimony about Pepper's confession was critical, rather than cumulative.  In a case where it is the word of one alleged perpetrator against another, the confession of a third party, who both Mr. Jones and Mr. Spears agree was present at the shooting, would create a reasonable doubt.  In this way, the fact that Ms. Bember testified to a separate confession by Pepper does not detract from the evidentiary value of Mr. Bember's testimony, but enhances it by showing that Pepper confessed to killing Mr. Harp with Mr. Spears on multiple occasions to multiple people.  Indeed, it further supports Mr. Jones's version of the events[461]—i.e., that there were only two shooters, Pepper and Mr. Spears—and challenges that of Mr. Spears.

---

[458] Id. at 54:15–23, 142:18–22.

[459] See, infra, Section V.D.1.a.

[460] Det. Trocchio's Report at 4 (noting that, on the night in question, Mr. Spears indicated he "had been in the company of 'Pepper'" and that he "had not been in [the] company of [Mr. Jones].").

[461] Because the "materiality" analysis is limited to the record at the 1995 criminal trial, see Jimenez, 458 F.3d at 146 (citing United States v. Agurs, 427 U.S. at 112–13), this court may not consider Ms. McCray's statements to police and the impact her testimony might have had on the jury in tandem with Pepper's erroneously excluded confession.

Even if Pepper's statement against interest may appear to be of minor relevance to some—a view not shared by this trial judge—when considered in the context of the State's minimal evidence and reliance on the word of Pepper's co-conspirator, Mr. Spears, it was anything but.  In light of the "flims[iness]"[462] of the State's case against Mr. Jones and considering the trial record as a whole, the court is compelled to conclude that Pepper's confession would have introduced reasonable doubt where it did not otherwise exist.  As such, the exclusion of Pepper's statement against interest was not just an evidentiary error, but one of constitutional dimension.

4.    Unreasonable Application of Due Process Precedent

As the Second Circuit has acknowledged, granting Mr. Jones's Petition on this ground requires concluding "not only that the trial court's exclusion of the . . . evidence was unconstitutional but that it was so plainly unconstitutional that it was objectively unreasonable for the Appellate [Court] to conclude otherwise."[463]  As such, the final step in the court's analysis is to assess whether the 1997 Appellate Court unreasonably applied clearly established federal law in its determination that Mr. Jones's right to present a defense was not abridged by the 1995 Criminal Trial Court's evidentiary decision.[464]

---

[462] Scrimo, 935 F.3d at 120.

[463] Jimenez, 458 F.3d at 147; see also Stinson, 229 F.3d at 120 (holding that, although the court might have applied the Agurs standard to determine that the trial court's ruling "create[d] a reasonable doubt that did not otherwise exist," the Second Circuit could not conclude that the excluded evidence "would so certainly have created new ground for reasonable doubt that the appellate division's decision [affirming the trial court's ruling] was objectively unreasonable.").

[464] State v. Jones, 46 Conn. App. at 647, 649–50; 28 U.S.C. § 2254(d)(1).

a)      Appellate Court's "Adjudication"

The 1997 Appellate Court found no error in the 1995 Criminal Trial Court's decision to exclude Mr. Bember's testimony in its entirety.  Although the 1997 Appellate Court rendered an adjudication on the merits with respect to whether there was a constitutional violation,[465] it did so without regard to the prejudice, or harm, that resulted from Mr. Jones's claimed error.  On the issue of harm, the 1997 Appellate Court noted:

> Because we conclude that the trial court acted correctly in excluding the proffered evidence, we do not reach the issue raised by the defendant as to whether existing law should be revisited as to the burden of proof to establish harmlessness in the face of a nonconstitutional evidentiary error. Even if we were to reach that issue, we are bound by the decisional law of our Supreme Court . . . that places the burden on the defendant to establish the harmfulness of an improper evidentiary ruling nonconstitutional in nature.[466]

The 1997 Appellate Court explicitly did not "reach the issue" of prejudice.  Even though it briefly commented on the merits, the 1997 Appellate Court preceded that cursory discussion with the phrase, "[e]ven if we were to reach that issue[.]"  Such language is what the Second Circuit calls "contrary-to-fact construction", and it is "not the same as an alternative holding."[467]  By employing a contrary-to-fact construction, the state court clarified that it "was not basing its judgment on the merits" of the prejudice to Mr. Jones,

---

[465] Id. at 649–50 ("[W]e conclude that . . . neither the defendant's right to present a defense nor his right to expose admissible evidence were abridged by the trial court's proper action.").

[466] Id. at 649 (emphasis added).

[467] Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007); see also Fulton v. Graham, 802 F.3d 257, 264–65 (2d Cir. 2015) (collecting cases) (despite a state court's having "commented on the merits of . . . [the petitioner's] claim, its commentary does not constitute a decision on the merits for purposes of 28 U.S.C. § 2254(d) [because] [w]hen a state court's discussion of the merits was preceded by a contrary-to-fact construction, then the wording of the opinion reflects that the disposition was not premised on the court's view of the merits.") (internal quotations and citations omitted)).

but rather on the underlying evidentiary finding.[468]  Accordingly, there is no ruling on the merits as to the prejudice flowing from any constitutional error, and this court considers the issue de novo.[469]  This court reiterates that the constitutional standard for materiality in the fundamental fairness context imposes a higher burden on the petitioner than the error analysis otherwise applicable in a habeas proceeding.[470]  Thus, this court's prior conclusion on the issue of materiality—that Pepper's confession would have introduced reasonable doubt where it did not otherwise exist—controls on this issue of prejudice.[471]

b)      Clearly Established Federal Law

As of the 1997 Appellate Court's decision in the instant case, the aforementioned Chambers decision was the "clearly established Federal law, as determined by the Supreme Court."[472]  To reiterate, Chambers held that, in some cases, a defendant's due process rights to a fair trial and to present witnesses in his defense is violated by the exclusion of properly admissible hearsay testimony offered by the defendant.[473]  In particular, the Chambers Court concluded that constitutional due process rights may be violated where the "testimony rejected by the trial court . . . [(1) bears] persuasive

---

[468] Fulton, 802 F.3d at 265.

[469] Id.

[470] Kyles, 514 U.S. at 436 ("Agurs . . . opted for its formulation of materiality   . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos[/Brecht]."); Washington, 255 F.3d at 56–57 ("The creation of otherwise non-existent reasonable doubt [under Agurs] satisfies the 'substantial and injurious' standard" under Brecht.) (quoting Stinson, 229 F.3d at 120).

[471] See, supra, Section V.C.3.

[472] 28 U.S.C. § 2254(d).

[473] Id.; see also Evans, 712 F.3d at 134 ("Chambers stands for the . . . proposition[ ] that in some cases the exclusion of hearsay proffered by a defendant in a correct application of state rules of evidence can violate the guarantee of due process by denying a defendant his right to present witnesses in his own defense.").

assurances of trustworthiness and thus [falls] within the basic rationale of the [hearsay] exception for declarations against interest" and (2) is "critical to [the defendant]'s defense."[474]

          c)      Unreasonable Application of <u>Chambers</u>

The 1997 Appellate Court's decision unreasonably applied federal law in concluding that Mr. Jones's due process rights were not violated by the exclusion of Mr. Bember's testimony about Pepper's statement against penal interest.  Even though AEDPA is not concerned with the application of state law, this court begins by restating the state evidentiary law error, as it "assists . . . in 'ascertaining whether the appellate [court] acted within the limits of what is objectively reasonable."[475]  In this case, the 1997 Appellate Court's discussion of the 1995 Criminal Trial Court's evidentiary decision suggests it was acting outside the bounds of what is objectively reasonable.

For example, in evaluating the third factor—the extent to which the statement at issue was against the declarant's penal interest—the 1997 Appellate Court's analysis focused on the wrong statement.  Rather than evaluate Pepper's statement as it was made to and proffered by Mr. Bember,[476] the 1997 Appellate Court focused on Detective Trocchio's recollection of Mr. Bember's statement to police about what Pepper said.[477]  In so doing, the 1997 Appellate Court erroneously concluded that "the

---

[474] <u>Chambers</u>, 410 U.S. at 302; <u>see also</u> <u>Bowman</u>, 661 F. App'x at 59 ("In <u>Chambers</u>, the Supreme Court held that a correct application of state evidentiary rules can violate due process where the excluded evidence bore indicia of reliability and where exclusion prevents the defendant from mounting an effective defense.").

[475] <u>Bell</u>, 368 F. App'x at 218 (quoting <u>Hawkins</u>, 460 F.3d at 242–44.

[476] 3/24/1995 CT Tr. at 31–32.

[477] <u>Jones</u>, 46 Conn. App. at 648.

trial court had substantial evidence that the <u>original</u> statement given by [Mr.] Bember to the police as to what Pepper had told him did not rise to the level of a statement against Pepper's penal interests."[478]  However, the <u>original</u> statement at issue at the trial was not what Mr. Bember provided to Detective Trocchio, it was what Pepper said to Mr. Bember: "last night me and [Mr. Spears] caught a body[.]"[479]  This admission by Pepper to "kill[ing] this dude last night"[480] is undeniably against his penal interest.[481]

The 1997 Appellate Court repeated this error in discussing the timing of the declaration as part of the first factor: "The evidence before the trial court reveals that, about nineteen hours after [Mr.] Harp's murder, [Mr.] Bember told [Detective] Trocchio in an interview that Pepper had told him that [Mr.] Spears had shot 'that dude [Harp] last night.'"[482]  Again, the declaration at issue is what Pepper said to Mr. Bember within hours of the shooting, not what Mr. Bember later conveyed to Detective Trocchio.

In discussing the other component of the first factor—the party to whom the declaration was made—the 1997 Appellate Court summarily concluded that "nothing in the record would support a finding that [Mr.] Bember and Pepper enjoyed a close and confidential relationship or that [Mr.] Bember was a person in whom Pepper would naturally confide."[483]  To reach this conclusion, the 1997 Appellate Court appears to

---

[478] <u>Id.</u> (emphasis added).

[479] 3/24/1995 CT Tr. at 31–32.

[480] <u>Id.</u>

[481] <u>See</u> <u>Chambers</u>, 410 U.S. at 300–01 (concluding that a confession is "in a very real sense self-incriminatory and unquestionably against interest").

[482] <u>Jones</u>, 46 Conn. App. at 648.

[483] <u>Id.</u> (citing <u>State v. Rivera</u>, 221 Conn. 58, 70 (1992)).

have simply ignored the evidence to the contrary, including that Mr. Bember and Pepper were "personal friends" and members of the Red Line Crew.[484]

Similarly, with respect to the second factor—corroborating evidence—the 1997 Appellate Court baldly asserted that "the record is devoid of corroboration that Pepper actually implicated himself to Bember."[485]  That is plainly inaccurate.[486]  It is based on the faulty contention that Detective Trocchio's testimony was a "direct contradiction" undermining the trustworthiness of Pepper's statement against interest.[487]  However, Detective Trocchio did not testify about the declaration at issue—Pepper's confession to Mr. Bember.  Nor was Detective Trocchio even present when Pepper made his alleged confession.  Thus, Detective Trocchio could not contradict what Pepper said to Mr. Bember; he could only testify to his own recollection of Mr. Bember's later statement concerning a statement by Pepper.  Moreover, despite averring that "the record is devoid of corroboration",[488] the 1997 Appellate Court confoundingly added that "the record indicates that the testimony of [Mr.] Bember would have been cumulative, even if admitted."[489]  This court struggles to reconcile how a declaration can be excluded as untrustworthy due to a lack of evidentiary corroboration, while simultaneously being duplicative of other evidence in the record.  It stands to reason that, if the testimony

---

[484] 3/24/1995 CT Tr. at 31, 41, 59; 3/27/1995 CT Tr. at 21.

[485] Jones, 46 Conn. App. at 648.

[486] See, supra, Section V.C.2.

[487] Jones, 46 Conn. App. at 648.

[488] Id.

[489] Id. at 649.

would be cumulative because of other evidence in the record, then it is corroborated by that evidence.

The foregoing not only informs this court's determination that the 1997 Appellate Court acted in a manner that was objectively unreasonable,[490] but it is also highly relevant to the 1997 Appellate Court's assessment that Mr. Jones's due process rights were not violated by the exclusion of "untrustworthy" evidence.[491]  Although the 1997 Appellate Court applied a framework that comports with the governing United States Supreme Court precedent,[492] its affirmance of the exclusion of Pepper's statement against penal interest was an unreasonable application of law.[493]  To be clear: it is not simply that this court disagrees with the 1997 Appellate Court's conclusion, but rather it is this court's conclusion that no fairminded jurist evaluating the correct statement against penal interest could have held that it was not trustworthy as required by Chambers.  The statement was clearly against Pepper's penal interest, it was made in a timely and spontaneous manner to a person to whom Pepper would be expected to confide, it was corroborated by other evidence in the record, and it was critical to Mr. Jones's defense.[494]  Clearly, the "testimony rejected by the trial court here bore

---

[490] Bell, 368 F. App'x at 218 (quoting Hawkins, 460 F.3d at 242–44).

[491] Jones, 46 Conn. App. at 647.

[492] Id. (citing Sanchez in setting forth the test for declarations against penal interest); Sanchez, 202 Conn. at 695 (confirming that Connecticut's rule for third party statements against penal interest is "consistent with the United States Supreme Court decision in Chambers").

[493] See Williams v. Taylor, 529 U.S. 362, 413 (2000) (determining that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."); Jordan, 33 F.4th at 150 (accord).

[494] Chambers, 410 U.S. at 287, 300–01.

persuasive assurances of trustworthiness and . . . was well within the basic rationale of the exception for declarations against interest."[495]  Thus, the exclusion of this material evidence "denied him a trial in accord with traditional and fundamental standards of due process."[496]

The 1997 Appellate Court attempted to downplay the significance of Mr. Jones's constitutional claim by emphasizing that, "[r]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature."[497]  It continued by adding:

> [T]he right to present a defense does not include the right to offer evidence that is incompetent, irrelevant or otherwise inadmissible.  Every evidentiary ruling that denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error.  [Here] the defendant has put a constitutional tag on a nonconstitutional claim.  Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender.[498]

This court does not dispute that there is no talismanic tag capable of transforming an ordinary evidentiary claim into a constitutional one.  However, the invocation of applicable United States Supreme Court precedent[499] delineating the existence of a constitutional dimension for this particular evidentiary error is sufficient to do so.  Additionally, the evidence at issue in this case comported with the standard set

---

[495] Id. at 302.

[496] Id.

[497] Jones, 46 Conn. App. at 646 (internal quotation marks and citations omitted).

[498] Id. (internal quotation marks and citations omitted).

[499] Mr. Jones's DA Brief at 18.

forth in <u>Chambers</u> as well as with state evidentiary law.  Therefore, no fairminded jurist

could assess the evidence to be "incompetent, irrelevant, or otherwise inadmissible."[500]

The 1997 Appellate Court also opined that Mr. Bember's testimony would have

been cumulative to that of Ms. Bember.[501]  Specifically, it concluded that "the testimony

of [Mr.] Bember would have been cumulative, even if admitted . . . [because] Ernestine

Bember was permitted to testify" about an admission Pepper made to her about having

been involved in the murder.[502]  However, Mr. Bember's testimony would not have been

cumulative.  First, Mr. Bember's testimony concerned a completely different statement

against penal interest than Ms. Bember's testimony did.  Accordingly, this is not a case

where the jury was prevented from hearing another witness testify that a particular

confession was made.  Rather, the exclusion of Mr. Bember's testimony prevented the

jury from hearing that Pepper admitted that he and Mr. Spears killed Mr. Harp on more

than one occasion, to more than one close friend.[503]  Second, Pepper's confession to

Mr. Bember was made hours after Mr. Harp was killed, whereas Pepper's statement to

Ms. Bember was made weeks later.[504]  Therefore, the confession to Mr. Bember not

only possesses greater indicia of trustworthiness, but it also demonstrates that Pepper's

---

[500] <u>Jones</u>, 46 Conn. App. at 646.

[501] <u>Id.</u> at 649.

[502] <u>Id.</u>  The court notes that it is odd that the third-party statement against penal interest conveyed by Ms. Bember was admitted as trustworthy, despite possessing fewer indicia of reliability than the testimony offered by Mr. Bember.

[503] In this respect, the evidentiary error mirrors what occurred in <u>Chambers</u>, where the trial court refused to allow the defendant to introduce the testimony of three separate witnesses, who each "would have testified to [purported confessions by a single third-party], on three separate occasions shortly after the crime. . . ."  410 U.S. at 298.

[504] 3/24/1995 CT Tr. at 64.

account did not change with time (unlike that of Mr. Spears[505]).  Third, the dearth of physical evidence linking Mr. Jones to the murder meant that the State's case fundamentally turned on jurors believing Mr. Spears's narrative rather than Mr. Jones's version of events.  In such a dispute, any testimony that corroborates Mr. Jones's account would be vital in creating reasonable doubt, especially evidence that does so strongly.  Rather than being duplicative, Mr. Bember's testimony works in concert with, and strengthens, Ms. Bember's testimony, which undermines Mr. Spears's testimony.

The only conclusion made by the 1997 Appellate Court then, that could be construed as supporting that Court's insistence that Mr. Jones's claim was nonconstitutional, is the 1997 Appellate Court's "note that . . . if [Pepper] did not mention [Mr. Jones]'s name or involvement in the murder of Harp in his conversation with [Mr.] Bember, this is not exculpatory of [Mr. Jones]."[506]  Viewed in isolation, this proposition may be true.  However, this court must evaluate the record as a whole.[507]  Given the eyewitness statement to police that night that there were only two men involved in the shooting[508] as well as Mr. White's testimony that, at the time of the murder, there were only three Red Line Crew members who were not incarcerated,[509] the fact that Mr. Jones's name was not raised is both exculpatory and material to Mr. Jones's defense. Particularly because Pepper also did not mention Mr. Jones's name in his admission to

---

[505] See, e.g., Mr. Jones's DA Brief at 13 ("Until his plea negotiations, [Mr. Spears never inculpated [Mr. Jones] or placed him at the scene, as [Mr.] Spears did Pepper.").

[506] Jones, 46 Conn. App. at 649.

[507] See, e.g., Stinson, 229 F.3d at 121.

[508] Det. Trocchio's Report at 3.

[509] 3/24/1995 CT Tr. at 13.

Ms. Bember, nor did Mr. Spears admit he was with Mr. Jones on the night of Mr. Harp's murder in his initial statement to police or in his statement to Ms. Bember.

For all these reasons, this court concludes that 1995 Criminal Trial Court's exclusion of Mr. Bember's testimony was not just an evidentiary error, but one of constitutional dimension.  Moreover, no fairminded jurist could conclude that Mr. Bember's testimony as to his recollection of Pepper's confession, mere hours after the crime, wherein Pepper did not mention Mr. Jones among the shooters, was not a trustworthy statement against penal interest that was material and critical to the defense.  As Mr. Jones argued in his 1997 Appellate Brief, due process guarantees criminal defendants a "meaningful opportunity to present a complete defense",[510] and "the right to put before a jury evidence that might influence a determination of guilt."[511] The 1995 Criminal Trial Court denied Mr. Jones that opportunity, and the 1997 Appellate Court unreasonably applied clearly established federal law in affirming that mistake.  And because Mr. Bember's testimony concerning Pepper's confession would have introduced reasonable doubt where it did not otherwise exist,[512] this court grants Mr. Jones's Petition on Ground Three.

D.    Ground Four

As his fourth ground for federal habeas relief, Mr. Jones claims that Attorney Ahern was ineffective for failing to "investigate the crime scene and present ballistics

---

[510] Mr. Jones's DA Brief at 7 (quoting Crane, 476 U.S. at 690).

[511] Id. at 7–8 (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1986)).

[512] Again, because this is a higher burden on the petitioner than the error analysis otherwise applicable in a habeas proceeding, this determination is sufficient to show that Mr. Jones was sufficiently harmed by the constitutional error.  See, supra, Sections V.C.3, V.C.4.a.

evidence."[513]  Mr. Jones argues that, "[h]ad Attorney Ahern retained and presented testimony from an expert in crime scene reconstruction or ballistics, the jury would have heard . . . that the physical evidence conclusively refuted [Mr.] Spears's version of the shooting, which would have cast doubt on his credibility."[514]

Habeas relief is unwarranted on this claim because (1) the record reflects that the jury in 1995 did hear expert testimony regarding the absence of evidence in support of Mr. Spears's theory and undermining the quality of the state's investigation; and (2) Mr. Jones has not shown prejudice stemming from Attorney Ahern's alleged failures.

1.     Relevant Record Excerpts

a)     1995 Criminal Trial Testimony

The transcripts from the 1995 criminal trial indicate that Attorney Ahern used his cross-examination of the State's witness—Detective Mark Caporale of the Identification Unit of the New Haven Police Department[515]—to alert the jury to the fact that Mr. Spears's version of events did not match the physical evidence.

The crux of Mr. Jones's fourth claim is that Attorney Ahern obtained neither a crime scene analyst nor a ballistics expert.  Even without the use of an expert, however, Attorney Ahern attempted to sow reasonable doubt as to the thoroughness of the State's ballistics investigation.  This included questioning Detective Caporale about why at least one bullet was not recovered by State investigators:

[Attorney Ahern:]  And you didn't think it was important enough to go back and try to extract that bullet?

---

[513] Pet. at 40.

[514] Id. at ¶ 222.

[515] 3/22/1995 CT Tr. at 43:8–16.

117

[Detective Caporale:]  No.

[Attorney Ahern:]  Why is that?

[Detective Caporale:]  Our leads ended.  We didn't have the proper tools to dig any further.

[Attorney Ahern:]  But it is true you would have retrieved a piece of evidence that may have been crucial to the case if, in fact, you would have been able to get in and get that bullet?

[Detective Caporale:]  Yes.  That's correct.[516]

Attorney Ahern also sought to highlight the near impossibility of Mr. Spears's testimony—again, not through his own ballistics or crime scene expert (much to Mr. Jones's dismay)—during his cross examination of Detective Caporale:

[Attorney Ahern:]  Okay.  Now, I want you for the sake of this question to believe that four shots were fired at this motor vehicle, either while it's in the position it was in or while it was proceeding across the driveway into the parking lot.

[Detective Caporale:]  Okay.

[Attorney Ahern:]  If any of those four shots struck the vehicle, where would we see the damage to that motor vehicle?

[Detective Caporale:]  Depending on where the shots were coming from.

[Attorney Ahern:]  I want you to assume for the sake of this question that the shots were being fired right here, right from the middle of the TS [notation for Tyrone Spears, left from his testimony], that the car is here, and then apparently slowly proceeds across here.  Four shots are fired at it, right in the middle of that TS.  If those shots were to hit the car, where would those bullets be found?

[Detective Caporale:]  They would be found on the right side of the car.  Standing where I am at the rear of the car, they would be found on the right side of the car.

[Attorney Ahern:]  Correct.  Now, did you search the main lobby area?

[Detective Caporale:]  Yes.

[Attorney Ahern:]  If bullets fired from, again, these are assuming these facts, the car is here, correct?

[Detective Caporale:]  Correct.

---

[516] Id. at 88:9–19.

118

[Attorney Ahern:]  When I say 'the car,' the car in question, Mr. Harp's car, and that somebody is shooting at least four gun shots at this car and missing, okay.  Now, let's for the purpose of this question take shots fired while the car is just here -- while it's crossing the street.  If they were to miss, are there any objects, pieces of glass, buildings, or anything else over here where you might find it impacted?

[Detective Caporale:]  Yes.

[Attorney Ahern:]  And you did search those areas, right?

[Detective Caporale:]  Yes.

[Attorney Ahern:]  And can you describe to the best of your common words and phrases what we would see over on this side of the driveway -- Judge, I'm indicating as you're looking at this exhibit, the left of the circular driveway.

[Detective Caporale:]  The buildings?

[Attorney Ahern:]  Yes.

[Detective Corporale:]  Buildings, glass, concrete.

[Attorney Ahern:]   And can you show us where the buildings, glass, concrete, et cetera to be?

[Detective Caporale:]  This is the drive area, circular drive is beyond that, so it would be in this area.

[Attorney Ahern:]  Now, between the circular area, right here, and where buildings or glass begins, is there much difference?

[Detective Caporale:]  I'm not really sure.  To the best of my recollection, I'd say a matter of feet.

[Attorney Ahern:]  Okay.  And you did inspect in fact those walls and glass, anything that was in that area?

[Detective Caporale:]  Yes.

[Attorney Ahern:]  Did you find anything?

[Detective Caporale:]  No.

[Attorney Ahern:]  Did you look down at all on Chapel Street to see if any objects -- Did you look down at all on Chapel Street to see if any parked cars or any other physical objects --

[Detective Caporale:]  Yes.

[Attorney Ahern:]   And you found nothing, right?

[Detective Caporale:]  No.

[Attorney Ahern:]  And in the street itself -- well, and in the street itself, did you see bullet holes in the street?

[Detective Caporale:]  No.[517]

Attorney Ahern emphasized Detective Caporale's testimony and the impossibility of Mr.

Spears's testimony once more during his Closing Argument.[518]  Therefore, the jury did

hear testimony—from the State's own witness—showing that there was no ballistics

evidence to support Mr. Spears's version of events.

> b)   Dr. Harper's 2015 Report

In 2015, Mr. Jones presented a Shooting Reconstruction Report in his SSH trial.

The author of that Report, Dr. Harper, underscored that his attempt to reconstruct the

shooting was "highly constrained"[519] by the "available evidence."[520]  "Because the

vehicle was no longer available it was impossible to determine angles and trajectories of

the various bullet strike marks to the vehicle.  It was also impossible to search for

additional projectiles and strike marks that must necessarily have existed."[521]

Additionally, Dr. Harper testified at the SSH trial on April 28, 2015 that, after a thorough

investigation of all evidence available to him in 2015, Mr. Spears's version of the

shooting was unsupported by physical evidence:

> What we don't have is any evidence of a third person being involved.  We
> have a witness statement saying there were two people; one to the left, one
> to the rear of the car.  We have testimony that there was a third person at
> some remote distance, but there is no evidence of anything hitting the car

---

[517] Id. at 84:17–87:2.

[518] 3/28/1995 CT Tr. at 43:4–45:8.

[519] Petitioner's Exhibit 60, Shooting Reconstruction Report in the Matter of State v. Maleek Jones
("Dr. Harper's Report") at 9 (Doc. No. 97–60).

[520] Id. at 8.

[521] Id. at 9.

from the passenger side -- the right side of the car.  So, there's no evidence for it . . . ."[522]

Crucially, when asked whether a crime scene reconstruction or a review of the evidence by a ballistics expert for the defense could have undermined the trial testimony of either the State's ballistic expert or Mr. Spears, Dr. Harper answered: "I can speculate, but that's all it would be because we don't have any evidence and I don't know what the evidence would have shown."[523]

    2.    SSH Appellate "Adjudication"

The SSH Court, in its 2016 Ruling which was summarily affirmed by the Appellate Court, summarized the argument before it as follows:

> [Mr. Jones]'s next grouping of allegations against Attorney McIntyre allege that he failed to plead that Attorney Ahern was ineffective because he did not present ballistic and/or crime scene reconstructionist expert testimony. Such expert testimony could have been used, according to [Mr. Jones], to rebut eyewitness and police officer testimony.[524]

However, the SSH Court was not convinced and rendered an adjudication on the merits that Mr. Jones did not establish prejudice stemming from Attorney McIntyre's failure to obtain an expert to prove Attorney Ahern's ineffectiveness for failing to do the same.[525]

Because evidence rebutting Mr. Spears's account was brought out on cross examination and Mr. Jones cannot demonstrate what exculpatory evidence a crime scene and ballistics expert would have uncovered, this court is unable to call the SSH

---

[522] April 28, 2015 Second State Habeas Transcript ("4/28/2015 SSH Tr.") at 43:13–19 (Doc. No 74–30).

[523] Id. at 47:9–11.

[524] Jones, 2016 WL 921751 at *10.

[525] Id. at *11.

Court's conclusion contrary to, or an unreasonable application of, clearly established federal law.[526]

>3. Legal Standard: Prejudice

As discussed above,[527] a petitioner claiming ineffective assistance of counsel must satisfy <u>Strickland's</u> two-prong test.[528]  First, he must demonstrate that his counsel's performance "fell below an objective standard of reasonableness."[529] Second, he must show that he was actually prejudiced as a result of counsel's deficient performance.[530]  While a petitioner must prove deficient performance and actual prejudice in order to prevail, "there is no reason for a court to address both components of the inquiry if the [petitioner] makes an insufficient showing on one."[531]  Where, as here, "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."[532]

In habeas petitions alleging failure to investigate, courts typically require the petitioner to come forward with evidence which would have been uncovered if not for

---

[526] Even if the court were able to review this issue <u>de novo</u>, as Mr. Jones asserts, <u>see</u> Pet. ¶ 225, the record and relevant caselaw still do not support a finding of prejudice.

[527] <u>See</u>, <u>supra</u>, Section V.A.2–3.

[528] 466 U.S. at 687.

[529] <u>Id.</u> at 688; <u>see also</u> <u>United States v. Abad</u>, 514 F.3d 271, 275 (2d Cir. 2008).

[530] <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 692; <u>see also</u> <u>Waiters v. Lee</u>, 857 F.3d 466, 479–80 (2d Cir. 2017).

[531] <u>Garner v. Lee</u>, 908 F.3d 845, 861 (2d Cir. 2018) (internal quotation marks and alterations omitted).

[532] <u>Id.</u> (internal quotation marks omitted).

the deficient investigation by counsel.[533]  To satisfy the prejudice prong of <u>Strickland</u>, the Second Circuit has made clear that the petitioner must show that the evidence that would have been uncovered would be exculpatory.[534]

Mr. Jones argues that, because of Attorney Ahern's failure to employ an expert to conduct his own ballistics or crime scene analysis and testify as to the results, the jury did not hear that the physical evidence in this case did not support Mr. Spears's account of the crime.[535]  As set forth above, this is not the case: Attorney Ahern obtained that testimony through the cross examination of State's witness Detective Caporale, which he highlighted during his Closing Argument.  Indeed, Dr. Harper posited that Detective Caporale conducted a "good search of the scene", adding:

> He was attentive to [the crime scene] at night time, when it -- it as a very fresh scene and then he went back the next day and looked at the scene a second time and then he went and examined the automobile and if you read his reports, you see the sequence of how he is uncovering things and making new discoveries and I believe he did a -- an adequate job of collecting what physical evidence was available.[536]

---

[533] <u>See</u>, <u>e.g.</u>, <u>Maddox v. Lord</u>, 818 F.2d 1058, 1062 (2d Cir. 1987) (holding prejudice unsatisfied because the proffered "affidavit from an expert who will testify as to the path and trajectory of the bullets fired from the rifle, [gave] no indication that this evidence would be in any way exculpatory"); <u>Wadsworth v. Williams</u>, 760 F. App'x 521, 525 (9th Cir. 2019) (rejecting petitioner's ineffective assistance claim against his trial counsel for failing to investigate the case and hire a ballistics expert where the petitioner "has not alleged what evidence additional expert testimony would have provided"); <u>Santana v. Comm'r of Corr.</u>, 2017 WL 3205474, at *8–9 (D. Conn. July 26, 2017) (denying petitioner's ineffective assistance claim based on a failure to investigate and present independent ballistic evidence where the petitioner did not demonstrate "what the additional investigation would have revealed and how it would have altered the outcome of the criminal trial.").

[534] <u>Maddox</u>, 818 F.2d at 1062; <u>see also</u> <u>Santana</u>, 2017 WL 3205474, at *8–9 ("In order to prevail, the petitioner must demonstrate what the additional investigation would have revealed and how it would have altered the outcome of the criminal trial.").

[535] <u>See</u> Pet. ¶ 222.

[536] 4/28/2015 SSH Tr. at 23:22–24:9.

Thus, not only did Attorney Ahern elicit testimony undermining Mr. Spears's testimony, but Mr. Jones's own expert from the SSH undermined the petitioner's claim by endorsing the adequacy of the State's expert's collection of the physical evidence.  Most crucially, Dr. Harper conceded that he could only "speculate" as to what evidence would have been uncovered if Attorney Ahern had employed a crime scene and ballistics expert.[537]

Here, there is no indication that an independent review of the crime scene would have uncovered anything contrary to the existing record, let alone more exculpatory.[538] Moreover, testimony that Mr. Spears's version of events was not supported by the physical evidence could have and did come in through the cross examination of the State's expert witness.  Indeed, the State's physical evidence—as elicited on cross examination—was nearly impossible to square with Mr. Spears's account.

Mr. Jones has not, therefore, established that, but for Attorney Ahern's failure to call a ballistics and crime scene expert, there is a reasonable probability that the trial outcome would have been different.  Nor can a fairminded jurist disagree with this conclusion.  Mr. Jones is not entitled to habeas relief, and the Petition is denied, on this Fourth Ground.

---

[537] Id. at 47:9–11.

[538] See Maddox, 818 F.2d at 1062; Santana., 2017 WL 3205474, at *8–9; see also Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("In balancing [the petitioner]'s claim of prejudice against the state's interest in finality, moreover, we take into account the fact that [the petitioner] cannot now show that the results of the test [of evidence from the crime scene] would have been in his favor, [the evidence] having long since been destroyed.").

**VI.        CONCLUSION**

For the foregoing reasons, the Petition of Maleek Jones for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) is GRANTED as to Grounds One and Three and DENIED as to Grounds Two and Four.

Respondent Commissioner of Correction of the State of Connecticut is hereby directed to release the Mr. Jones from the custody of the State of Connecticut within sixty (60) days of the date of this Ruling, unless the State of Connecticut, within those 60 days, declares its written intention, addressed to this court and counsel for Mr. Jones, to retry Mr. Jones on the same charges.

**SO ORDERED.**

Dated at New Haven, Connecticut this 11th day of August 2023.


  /s/  Janet C. Hall
Janet C. Hall
United States District Judge